UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## 07-60399

Spirit Airlines, Inc.,

                Plaintiff,

vs.

24/7 Real Media, Inc., Advertising.com, Inc.,
America Online, Inc. dba AOL, Burst Media
Corporation, Carrollton Bank, CheapFlights
(USA), Inc., Echo Target, Inc., Hotwire, Inc.,
Intercept Interactive, Inc., Priceline.com, LLC,
Rackspace, Ltd., Shermans Travel, Inc., SideStep,
Inc., Smarter Living, Inc., SpecificMedia, Inc.,
Travel Marketing Group, Inc., TravelZoo, Inc.,
Tribal Fusion, Inc., TripAdvisor LLC,
Valueclick, Inc., The Weather Channel
Interactive, Inc., and all other persons
or entities unknown claiming any right, title,
or interest to the funds described in the
Complaint herein,

                Defendants.

Civil Action File No.

CIV-ALTONAGA

MAGISTRATE JUDGE
TURNOFF



FILED by
2007 MAR 21 AM 11:56
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.-FT.L.

---

## COMPLAINT FOR INTERPLEADER

---

    Spirit Airlines, Inc. ("Spirit Airlines"), hereby files this complaint ("Complaint") of

interpleader brought under the authority of the provisions of 28 U.S.C.A. § 1335 and Rule 22 of

the Federal Rules of Civil Procedure. Spirit Airlines, on information and belief, respectfully

states and alleges as follows:

### PARTIES

    1.    Spirit Airlines is a corporation organized under the laws of the States of

Delaware, with a principal place of business at 2800 Executive Way, in Miramar, Florida.

BERGER SINGERMAN
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard  Suite 1000  Fort Lauderdale, Florida 33301  Telephone 954·525·9900  Facsimile 954·523·2872

2.      Upon information and belief, Defendant 24/7 Real Media, Inc. is a corporation organized under the laws of the State of Delaware, with a principal place of business at 132 West 31st Street, 9th Floor in New York, New York 10001.

3.      Upon information and belief, Defendant Advertising.com, Inc. is a corporation organized under the laws of the State of Maryland, with a principal place of business at 7 St. Paul Street, Suite 1660, in Baltimore, Maryland 21202.

4.      Upon information and belief, Defendant America Online, Inc., dba AOL is a corporation organized under the laws of the State of Delaware, with a principal place of business at 22000 AOL Way in Dulles, Virginia 20166.

5.      Upon information and belief, Defendant Burst Media Corporation is a corporation organized under the laws of the State of Maryland, with a principal place of business at 8 New England Executive Park in Burlington, Massachusetts 01803.

6.      Upon information and belief, Defendant Carrollton Bank is a banking corporation organized under the laws of the State of Maryland, with a principal place of business at 344 North Charles Street, Suite 300, in Baltimore, Maryland 21201-4301.

7.      Upon information and belief, Defendant CheapFlights (USA), Inc. is a corporation organized under the laws of the State of Delaware, with a principal place of business at 24 School Street in Boston, Massachusetts 02108.

8.      Upon information and belief, Defendant Echo Target, Inc. is a corporation organized under the laws of the State of New York, with a principal place of business at 545 W. 45th Street, 7th Floor in New York, New York 10036.

9.      Upon information and belief, Defendant Hotwire, Inc. is a corporation organized under the laws of the State of Delaware, with a principal place of business at 333 Market Street, Suite 100 in San Francisco, California 94105.

10.     Upon information and belief, Defendant Intercept Interactive, Inc. is a corporation organized under the laws of the State of New York, with a principal place of business at 15 East 26th Street, Suite 1903 in New York, New York 10010.  Intercept Interactive, Inc. operates under the assumed name of Undertone Networks.

11.     Upon information and belief, Defendant Priceline.com, LLC is a corporation organized under the laws of the State of Delaware, with a principal place of business at 545 W. 45th Street, 7th Floor in New York, New York 10036.

12.     Upon information and belief, Defendant Rackspace, Ltd. is a corporation organized under the laws of the State of Texas, with a principal place of business at 9725 Datapoint Drive, Suite 100 in San Antonio, Texas 78229.  Rackspace, Ltd. operates under the assumed name of Rackspace Managed Hosting.

13.     Upon information and belief, Defendant Shermans Travel, Inc. is a corporation organized under the laws of the State of New York, with a principal place of business at 255 W. 36th Street, 15th Floor in New York, New York 10018.

14.     Upon information and belief, Defendant SideStep, Inc. is a corporation organized under the laws of the State of Delaware, with a principal place of business at 3131 Jay Street, Suite 210 in Santa Clara, California 95054.

15.     Upon information and belief, Defendant Smarter Living, Inc. is a corporation organized under the laws of the State of Massachusetts, with a principal place of business at 465 Medford Street, Suite 400 in Boston, Massachusetts 02129.

16.     Upon information and belief, Defendant SpecificMedia, Inc. is a corporation organized under the laws of the State of California, with a principal place of business at 4 Park Plaza, Suite 1900 in Irvine, California 92614.

17.     Upon information and belief, Defendant Travel Marketing Group, Inc. is a corporation organized under the laws of the State of Iowa, with a principal place of business at 5525 Meredith Drive, Suite C in Des Moines, Iowa 50310.

18.     Upon information and belief, Defendant TravelZoo, Inc. is a corporation organized under the laws of the State of Delaware, with a principal place of business at 590 Madison Avenue, 21st Floor in New York, New York 10022.

19.     Upon information and belief, Defendant Tribal Fusion, Inc. is a corporation organized under the laws of the State of California, with a principal place of business at 2087 Key Boulevard in El Cerrito, California 94530.

20.     Upon information and belief, Defendant TripAdvisor LLC is a corporation organized under the laws of the State of Delaware, with a principal place of business at 464 Hillside Avenue in Needham, Massachusetts 02494.

21.     Upon information and belief, Defendant Valueclick, Inc. is a corporation organized under the laws of the State of Delaware, with a principal place of business at 30699 Russell Ranch Road, Suite 250 in Westlake Village, California 91362.

22.     Upon information and belief, Defendant The Weather Channel Interactive, Inc. is a corporation organized under the laws of the State of Georgia, with a principal place of business at 300 Interstate North Parkway SE, in Atlanta, Georgia 30339-2403.

## JURISDICTION AND VENUE

23.     This is an action for rule interpleader under Rule 22 of the Federal Rules of Civil

Procedure, and for statutory interpleader under the Federal Interpleader Act, 28 U.S.C.A. § 1335.

24.     Jurisdiction exists under the Federal Interpleader Act, 28 U.S.C.A. § 1335, because the amount in dispute exceeds the sum of $500.00, and there is diversity between plaintiff and defendant claimants.

25.     Diversity jurisdiction exists under 28 U.S.C.A. § 1332, because the matter in controversy exceeds the sum of $75,000.00, and is between citizens of different states.

26.     Venue in this Court is proper pursuant to 28 U.S.C.A. § 1391.

## FACTS

### A.     Agreement Between Eisner And Spirit Airlines

27.     On September 15, 2005, Spirit Airlines entered into an advertising agreement ("Agreement") with Eisner Communications, Inc. ("Eisner").  Attached as Exhibit A is a true and correct copy of the Agreement.  The effective date of the Agreement is November 28, 2005. See Agreement, Article 3.1.  Pursuant to the Agreement, Eisner agreed to prepare and place online advertising for Spirit Airlines, which included the management, coordination, supervision, and liaison of the account.  See Agreement, Article 2.1.

28.     Pursuant to the terms of the Agreement, Eisner's services to Spirit Airlines also included ordering and contracting for necessary interactive space, talent, and materials.  See Agreement, Article 2.1(b).

29.     Pursuant to the terms of the Agreement, Eisner agreed to render invoices to Spirit Airlines from Eisner for the charges incurred for advertising and audit and pay invoices from media and other suppliers.  See Agreement, Article 2.1(f).

30. Pursuant to the terms of the Agreement, in exchange for Eisner's advertising work, Spirit Airlines agreed to pay Eisner for:

> all reasonable costs for space, time, materials, and services which are purchased from third parties on behalf of Spirit Airlines in accordance with Spirit Airlines' authorization procedures and for which an estimate and/or media plan has been approved by a Spirit Airlines authorized representative.

See Agreement, Article 4.0.

31. Pursuant to the terms of the Agreement, Spirit Airlines received invoices only from Eisner. See Agreement, Article 2.1(f).

32. Spirit Airlines did not receive invoices from other parties, including the third parties from which Eisner purchased space, time, materials, and services.

33. Pursuant to the terms of the Agreement, Spirit Airlines was required only to pay Eisner, not any other parties, including the third parties from which Eisner purchased space, time, materials, and services. See Agreement, Article 4.0.

34. Pursuant to the terms of the Agreement, Eisner was required to pay the third parties from which Eisner purchased space, time, materials, and services. See Agreement, Article 4.0.

35. Pursuant to the terms of the Agreement, Spirit Airlines did not contract with any third parties for online advertising services.

36. On or about November 12, 2006, Eisner informed Spirit Airlines that it was closing its business operations.

**B. Communications Spirit Airlines Received From Carrollton Bank And Other Defendants**

37. On or about November 17, 2006, Spirit Airlines received a letter dated November 14, 2006, from Robert J. Parsons, II, attorney for Carrollton Bank ("November 17 Letter").

Pursuant to the November 17 Letter, Carrollton Bank provided the following notice to Spirit Airlines:

> This is to advise you that the undersigned is the attorney for Carrollton Bank ("Bank"), secured creditor, in connection with the collection and liquidation of the open and payable accounts receivable of the now defunct business entity known as Eisner Communications, Inc. ("Eisner"). The Bank holds a perfected Security Interest in all of the said accounts receivable of said payee, Eisner, and has elected to pursue the collection of the same pursuant to the terms and conditions of its duly executed Security Agreement and perfected Security Interest Filing.

In the November 17 Letter, Carrollton Bank demanded that any and all prior unpaid invoices and future invoices for work performed by Eisner must be made payable to Carrollton Bank. The November 17 Letter demanded that Spirit Airlines pay to Carrollton Bank the sum of $660,697.73. Attached as Exhibit B is a true and correct copy of the November 17 Letter.

38. On or about November 20, 2006, counsel for Carrollton Bank sent a letter to Spirit Airlines enclosing copies of two commercial security agreements and Uniform Commercial Code financing statements relating to the two commercial loans owed to Carrollton Bank by Eisner ("November 20 Letter") . Attached as Exhibit C is a true and correct copy of the November 20 Letter.

39. Shortly after Eisner notified Spirit Airlines that it was closing its business operations, Spirit Airlines began receiving communications from third-party advertising vendors demanding payment of outstanding Eisner invoices. Spirit Airlines had not received communications from these parties in the past and was uncertain as to why these parties were making demands upon Spirit Airlines for obligations owed by Eisner.

40. On or about December 12, 2006, in response to the demands from third-party advertising vendors, Spirit Airlines sent a letter to these third-party advertising vendors notifying

them of the demand by Carrollton Bank that Spirit Airlines pay all amounts owed under past and future Eisner invoices directly to Carrollton Bank ("December 12 Letter"). Attached as <u>Exhibit D</u> is a form of the December 12 Letter.

41.     The December 12 Letter also stated that Spirit Airlines is in the process of reconciling what Eisner alleges are the accounts receivable and what Spirit Airlines' records reflect in terms of what is due and owing to Eisner. Additionally, the December 12 Letter stated that Spirit Airlines will not be making any payments to Carrollton Bank beyond the date it is determined that Eisner ceased providing services on behalf of Spirit Airlines. The December 12 Letter also informed the recipients that Spirit Airlines hired a new advertising agency, Siquis Ltd., which replaced Eisner as of November 13, 2006, and Spirit Airlines will continue making the appropriate payments to Siquis for the fees incurred in connection with the services that third-party advertising vendors provide on behalf of Spirit Airlines.

42.     Spirit Airlines received communications from several third-party advertising vendors in response to its December 12 Letter. Some of the responses demanded that Spirit Airlines make payments directly to them instead of making payments to Carrollton Bank.

43.     On or about December 22, 2006, Tribal Fusion, Inc. sent a letter to Spirit Airlines demanding that Spirit Airlines pay Tribal Fusion, Inc. the sum of $47,867.59 for services performed by it pursuant to the terms of an agreement between Tribal Fusion and Eisner ("December 22 Letter"). Attached as <u>Exhibit E</u> is a true and correct copy of the December 22 Letter. Tribal Fusion enclosed three Tribal Fusion invoices billed to Eisner Interactive in the December 22 Letter. <u>See</u> Exhibit E.

44.     Spirit Airlines does not have a contract for online advertising services with Tribal Fusion.

45.     On or about January 11, 2007, America Online, Inc. dba AOL sent an e-mail to Spirit Airlines demanding that Spirit Airlines pay America Online, Inc. dba AOL the sum of $214,105.24 for services performed by it pursuant to the terms of an agreement between America Online, Inc. dba AOL and Eisner ("January 11 E-mail").   America Online, Inc. dba AOL attached to the January 11 E-mail a spreadsheet summarizing America Online, Inc. dba AOL invoices billed to Eisner Communications.  Attached as <u>Exhibit F</u> is a true and correct copy of the spreadsheet.

46.     Spirit Airlines does not have a contract for online advertising services with America Online, Inc. dba AOL.

47.     On or about January 22, 2007, counsel for Carrollton Bank sent a letter to counsel for Spirit Airlines enclosing a statement of account and copies of invoices issued by Eisner for its account with Spirit Airlines for the period from August 2, 2006 through November 7, 2006, which alleges that Spirit Airlines owes Eisner $660,697.73 ("January 22 Letter").  Attached as <u>Exhibit G</u> is a true and correct copy of the January 22 Letter.

48.     Counsel for Carrollton Bank has acknowledged that the amount owed by Spirit Airlines as stated in the January 22 Letter may be reduced following a reconciliation of amounts already paid by Eisner and a proration of amounts owed for the month of November 2006.  In fact, in his letter dated February 9, 2007, counsel for Carrollton Bank stated that the Eisner records are incomplete and requested an invoice reconciliation from Spirit Airlines as to the total amount outstanding to Eisner.  Specifically, the February 9, 2007, letter states the following:

> The Bank requests that Spirit Airlines, Inc., provide it with an invoice reconciliation so that the actual amount owed by Spirit to Eisner can be calculated and paid.

49.     On or about January 24, 2007, Siquis, Ltd., the advertising company hired by

BERGER SINGERMAN
attorneys at law
*Boca Raton   Fort Lauderdale   Miami   Tallahassee*
350 East Las Olas Boulevard  Suite 1000  Fort Lauderdale, Florida 33301  Telephone 954·525·9900  Facsimile 954·523·2872

9

Spirit Airlines to replace Eisner, provided Spirit Airlines with a list of third-party advertiser vendors that asserted they were entitled to outstanding payments incurred by Eisner on behalf of Spirit Airlines. The third-party advertiser vendors on this list include the following: 24/7 Real Media Inc.; Advertising.com, Inc.; America Online, Inc. dba AOL; Burst Media Corporation; CheapFlights (USA), Inc.; Echo Target, Inc.; Priceline.com, LLC; Shermans Travel, Inc.; SideStep, Inc.; Smarter Living, Inc.; SpecificMedia, Inc.; TravelZoo, Inc.; TripAdvisor, LLC; Tribal Fusion, Inc.; Undertone Networks; ValueClick, Inc.; and The Weather Channel Interactive, Inc. Attached as <u>Exhibit H</u> is a true and correct copy of the list from Siquis, Ltd.

50.     On or about January 29, 2007, Hotwire, Inc. contacted Spirit Airlines by e-mail and asserted it is owed $9,000.00 for advertising work done for Spirit Airlines at the request of Eisner as stated on an invoice to Eisner ("January 29 E-mail"). Hotwire, Inc. attached a Hotwire, Inc. invoice billed to Eisner Communications on the January 29 E-mail. Attached as <u>Exhibit I</u> is a true and correct copy of the Hotwire, Inc. invoice from the January 29 E-mail.

51.     Spirit Airlines does not have a contract for online advertising services with Hotwire, Inc.

52.     On or about February 2, 2007, counsel for Carrollton Bank sent a letter to counsel for Spirit Airlines enclosing an invoice Eisner received from Travel Marketing Group, Inc. seeking payment in the amount of $97.76 for advertising work done for Spirit Airlines at the request of Eisner ("February 2 Letter"). Attached as <u>Exhibit J</u> is a true and correct copy of the February 2 Letter. Enclosed with the February 2 Letter is a Travel Marketing Group, Inc. invoice billed to Eisner Interactive. <u>See</u> Exhibit J.

53.     Spirit Airlines does not have a contract for online advertising services with Travel Marketing Group, Inc.

54.     The February 2 Letter also enclosed an invoice Eisner received from Sidestep, Inc. seeking payment in the amount of $18,426.74 for advertising work done for Spirit Airlines at the request of Eisner ("February 2 Letter").  Enclosed with the February 2 Letter is a SideStep, Inc. invoice billed to Eisner Communications.  See Exhibit J.

55.     Spirit Airlines does not have a contract for online advertising services with SideStep, Inc.

56.     On or about February 8, 2007, counsel for Carrollton Bank sent a letter to counsel for Spirit Airlines enclosing a demand letter and invoice from Advertising.com, Inc. to Eisner, which demands payment in the amount of $292,739.06 for advertising work done for Spirit Airlines at the request of Eisner ("February 8 Letter").  The invoice from Advertising.com, Inc. is addressed to Eisner Interactive.  Attached as Exhibit K is a true and correct copy of the February 8 Letter.

57.     Spirit Airlines does not have a contract for online advertising services with Advertising.com, Inc.

58.     On or about February 9, 2007, counsel for Carrollton Bank sent a letter to counsel for Spirit Airlines requesting an invoice reconciliation from Spirit Airlines for the total amount outstanding to Eisner ("February 9 Letter").  Attached as Exhibit L is a true and correct copy of the February 9 Letter.

59.     On or about February 28, 2007, pursuant to the request of Carrollton Bank, Spirit Airlines reconciled the amount it owes to Eisner.  Specifically, Spirit Airlines reviewed the outstanding Eisner invoices and determined the actual amounts owed to Eisner for services as $458,186.26 ("Eisner Funds").  The reconciliation was based upon amounts Spirit Airlines already paid to Eisner, as well as a proration of certain invoices after the date Eisner ceased

business operations and services provided to Spirit Airlines. Attached as <u>Exhibit M</u> is a true and correct copy of the February 28 Reconcilation.

60.     As part of the reconciliation, Spirit Airlines prorated the total amounts owed to Eisner to November 10, 2006, on two Eisner invoices, based upon Eisner's cessation of business operations for Spirit Airlines at that time.

61.     Spirit Airlines prorated Invoice No. 81981620970 from $279,217.88 to $120,994.41 based on payments to third-party advertiser vendors through November 13, 2006. Spirit Airlines' new advertising agency, Siquis, Ltd. paid the amounts outstanding from November 14-30, 2006, for this invoice. <u>See</u> Exhibit M.

62.     Spirit Airlines prorated Invoice No. 81981720971 from $26,400.00 to $8,800.00 because Eisner did not provide services to Spirit Airlines beyond November 10, 2006. <u>See</u> Exhibit M.

63.     In the February 9 Letter, Carrollton Bank also recommended that Spirit Airlines commence an interpleader action to resolve both the demands for payment by Carrollton Bank for amounts owed to Eisner and the demands for payment by third-party advertising vendors for amounts owed by Eisner. <u>See</u> Exhibit L.

**C.     Deposit of Funds**

64.     Spirit Airlines is merely a disinterested stakeholder in this action inasmuch as it claims no interest in the Eisner Funds.

65.     Spirit Airlines admits that the Eisner Funds are due and owing to someone.

66.     Spirit Airlines has received conflicting demands for the Eisner Funds from claimants, including Carrollton Bank, a secured creditor of Eisner, and third-party advertising vendors that contracted with Eisner.

67. Spirit Airlines has taken numerous steps to ensure that all claimants are included as defendants in this action. First, Spirit Airlines included all of the third-party advertising vendors that contacted Spirit Airlines directly and demanded payment following the inability of these parties to collect money directly from Eisner. Next, Spirit Airlines included all of the third-party advertising vendors that asserted they were entitled to outstanding payments incurred by Eisner on behalf of Spirit Airlines that were set forth on the list provided to Spirit Airlines by Siquis, Ltd., the advertising company hired by Spirit Airlines to replace Eisner. Finally, Spirit Airlines included all of the third-party advertising vendors from the list Carrollton Bank, on behalf of Eisner, provided to Spirit Airlines.

68. Spirit Airlines is disinterested because it is not entitled to the Eisner Funds and is not contractually obligated to any of the claimants and named defendants in this interpleader action.

69. Spirit Airlines hereby offers to and is ready to deposit the Eisner Funds with the Court upon the entry of an appropriate order.

## COUNT I
## Interpleader Under 28 U.S.C.A. § 1335 And
## Rule 22 Of The Federal Rules Of Civil Procedure

70. Spirit Airlines repeats and realleges each and every allegation contained in paragraphs 1 through 69.

71. Pursuant to the terms of the Agreement between Spirit Airlines and Eisner, Spirit Airlines owes $458,186.26 to Eisner for advertising services during the period of time from August 2, 2006 through November 7, 2006.

72. Spirit Airlines admits that it must pay the Eisner Funds pursuant to the terms of the Agreement between Eisner and Spirit Airlines.

BERGER SINGERMAN
attorneys at law
Boca Raton   Fort Lauderdale   Miami   Tallahassee
350 East Las Olas Boulevard  Suite 1000  Fort Lauderdale, Florida 33301  Telephone 954·525·9900  Facsimile 954·523·2872

13

73.     Spirit Airlines has received conflicting demands for the Eisner Funds from Eisner claimants, including Carrollton Bank, a secured creditor of Eisner, and numerous third-party advertising vendors that contracted with Eisner.

74.     Spirit Airlines is merely a disinterested stakeholder in this action inasmuch as it claims no interest in the Eisner Funds because Spirit Airlines is contractually obligated to Eisner and not contractually obligated to any of the claimants and named defendants in this interpleader action.

75.     Unless Spirit Airlines is allowed to interplead the claimants, Spirit Airlines is at risk for double, multiple, or inconsistent litigation and judgments.

76.     Spirit Airlines will deposit a check with this Court in the amount of $458,186.26, after the entry of an appropriate order.

77.     Pursuant to 28 U.S.C.A. § 1335, Spirit Airlines is entitled to interplead the claimants because two or more of the claimants, of diverse citizenship, are claiming or may claim to be entitled to the Eisner Funds.

78.     Pursuant to Pursuant to Rule 22 of the Federal Rules of Civil Procedure, Spirit Airlines is entitled to interplead the claimants because Spirit Airlines may be exposed to double or multiple liability.

79.     Pursuant to Rule 22 of the Federal Rules of Civil Procedure, Spirit Airlines is entitled to an award of its reasonable costs and attorneys' fees associated with initiating this interpleader action.

80.     By reason of the foregoing, Spirit Airlines is entitled to have this Court adjudicate the competing claims, or potentially competing claims of the defendants and to establish Spirit Airline's legal obligations to the defendants with finality.

WHEREFORE, Spirit Airlines respectfully requests that the Court issue an order:

a.      Allowing Spirit Airlines to deposit the Eisner Funds into the Court's registry;

b.      Compelling the defendants to determine through interpleader their competing, or potentially competing and adverse claims for the Eisner Funds;

c.      Extinguishing with finality all claims that the defendants, and all other persons or entities unknown claiming any right, title, or interest to the Eisner Funds, have against Spirit Airlines on Spirit Airlines' payment of the Eisner Funds into this Court;

d.      Restraining the defendants, and all other persons or entities unknown claiming any right, title, or interest to the Eisner Funds, from instituting or prosecuting, in any other state or federal court, any proceeding against Spirit Airlines with respect to the Eisner Funds;

e.      That on Spirit Airlines' deposit of the Eisner Funds with the Court, Spirit Airlines will be discharged from any liability in this action;

f.      Awarding Spirit Airlines its reasonable attorneys' fees and costs associated with filing this interpleader action; and

g.      Granting Spirit Airlines such other and further relief as the Court deems just and proper.

Dated: _____, 2007

**BERGER SINGERMAN**

_____

Anthony J. Carriuolo
Florida Bar No. 434541
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
954-525-9900 (phone)
954-523-2872 (fax)
acarriuolo@bergersingerman.com

LOCAL COUNSEL FOR SPIRIT AIRLINES, INC.

AND

**FAFINSKI MARK & JOHNSON, P.A**
Connie A. Lahn (MN Bar No. 0269219)
Lara O. Glaesman (MN Bar No. 316866)
Flagship Corporate Center
775 Prairie Center Drive, Suite 400
Eden Prairie, MN 55344
952-995-9500 (phone)
952-995-9577 (fax)
lara.glaesman@fmjlaw.com
connie.lahn@fmjlaw.com

COUNSEL FOR SPIRIT AIRLINES, INC.



SEP 29 2005 11:03AM   HP LASERJET 3200

P.1

This Advertising Agreement ("Agreement") is made and entered into as of the 15th day of September 2005 by and between Eisner Communications, Inc. ("Agency") a corporation existing under the laws of the state of Maryland and having its principal place of business at 509 South Exeter St., Baltimore MD 21202 and Spirit Airlines, Inc., a Delaware corporation with its headquarters at 2800 Executive Way, Miramar, Florida 33025 ("Spirit Airlines").

## WITNESSETH.

**WHEREAS**, Spirit Airlines is desirous of utilizing the advertising expertise of Agency; and

**WHEREAS**, Agency is willing to represent Spirit Airlines;

**NOW THEREFORE**, in consideration of the mutual promises, agreements, and covenants hereinafter set forth, Agency and Spirit Airlines agree as follows:

## ARTICLE 1.0. Commitments

It is understood that this Agreement covers interactive advertising services carried out by Spirit Airlines in North America, South America, Bermuda and the Caribbean.

## ARTICLE 2.0. Agency Services

2.1    **Services Regularly Provided by Agency.** In consideration of the compensation provided in Paragraph 4.1, Agency will perform the services customarily performed by an interactive agency in connection with the preparation of Spirit Airlines' on line advertising and the preparation and placement of those materials. The Agency's services will include, but not be limited to, the management coordination, supervision and liaison of the account as follows:

(a)    Familiarize itself thoroughly with the business of Spirit Airlines. Analyze and study marketing, promotional, interactive and media requirements and prepare recommendations and plans to meet them.

(b)    Services, including concepting, developing, executing and proofing for internet advertising campaigns. Also includes ordering and contracting for necessary interactive space, talent and materials.

(c)    Check the advertising to verify the accuracy of all information contained therein prior to submission to Spirit Airlines for final approval, including ares, restrictions, service levels, competitive claims, etc.

(d)    Manage online ad serving for the purposes of tracking, optimizing and reporting online media activity.

(e)    Manage all search marketing activity, including research of search terms, creation of text creative associated with search terms, tracking of performance and optimization of terms, creatives and bid prices.

(f)    Render invoices to Spirit Airlines for the charges incurred for advertising and audit and pay invoices from media and other suppliers.

**EXHIBIT A**

(g)    Abide by all laws and regulations applicable to the advertising and public relations industry with respect to this Agreement, and further, to provide Spirit Airlines, at nominal expense (estimated in advance), the initial review for legal compliance (where necessary) of all proposed titles, slogans, uses of names and/or ideas, as the case may be, for the purpose of informing Spirit Airlines of the risks reasonably anticipated with the use of the same.

## ARTICLE 3.0. Term and Termination

3.1    **Term.** This Agreement shall be effective [November 28, 2005] and shall remain in full force and effect for one year, unless terminated in accordance with the provisions hereof. Thereafter, subject to the mutual agreement of Spirit Airlines and the Agency (including, but not limited to, mutual agreement on the fees due the Agency for services rendered in each successive one-year term), and unless notice of termination is provided by either party ninety (90) days prior to the expiration of any one-year term then in effect, this Agreement shall automatically renew on the anniversary date for additional, renewable one-year terms. The parties agree that they will confer at least 100 days prior to the expiration of any one-year term for the purpose of discussing and negotiating their respective proposed modifications to this Agreement, if any, for the applicable renewal term.

3.2    **Termination for Convenience.** Spirit Airlines reserves the right to terminate this Agreement at any time upon ninety (90) days prior written notice. In the event of such termination, Agency shall receive its regular and agreed fees for work performed through the effective date of the termination and to bring to closure any work-in-progress. Upon expiration of the 90-day notice period, in the event that any third parties shall refuse to release Agency from any commitments made prior to Spirit Airlines' notice of termination, Agency shall be reimbursed, in accordance with Article 5.0, for costs incurred by the Agency in connection with non-cancelable contracts made in accordance with Spirit Airlines' authorization procedures, including costs reflected in third-party invoices received after the termination effective date.

3.3    **Ownership of Materials upon Termination.** Agency shall deliver to Spirit Airlines or its designated successor agency, all materials belonging to Spirit Airlines, subject to the provisions of Article 6.0, Ownership of Materials. Agency shall notify Spirit Airlines in writing when artwork, film, disks, CD's, photographs, manuscripts and tapes are of no further value. Upon receipt of such notification, Spirit Airlines will, within reasonable time, supply in writing, complete disposition instructions. Shipping costs shall be the responsibility of Spirit Airlines.

## ARTICLE 4.0. Agency Compensation

Spirit Airlines will pay Agency for all reasonable costs for space, time, materials and services which are purchased from third parties on behalf of Spirit Airlines in accordance with Spirit Airlines' authorization procedures and for which an estimate and/or media plan has been approved by a Spirit Airlines authorized representative.. Spirit Airlines will compensate Agency for its services as follows:

4.1     Spirit Airlines will compensate Agency for services performed (time spent) at the initial rate of $26,400 ("Agency Fee") per month for interactive services, for up to 480 hours per month. ($85.00 per hour for hours over 480.) Any hours in excess of 480 must be pre-approved by an authorized Spirit representative.

4.2     **Exploratory Creative Development, Monitoring Competitors Advertising, Packaging, Shipping, Delivery, Communications and Travel:** Expenses incurred by Agency on Spirit Airlines' account (at the request of Spirit Airlines) for the following items will be billed to Spirit Airlines at Agency's outside costs without commission.

    (a)     Exploratory creative development materials, including but not limited to demo music, with an approved signed estimate of expense from Spirit Airlines.

    (b)     Procurement of competitors' advertising.

    (c)     Courier and/or special messenger charges. Fax and long distance telephone.

    (d)     Travel, at Spirit Airlines' request, in connection with Spirit Airlines' account activity will be at Spirit Airlines' expense using Spirit Airlines' space positive Coach Class at all times. Travel arrangements must be pre-approved by an authorized Spirit Airlines' representative.

4.3     **Expenses and risk associated with full review for legal compliance of titles, slogans, use of names and/or ideas subject to potential claims for misappropriation, infringement of copyright, property right, libel, slander, defamation, invasion of privacy.** The Agency will provide Spirit Airlines with its initial review for legal compliance of certain proposed titles, slogans, uses of names and/or ideas for the purposes of informing Spirit Airlines of the risks reasonably anticipated with the use of the same for a nominal cost, estimated in advance. Should the Agency fail to provide notice of risk, all risk will remain with the agency, and the Agency shall indemnify and hold Spirit Airlines harmless for all claims, losses, and expenses associated with the use of said title, slogan, name and/or idea. In the event Spirit Airlines is advised of the risk and accepts said risk, it will indemnify and hold the Agency harmless for all claims, losses, and expenses associated with the same. Further, should Spirit Airlines request a full and complete legal review, including trademark scans and/or legal opinions from outside counsel, the Agency will provide estimates to Spirit Airlines of cost, and shall seek advanced written authorization from Spirit Airlines for same. Spirit Airlines will be invoiced without markup for all such costs incurred. Spirit Airlines may select and/or approve outside counsel utilized or, at its option, it may elect to review such matters itself. Thereafter, if Spirit Airlines approves the use of the subject title, slogan, name and/or idea, it will have done so having been made aware of the risks and it will then indemnify and hold the Agency harmless for all claims, losses, and expenses associated with them.

## ARTICLE 5.0. Payment, Cash Discounts and Billing Procedures

Agency's invoices are payable on or before the due dates specified thereon, not later than thirty (30) days following the date of receipt of the invoice.

5.1     The billing procedures are as follows:

(a)     Agency will bill to Spirit Airlines pursuant to the approve  estimate for all media placements and production expenses.

(b)     Agency will provide invoices on a monthly basis, for media or production scheduled for not more than thirty (30) days in the future. Where these dates occur on a weekend or holiday, the invoice will be submitted on the first business day immediately preceding the date. The Agency Fee will be billed at the start of each month and will be paid within thirty (30) days of receipt of invoice. In the event that additional media is required to be placed after monthly billing occurs, agency will provide an interim invoice upon approved estimate, which will be paid within thirty (30) days of receipt of invoice.  Payments falling due on a non-banking day shall be made on the immediately following banking day.  Appropriate proration shall be made for any partial calendar months during the Term.

(c)     Agency will invoice Spirit Airlines at "Net Media Billings." "Net Media Billings" shall mean the rates charged by the owners of media less Agency commissions.

(d)     Production is estimated plus or minus ten percent (+/-10%).  f costs are running more than ten percent (10%) over the estimate, Agency is responsible for providing a new estimate.

5.2     **Invoice Disputes** Any invoice disputes should be communicated to the Agency in writing within thirty () (30) days of receipt and should clearly indicate the reason for the dispute and the steps required to resolve the dispute.  Spirit Airlines and the Agency agree to resolve all disputes as quickly as possible. In the event of a dispute regarding an invoice, Spirit Airlines will notify the Agency according to the above timelines and pay the portion of the invoice not in dispute by the due date specified thereon in accordance with Article 5.0.

Should the Agency and Spirit Airlines fail to agree to a resolution of the dispute, they will abide by the arbitration provision set forth in Article 12.

## ARTICLE 6.0. Ownership of Materials

Agency and Spirit Airlines agree that any and all work produced, which may or may not ultimately be used, including plans for advertising, unique campaign ideas, concept, slogans, copy themes, preliminary sketches, layouts, copy, finished artwork, and other advertising material accepted by Spirit Airlines or purchased for Spirit Airlines' account by Agency and paid for by Spirit Airlines in accordance with the terms of this Agreement, will be considered work made for hire for Spirit Airlines and shall be the exclusive property of Spirit Airlines except to the extent that rights therein shall have been reserved by third parties including, but not limited to, actors, photographers and persons engaged or employed by Agency to compose the words and/or music of musical compositions used on behalf of Spirit Airlines. All title and proprietary rights shall belong exclusively to Spirit Airlines as long as all invoices relating thereto have been paid. Spirit Airlines shall have the exclusive right to obtain and to hold in its own name, that copyright registration and any other protection as may be appropriate with respect to the advertising material or special

material, including any extensions or renewals of such registration. Spirit Airlines shall have the right to review Spirit Airlines work in progress by Agency at any time.

## ARTICLE 7.0. Indemnification

7.1    Agency will indemnify, defend, and save harmless Spirit Airline; its directors, officers, employees and agents from and against any and all liability, lamages, claims, suits, judgments, governmental fines or any other proceedings relating the Agency's breach of the terms and conditions of this Agreement or its negligence or willful n isconduct, provided that Agency is given the right, but not the obligation, to join in the defe use of, or, at its option, take over on behalf and in the name of Spirit Airlines, and to conduc the defense of any such action or proceeding. This will include, but not be limited to, matters relating to claims arising out of Agency's failure to obtain proper contracts or releases om those whose names, likenesses, testimonials, scripts, musical compositions, art works, photographs or similar materials or rights are used in Spirit Airlines advertising or other ma erial prepared under this Agreement. Agency also agrees and hereby undertakes to release, inc emnify, defend and save harmless Spirit Airlines for claims by third parties for libel, slander defamation, invasion of privacy, piracy, plagiarism, unfair competition, idea misappropriat m, and infringement of copyright, property right, title or slogan, penalties or actions of eve y name and description, including any and all costs and expenses related thereto, includ ng the defense thereof, attorneys' fees and court costs arising out of or resulting from the ac or omission of Agency, its directors, officers and employees, and/or in connection with he performance of this Agreement to the extent set forth in Section 4.3 above. Agency w l not be responsible for matters caused by the negligence or willful misconduct of Spirit Airl es.

7.2    Except as otherwise provided above and subject to the limitations contained in Section 7.1 above, it will be the responsibility of Spirit Airlines to verify th: accuracy of claims or assertions made about Spirit Airlines products or services or the pr ducts or services of any competitor of Spirit Airlines in advertising created by the Agency, rovided that Agency has obtained written approval of Spirit Airlines for the final copy of ll advertising before its publication or broadcast, and such advertising is the advertising that s published or broadcast. Spirit Airlines and Agency will use due care in the performance of tl eir responsibilities under this Agreement. Except for the matters for which Agency will i idemnify Spirit Airlines pursuant to Section 7.1 above or any breach by Agency of any pro ision of this Agreement, Spirit Airlines agrees to indemnify, defend, and save harmless Ager 2y, its directors, officers, employees, and agents from and against any and all liability, damag s, claims, suits, penalties or actions of every name and description, including any and ill reasonable costs and reasonable expenses related thereto, including the defense thereof, 1 asonable attorneys' fees and reasonable court costs arising out of or resulting from the perfo nance of this Agreement by Spirit Airlines, its directors, offices and employees, provided th t Spirit Airlines is given the right, but not the obligation, to join in the defense of, or, at its o tion, take over on behalf and in the name of Agency, the conduct of the defense of any s ch action or proceeding brought against the Agency. Spirit Airlines shall indemnify and ho d Agency harmless from and against all claims based upon the accuracy of information co tained in Spirit Airlines advertising, including but not limited to any and all express or i iplied warranties and/or representations made about safety and security of the airline, and cl ims for product liability, including, but not limited to, any claims for injury, death, or prope ty damage arising out of

the use of airplanes and/or facilities owned by or leased to Spirit Airlines and provided that Spirit Airlines is given the right, but not the obligation, to join in the defense or, or, at its option, take over on behalf and in the name of Agency, the conduct of any such action or proceeding brought against Agency.

Agency will endeavor to safeguard Spirit Airlines' advertising materials in its possession. It is understood that Agency will be responsible for the loss, damage, or destruction of all such materials in Agency's possession.

Notwithstanding the foregoing provisions of 7.1 or 7.2, with respect to any third party claims, the indemnifying party shall not be entitled to assume the defense or control of a such claims and shall pay the fees and expenses of counsel retained by the indemnified party if (i) such third party claim seeks an order, injunction or other equitable relief against the indemnified party, (ii) such third party claim involves any criminal proceeding, action, indictment, allegation or investigation, or (iii) counsel to the indemnified party shall have reasonably concluded that (a) there is a conflict of interest between the indemnified party and the indemnifying party in the conduct of the defense of such third party claim or (b) the indemnified party has one or more defenses not available to the indemnifying party.

The indemnified party shall otherwise have the right to participate in the defense of any third party claim with counsel employed at its own expense; provided, however, that, in the case of any third party claim described in clause ( ), (ii) or (iii) above or as to which the indemnifying party shall not in fact have employed counsel to assume the defense of such third party claim, the reasonable fees and disbursements of such counsel shall be at the expense of the indemnifying party. The indemnifying party shall have no indemnification obligations with respect to any third party claim which shall be settled by the indemnified party without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed.

## ARTICLE 8.0. Force Majeure

8.1    Neither party shall be liable for delays in its performance hereunder due to causes beyond its reasonable control, including, but not by way of limitation, delays occasioned by acts of God, or the public enemy; acts of government or courts of law or equity; civil war, insurrection or riots; fires, floods, explosions, earthquakes or other causalities; strikes, litigation initiated by third parties enjoining, modifying or in any way restricting the performance under this Agreement by one or both of the parties.

8.2    Notwithstanding any other provision of this Agreement, in the event that Agency fails to provide the goods and/or services contracted for under this Agreement for any reason, excluding force majeure, and such failure continues for more than five (5) days, Spirit Airlines may, at its sole option, acquire similar goods and/or services from another provider or provide services for itself. Agency agrees to reimburse Spirit Airlines for the difference in cost between those specified under this Agreement and those paid by Spirit Airlines to a

different service provider, provided, however, that such costs are standard in the industry. In acquiring service from another provider, Spirit Airlines may suspend this Agreement for a period of up to thirty (30) days longer than the condition leading to Agency's failure to provide service or terminate this Agreement. Where such failure, regardless of cause, continues for thirty (30) or more days, or where such failure lasts for five or more days on three or more occasions during the term of this Agreement than Spirit Airlines will have the right to terminate this Agreement immediately upon written notice to Agency, without any liability to Agency by reason of such termination.

## ARTICLE 9.0. Taxes

In addition to the amounts charged under this Agreement, Spirit Airlines will pay any applicable sales and/or use taxes that may be lawfully imposed by the Government of the United States or any State political subdivision thereof upon Agency for the Services provided to Spirit Airlines under this agreement provided Agency promptly notifies Spirit Airlines of the imposition or invoices Spirit Airlines for such taxes.

Each party will be responsible for all other taxes attributable to each taxes including, without limitation, any taxes based on gross receipts, revenue, income or the like, import or export taxes, or franchise or doing business taxes. If requested by Spirit Airlines in writing, Agency will not pay any sales or use tax assessed which is the responsibility of Spirit Airlines under this Agreement except under protest, and if payment is made, will use its best commercial efforts to obtain a refund thereof, or at Spirit Airlines' request, permit Spirit Airlines to protest such tax in Agency's name. Agency will be reimbursed at regular hourly rates for all time spent pursuing a tax protest at Spirit Airlines' request, and should it incur legal fees, they will be passed on to Spirit Airlines without markup. If all or any part of such tax is refunded, Agency will repay to Spirit Airlines so much thereof as Spirit Airlines will have paid, including any and all interest paid thereon. Spirit Airlines will pay to Agency, upon demand, Spirit Airlines' proportionate share of all out of pocket expenses and if the refund applies to customers of Agency other than Spirit Airlines, then Agency will make certain that Spirit Airlines receives a reimbursement for a proportionate share of such costs.

## ARTICLE 10.0. Confidentiality and Waiver

10.1    Confidential information means any information, in any form, including, without limitation, the financial terms of this Agreement, written documents, oral communications, proposed fares in advertisements that have not yet been made available publicly, recordings, videos, software, databases, business plans, and electronic/magnetic media, provided to or observed by either party pursuant to this Agreement, including information owned or provided by Spirit Airlines and/or third parties, excepting information that is generally available to the agency other than by or through Spirit Airlines/and or the public. Each party agrees that it will maintain all Confidential Information in confidence and use it solely for purposes of performance under this Agreement. Such Confidential Information will be distributed within each party's organization only to personnel with a need to know such information for purposes relating to this Agreement or in compliance with a court order or statutory requirement. In no event will either party disclose any Confidential Information to any third parties except subcontractors and independent consultants and then only where approved by the other in advance and subject to the execution of a confidentiality agreement. Agency further acknowledges and agrees that it will maintain the confidentiality of Spirit Airlines'

operating manuals even if the information contained in them becomes available to Agency from a non-confidential source. Notwithstanding the foregoing, it will not be a breach of this Agreement for either party to disclose Confidential Information of the other party if required to do so under law or in a judicial or other governmental investigation or proceeding, provided the other party has been given prior notice and the disclosing party has sought all available safeguards against widespread dissemination prior to such disclosure.

## ARTICLE 11.0. Entire Agreement

This Agreement constitutes the entire agreement between the parties hereto respecting the subject matter hereof, and there are no understandings or agreements between them respecting the subject matter hereof, written or oral, other than as set forth herein.

## ARTICLE 12.0. Governing Law

The Parties agree that this Agreement will be governed by and construed in accordance with the laws of the State of Florida. The parties further agree that they will negotiate in good faith to resolve any and all disputes arising out of this Agreement. Any unresolved dispute will be referred to the American Arbitration Association upon thirty (30) days written notice, and determined by the Arbitrator assigned to the case pursuant to the Association's rules. The parties agree to share arbitration costs equally.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

for Eisner Communications, Inc.

By: _____

Title: __Steven C. Eisner__
**President and CEO**

Date: __9/29/05__

for Spirit Airlines, Inc.

By: _____

Title: __DIRECTOR - INTERACTIVE MKTING__

Date: __9/29/05__



EXHIBIT

*B*

# ROGERS, MOORE and ROGERS, LLP
*Attorneys at Law*

<u>WILLIAM C. ROGERS (1921-1970)</u>

WILLIAM C. ROGERS JR.
W. CHARLES ROGERS, III
—————
ROBERT JAMES PARSONS, II
BRIAN N. ROGERS
M. RAMSAY BELL

SIX SOUTH CALVERT
BALTIMORE, MD 21202
(410) 727-4456
FAX (443) 524-0835

November 14, 2006

RECEIVED NOV 1 7 2006

Barry L. Biffle
Senior Vice President
and Chief Marketing Officer
Spirit Airlines
2800 Executive Way
Miramar, FL 33025

RE: Notice to Account Receivable Payor
Eisner Communications, Inc., Payee
Carrollton Bank, Secured Creditor

Dear Mr. Biffle:

This is to advise you that the undersigned is the attorney for Carrollton Bank ("Bank"), secured creditor, in connection with the collection and liquidation of the open and payable accounts receivable of the now defunct business entity known as Eisner Communications, Inc. ("Eisner"). The Bank holds a perfected Security Interest in all of the said accounts receivable of the said payee, Eisner, and has elected to pursue the collection of the same pursuant to the terms and conditions of its duly executed Security Agreement and perfected Security Interest Filing. Under the terms of the said above documents, all accounts receivable of Eisner are pledged as collateral security to the Bank and, upon default, under the said loan documents above, are fully collectible and payable to the Bank, as a secured creditor of Eisner.

Please, therefore, be advised that any and all prior unpaid invoices for jobs performed by Eisner for your company, as well as any future invoices to you from Eisner, unless otherwise directed by the undersigned, must be drawn payable to the Bank and mailed to the following address:

**EXHIBIT B**

Barry L. Biffle
November 14, 2006
Page Two


        Robert A. Altieri, President
        Carrollton Bank
        ATTN:  Eisner Collections
        P.O. Box 24129
        Baltimore, MD  21227

    In the alternative, payment may be wired to the Bank as
follows:

        Carrollton Bank ABA #052000773
        Credit Account of Carrollton Bank
        344 N. Charles Street
        Baltimore, MD  21201
        Account No. 101120 ATTN: Robert A. Altieri

    For identification purposes, please mark on your check the
Eisner Invoice number for which you are making payment.

    We are causing this letter to be mailed to you as an
account receivable payor of said payee, Eisner, as of the date
hereof and wish to inform you that any payment of any Invoices
hereafter that are paid by you to any other party other than to
the Bank, shall be null and void and will not relieve your
company of the obligation of making said payment to the Bank of
any open and unpaid Invoices owed by your company to Eisner.

    Therefore, I demand that your company pay to the Bank all
debts which you owe to Eisner.  In particular, I demand that you
pay to the Bank, as secured creditor, the sum of $660,697.73,
which your company owes according to the books and records of
Eisner.

                        Very truly yours,

                        Robert J. Parsons, II

RJP,II/cmd
cc:  Robert A. Altieri



# ROGERS, MOORE and ROGERS, LLP
### *Attorneys at Law*

WILLIAM C. ROGERS (1921-1970)

WILLIAM C. ROGERS, JR.
W. CHARLES ROGERS, III
—————————
ROBERT JAMES PARSONS, II
BRIAN N. ROGERS
M. RAMSAY BELL

SIX SOUTH CALVERT
BALTIMORE, MD 21202
(410) 727-4456
FAX (443) 524-0835

November 20, 2006

John Willis, Esq.
Vice President/General Counsel
Spirit Airlines
2800 Executive Way
Miramar, FL 33025

RE: Carrollton Bank, Secured Creditor
    Eisner Communications, Debtor
    Commercial Security Agreement/UCC Financing Statement

Dear Mr. Willis:

I am the attorney for the secured creditor, Carrollton Bank, in connection with the above-captioned matter.

Enclosed, per your request, please find copies of the following documents relating to the two commercial loans owed to Carrollton Bank by Eisner Communications, Inc.:

1. Commercial Security Agreement and UCC Financing Statement for Account No. 880001284/2385; and

2. Commercial Security Agreement and UCC Financing Statement for Account No. 880001284/8002117.

I trust this fully complies with your recent request of this law firm as counsel for Carrollton Bank.

Very truly yours,

Robert J. Parsons, II

RJP,II/mme
Enclosures
cc: Robert A. Altieri

**EXHIBIT C**



# UCC APPROVAL SHEET
## ** KEEP WITH DOCUMENT **

### TRANSACTION TYPE    FEES REMITTED

| | | |
|---|---|---|
| ___ | UO - Original Financing Statement | $20.00 |
| ___ | UOA - Original Financing Statement With Assignment | $20.00 |
| ___ | UOTU - Original Financing Statement Transmitting Utility | $20.00 |
| ___ | UMA - Amendment | $20.00 |
| ___ | UMDA - Amendment - Debtor Added | $20.00 |
| ___ | UMDC - Amendment - Debtor Name Change | $20.00 |
| ___ | UMDD - Amendment - Debtor Deleted | $20.00 |
| ___ | UMSA - Amendment - Secured Party Added | $20.00 |
| ___ | UMSC - Amendment - Secured Party Name Change | $20.00 |
| ___ | UMSD - Amendment - Secured Party Deleted | $20.00 |
| ___ | UMC - Amendment - Continuation | $20.00 |
| ___ | UMT - Amendment - Termination | $20.00 |
| ___ | UMZ - Amendment - Assignment | $20.00 |
| ___ | UMZP - Amendment - Partial Assignment | $20.00 |
| ___ | UMCS - Amendment - Correction Statement | $20.00 |
| ___ | UOMH - Manufactured Home - Original Financing Statement | $20.00 |
| ___ | UOPF - Public Finance - Original Financing Statement | $20.00 |
| ___ | Documents Nine (9) Pages or More | $75.00 |
| ___ | Certified Copies | |
| ___ | Plain Copies | |

TOTAL FEES: $20.00

### NO FEE TRANSACTION TYPES

| | |
|---|---|
| ___ | URC - Copies |
| ___ | UNCP - Void - Non-Payment |
| ___ | UCC - Cancellation |
| ___ | UCR - Reinstatement |
| ___ | UCO Departmental Action |
| ___ | UCREF - Refund Recordation Tax |
| ___ | UCIS - Incorrect ID Number |
| ___ | XOVRU - UCC Overrides |
| ___ | UMFC - Filing Office Correction Statement |

### METHOD OF PAYMENT

Cash _____   Check _____   Credit Card _____

Number of Checks _____

COMMENT(S):

---

1000361887866849

RECORDED ON 01/06/2003 AT 10:21 AM
IN THE FINANCING RECORDS OF THE MD. ST.
DEPARTMENT OF ASSESSMENTS AND TAXATION.
MD # 0000664111   ACK # 1000361887866849
ORIGINAL FILE NUMBER: 000000181144020
LIBER: U00250 FOLIO: 1535 PAGES: 0082
RECORDING FEE:        20.00
RECORDATION TAX:       0.00
EXPEDITED FEE:         0.00

_____ Other Charge(s)

_____

_____

_____

_____

Code _____

Attention _____

Mail to Address:

CARROLLTON BANK
344 N. CHARLES STREET
BALTIMORE                MD 21201

STATE OF MARYLAND
DEPT OF ASSESSMENTS AND TAXATION
CUST ID:0001032082
WORK ORDER:0008664111
DATE:01-06-2003 03:09:52 AM
AMT. PAID:$40.00

Stamp Work Order and Customer Number HERE

```
                                                    STATE OF MARYLAND
                                                    DEPT OF ASSESSMENTS AND TAXATION
                                                    CUST ID:0001032887
                                                    WORK ORDER:0008684111
                                                    DATE:01-07-2003 09:52 AM
                                                    AMT. PAID:$40.00
```

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

```
Carrollton Bank
344 N. Charles Street
Baltimore, MD 21201
```

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Eisner Communications, Inc. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 509 South Exeter Street | Baltimore | MD | 21202 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| 52-0561189 | | Corporation | MD | | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Carrollton Bank | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. Box 24129 | Baltimore | MD | 21227-0629 | |

4. This FINANCING STATEMENT covers the following collateral:

All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)

| 5. ALTERNATIVE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

9. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

Harland Financial Solutions
400 S.W. 6th Avenue, Portland, Oregon 97204

# COMMERCIAL SECURITY AGREEMENT



| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initial |
|-----------|-----------|----------|---------|-------------|---------|---------|---------|
| $1,000,000.00 | 11-30-2002 | 11-30-2003 | 8002117 | | 880001284 | *** | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** Elsner Communications, Inc.
509 South Exeter Street
Baltimore, MD 21202

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227–0529

THIS COMMERCIAL SECURITY AGREEMENT dated November 30, 2002, is made and executed between Elsner Communications, Inc. ("Grantor") and Carrollton Bank ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Despite any other provision of this Agreement, Lender is not granted, and will not have, a nonpurchase money security interest in household goods, to the extent such a security interest would be prohibited by applicable law. In addition, if because of the type of any Property, Lender is required to give a notice of the right to cancel under Truth in Lending for the Indebtedness, then Lender will not have a security interest in such Collateral unless and until such a notice is given.

**CROSS–COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to execute financing statements and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be Indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No changes in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any Account becomes subject to a security interest in favor of Lender, the Account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 8002117                                                                   Page 2

setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Maryland, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis acceptable to Lender and issued by a company or companies acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least fifteen (15) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; or (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured (and no event of default will have occurred) if Grantor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Maryland Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Without notice to Grantor, Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness and Grantor hereby consents to the appointment of such a receiver. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount and whether or not such receivership is incidental to a proposed sale of the Collateral or otherwise. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees that if Lender hires an attorney to help enforce this Agreement, Grantor will pay, subject to any limits under applicable law, Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit and including without limitation additional legal expenses for bankruptcy proceedings.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland. This Agreement has been accepted by Lender in the State of Maryland.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, if hand delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Collateral becomes

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Grantor (or to a third party grantor acceptable to Lender).

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Eisner Communications, Inc., and all other persons and entities signing the Note in whatever capacity.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Eisner Communications, Inc..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other Indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Carrollton Bank, its successors and assigns.

**Note.** The word "Note" means the Note executed by Eisner Communications, Inc. in the principal amount of $4,000,000.00 dated November 30, 2002, together with all modifications of and renewals, replacements, and substitutions for the note or credit agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED NOVEMBER 30, 2002.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**GRANTOR:**

EISNER COMMUNICATIONS, INC.

By: _____ (Seal)
   Steven C. Eisner, President and CEO of Eisner
   Communications, Inc.

**COMMERCIAL SECURITY AGREEMENT
(Continued)**

Loan No: 8002117             Page 6

LENDER:

CARROLLTON BANK

X _____
    Authorized Signer

STATE OF MARYLAND
DEPT OF ASSESSMENTS AND TAXATION
CUST ID:0001442783
WORK ORDER:0000928737
DATE:08-05-2004 12:19 PM
AMT. PAID:$925.00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

Carrollton Bank
344 N. Charles Street
Baltimore, MD 21201

2004 JUL 30 A II: 17

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Eisner Communications, Inc. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 509 South Exeter Street | Baltimore | MD | 21202 | USA |

| 1d. TAX ID # SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Corporation | MD | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. TAX ID # SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Carrollton Bank | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. Box 24129 | Baltimore | MD | 21227-0629 | USA |

4. This FINANCING STATEMENT covers the following collateral:

**All Inventory, Chattel Paper, Accounts and Equipment; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds)**

5. ALTERNATIVE DESIGNATION (if applicable)    ☐ LESSEE/LESSOR    ☐ CONSIGNEE/CONSIGNOR    ☐ BAILEE/BAILOR    ☐ SELLER/BUYER    ☐ AG. LIEN    ☐ NON-UCC FILING

6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum    [if applicable]    7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional]    ☐ All Debtors    ☐ Debtor 1    ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

ACKNOWLEDGMENT COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

Harland Financial Solutions
400 S.W. 6th Avenue, Portland, Oregon  97204

# UCC APPROVAL SHEET
## ** KEEP WITH DOCUMENT **

**TRANSACTION TYPE**         **FEES REMITTED**

| | | |
|---|---|---|
| _____ | UO - Original Financing Statement | $25.00 |
| _____ | UOA - Original Financing Statement With Assignment | $25.00 |
| _____ | UOTU - Original Financing Statement Transmitting Utility | $25.00 |
| _____ | UMA - Amendment | $25.00 |
| _____ | UMDA - Amendment - Debtor Added | $25.00 |
| _____ | UMDC - Amendment - Debtor Name Change | $25.00 |
| _____ | UMDD - Amendment - Debtor Deleted | $25.00 |
| _____ | UMSA - Amendment - Secured Party Added | $25.00 |
| _____ | UMSC - Amendment - Secured Party Name Change | $25.00 |
| _____ | UMSD - Amendment - Secured Party Deleted | $25.00 |
| _____ | UMC - Amendment - Continuation | $25.00 |
| _____ | UMT - Amendment - Termination | $25.00 |
| _____ | UMZ - Amendment - Assignment | $25.00 |
| _____ | UMZP - Amendment - Partial Assignment | $25.00 |
| _____ | UMCS - Amendment - Correction Statement | $25.00 |
| _____ | UOMH - Manufactured Home - Original Financing Statement | $25.00 |
| _____ | UOPF - Public Finance - Original Financing Statement | $25.00 |
| _____ | Documents Nine (9) Pages or More | $75.00 |
| _____ | Certified Copies | |
| _____ | Plain Copies | |

TOTAL FEES: _____

## NO FEE TRANSACTION TYPES

| | |
|---|---|
| _____ | URC - Copies |
| _____ | UNCP - Void - Non-Payment |
| _____ | UCC - Cancellation |
| _____ | UCR - Reinstatement |
| _____ | UCO Departmental Action |
| _____ | UCREF - Refund Recordation Tax |
| _____ | UCIS - Incorrect ID Number |
| _____ | XOVRU - UCC Override |
| _____ | UMFC - Filing Office Correction Statement |

**METHOD OF PAYMENT**

Cash _____   Check _____   Credit Card _____

Number of Checks _____

**COMMENT(S):**

---

1000381096166161

RECORDED ON 07/30/2004 AT 11:17 AM
IN THE FINANCING RECORDS OF THE MD. ST.
DEPARTMENT OF ASSESSMENTS AND TAXATION.
WO # 0000828737   ACK # 1000381096166161
ORIGINAL FILE NUMBER: 0000000181109803
LIBER: U00338   FOLIO: 1888 PAGES: 0002
RECORDING FEE:                    25.00
EXPEDITED FEE:                     0.00

_____ Other Charge(s)

_____

_____

_____

_____

Code _____

Attention: _____

Mail to Address:

CARROLLTON BANK
344 N. CHARLES STREET
BALTIMORE                    MD 21201

CUST ID: 0001442783
WORK ORDER:0000828737
DATE:08-05-2004 12:23 PM
AMT. PAID:9925.00

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,000,000.00 | 01-26-2004 | 01-26-2006 | 2385 | | 880001284 | JG | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Eisner Communications, Inc.
509 South Exeter Street
Baltimore, MD 21202

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

THIS COMMERCIAL SECURITY AGREEMENT dated January 26, 2004, is made and executed between Eisner Communications, Inc. ("Grantor") and Carrollton Bank ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other right which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

   **All Inventory, Chattel Paper, Accounts and Equipment**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

   (A)   All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

   (B)   All products and produce of any of the property described in this Collateral section.

   (C)   All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

   (D)   All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

   (E)   All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Despite any other provision of this Agreement, Lender is not granted, and will not have, a nonpurchase money security interest in household goods, to the extent such a security interest would be prohibited by applicable law. In addition, if because of the type of any Property, Lender is required to give a notice of the right to cancel under Truth in Lending for the Indebtedness, then Lender will not have a security interest in such Collateral unless and until such a notice is given.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

   **Perfection of Security Interest.** Grantor agrees to execute financing statements and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

   **Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any  (1)  change in Grantor's name;  (2)  change in Grantor's assumed business name(s);  (3)  change in the management of the Corporation Grantor;  (4)  change in the authorized signer(s);  (5)  change in Grantor's principal office address;  (6)  change in Grantor's state of organization;  (7)  conversion of Grantor to a new or different type of business entity; or  (8)  change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

   **No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

   **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any Account becomes subject to a security interest in favor of Lender, the Account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no

Loan No: 2385

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Page

selloffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's addr shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfact Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all property Grantor owns or is purchasing; (2) all real property Grantor owns or is purchasing; (3) all storage facilities Grantor owns, rents, leases uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other ti property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State Maryland, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherw provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in def under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in t ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a d or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includ security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from a disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provid however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately d any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens an encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other th those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Grantor rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repa and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or service rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against th Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine an inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon th Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withho any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to p and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is n discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accru as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final advers judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in th contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charge have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good fait conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of a governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all law or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultura product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreemer remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees t indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. Thi obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liabilit coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basi acceptable to Lender and issued by a company or companies acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender fron time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled o diminished without at least fifteen (15) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to giv such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any wa by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails t obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lende deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral. Lender may make proof o loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collatera Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoratior If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of th Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt an which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing su information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of t policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determini that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annual have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC-1 financing statement, or alternatively, a copy of this Agreement to perf continue Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, co continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unle prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute financi statements and documents of title in Grantor's name and to execute all documents necessary to transfer title if there is a default. Lender may file copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful mann not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to a Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notifi by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender m Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonal care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failu to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, n to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fa to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when du any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not b obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interest encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving th Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the da incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, w (A) be payable on demand; or (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments t become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note. The Agreement also will secur payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in an of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement betwee Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under thi Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes fals or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of an collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver fo any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceedin under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not appl if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the credito or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to Guarantor of any of the Indebtedness or Guarantor dies becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performanc of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the sam provision of this Agreement within the preceding twelve (12) months, it may be cured (and no event of default will have occurred) if Grantor, aft receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure require more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default a thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights a secured party under the Maryland Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of th following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title an other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral.

Loan No: 2385

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Page

the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goo
provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's o
name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily
value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice
the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However,
notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's r
to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the s
or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuri
preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demar
with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Without notice to Grantor, Lender shall have the right to have a receiver appointed to take possession of all or any part of t
Collateral, with the power to protect and preserve the Collateral, to operate the Collateral, and to collect the Rents from the Collateral and apply t
proceeds, over and above the cost of the receivership, against the Indebtedness and Grantor hereby consents to the appointment of such
receiver. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not t
apparent value of the Collateral exceeds the Indebtedness by a substantial amount and whether or not such receivership is necessary on t
proposed sale of the Collateral or otherwise. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from t
Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and recei
the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of t
Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insuran
policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, s
for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purpose
Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which m
and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payme
shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make paymer
directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficien
remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreeme
Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commerc
Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may ha
available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by th
Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election k
Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform a
obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise i
remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to th
matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by th
party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees that if Lender hires an attorney to help enforce this Agreement, Grantor will pay, subject to any limit
under applicable law, Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit and including witho
limitation additional legal expenses for bankruptcy proceedings.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define th
provisions of this Agreement.

**Governing Law. This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State o
Maryland. This Agreement has been accepted by Lender in the State of Maryland.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimor
State of Maryland.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing an
signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.
waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand stri
compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lende
and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever th
consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuin
consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretic
of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, if han
delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnig
courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the address
shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice
the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lend
informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any noti
given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documer
necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other securi
parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financi
statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and t
continuation of the perfection of Lender's security interest in the Collateral.

Loan No: 2385

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Page

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Grantor (or to a third party grantor acceptable to Lender).

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Eisner Communications, Inc. and includes all co-signers and co-makers signing the Note.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Eisner Communications, Inc..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Carrollton Bank, its successors and assigns.

**Note.** The word "Note" means the Note executed by Eisner Communications, Inc. in the principal amount of $2,000,000.00 dated January 26, 2004, together with all modifications of and renewals, replacements, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the 'Collateral Description' section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JANUARY 26, 2004.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

Loan No: 2385

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Page

GRANTOR:

EISNER COMMUNICATIONS, INC.

By: _____ (Seal)
    Steven C. Eisner, President and CEO of Eisner
    Communications, Inc.

LENDER:

CARROLLTON BANK

X _____
    Authorized Signer

LASER PRO Lending, Ver. 5.25.20.002  Copr. Harland Financial Solutions, Inc. 1997, 2004.  All Rights Reserved.  - MD  G:\CFI\WIN\CFI\LPL\E40.FC  TR-755  PR-4



**EXHIBIT**

D

November 29, 2006

Re:    Carrollton Bank, Secured Creditor
       Eisner Communications, Debtor
       Accounts Receivable

Dear _____:

I am writing in response to your recent communication concerning the status of Spirit Airlines, Inc.'s payments to the now defunct Eisner Communications, Inc. ("Eisner").

In that regard, kindly be advised that we have been contacted by the Carrollton Bank as secured creditor for Eisner. The bank executed a commercial security agreement and UCC financing statements with Eisner for loans the bank had made to Eisner. Pursuant to the terms of those documents, all accounts receivable of Eisner, including those of Spirit Airlines, Inc., ("Spirit") are collateral securing the loan to the bank. Upon default of that loan which has occurred, those accounts receivable are fully collectable and payable to the bank as a secured creditor of Eisner,

Accordingly, our legal department is in the process of reconciling what Eisner alleges are the accounts receivable and what our records reflect in terms of what is due and owing to them. We will not be making any payments to the bank beyond the date it is determined that Eisner's services provided on behalf of Spirit Airlines, Inc.'s had ceased. I can assure you that Spirit will continue to make the appropriate payments to Siquis, our new agency of record as of November 13, 2006, for the fees incurred in connection with the services that you will be providing to Spirit.

If you want to contact counsel for the Carrollton Bank, please be advised of the following information:

    Robert J. Parsons, II
    Rogers, Moore and Rogers, LLP
    Six South Calvert
    Baltimore, MD 21202
    (410) 727-4456
    FAX (443) 524-0835

I trust the foregoing will allay any concerns that you may have concerning Spirit's obligations to Eisner. We look forward to continuing our business relationship with you.

If you have any questions, please feel free to contact me.

**EXHIBIT D**

Sincerely,


cc:    John M. Willis
           VP & Corporate Counsel

**EXHIBIT**

E



2200 Powell Street, Suite 600
Emeryville, CA 94608
Main: 510.250.5500
Fax: 510.250.5700
www.exponential.com

To:    Robert Schroeter
       Senior Director, Consumer Marketing
       Spirit Airlines

In light of your letter to us dated December 12, 2006 and my emails of November 20, 2006 and December 21, 2006, I felt it was necessary to clarify our expectations concerning past due amounts owing on advertising services our company provided on behalf of Spirit Airlines. These are for invoices dated 8/31/2006 (no. 007419), 9/30/2006 (no. 007676), and 11/30/2006 (no. 007940), in the total amount of $47,867.59 (copies of the invoices are attached to this letter)

The services in question were performed by Tribal Fusion/Exponential under the terms of an agreement in effect since 2004 with Eisner Interactive (a copy of which is attached to this letter.) According to the terms of those agreements, and consistent with our understanding in fact, Eisner was acting as agent for Spirit Airlines as the disclosed principal. Under these agreements and under the law of agent/principal, Tribal Fusion/Exponential's remedy for non-payment is directly against the principal, Spirit Air. Accordingly, Tribal Fusion has a claim directly against Spirit Air for the invoiced amounts owing.

At this time we are asking that Spirit Airlines clear this obligation by making payment to Exponential of the overdue amount of $47,867.59. If Spirit Air makes payment of the full amount claimed by Eisner to Carrollton Bank, you are plainly at risk of having to pay a second time directly to Exponential.

We assume Spirit Airlines can assert available defenses or right of offset under your contract with Eisner, to avoid any alleged obligation to pay Eisner (or its secured creditor, Carrollton Bank) the amounts owed to Exponential on this transaction. Eisner/Carrollton Bank should receive only that net amount Eisner was expecting to realize on these transactions. There should be no additional loss to Spirit Airlines, beyond the total amount you were scheduled to pay on the transactions.

Should you have any questions concerning this matter, please do not hesitate to contact me either via email at michael.farrar@exponential.com or phone at 510-250-5586.

Regards,

Mike Farrar
Director of Finance

**EXHIBIT E**

| | | Invoice | 007419 |
|---|---|---|---|
| | | Date | 8/31/2006 |
| | | Page | 1 |



**Tribal Fusion**
2200 Powell Street
Suite 600
Emeryville CA   94608

**Bill To:**

Eisner Interactive
Attn: The Finance Department
509 S. Exeter Street
Baltimore MD   21202

**Invoice Description:**

Advertising For AUGUST 2006
Impressions are Base on Mediaplex Numbers
Advertiser Name: Spirit Airlines
Campaign Dates: 08/01/2006 - 08/31/2006
Billing Period: 08/01/2006 - 08/31/2006

| Insertion order # | | | Customer ID | Salesperson ID | Payment Terms |
|---|---|---|---|---|---|
| | | | EISNERI | | Due On Receipt |

| Contracted Impression (000's) | Impressions Delivered (000's) | Description | | CPM | Amount |
|---|---|---|---|---|---|
| 1,731,500 | 1,818,606 | 728x90 Leaderboards in Custom Channel | | $5.00 | $8,657.50 |
| 1,731,552 | 1,837,003 | 120x600 Skyscrapers in Custom Channel | | $5.00 | $8,657.76 |
| 1,043,888 | 1,072,348 | 300x250 Large Rectangles in Custom Channel | | $5.75 | $6,002.36 |
| 147,267 | 171,070 | 468x60 Banners + Pop Unders in RON | | $11.44 | $1,684.73 |

| | | | Total | | $25,002.35 |

Please Remit Payment to:
Tribal Fusion, Inc
Dept 33785
P.O. Box 39000
San Francisco, CA 94139

Tax ID: 94-3370688
Contact Phone # (510) 250-5542
Contact Email: billing@tribalfusion.com

Sent

| Invoice | 007940 |
|---|---|
| Date | 11/30/2006 |
| Page | 1 |



**TRIBAL** f u s i o n

**Tribal Fusion**
2200 Powell Street
Suite 600
Emeryville CA   94608

Bill To:

Eisner Interactive
Attn: The Finance Department
509 S. Exeter Street
Baltimore MD   21202

Invoice Description:
Advertising For NOVEMBER 2006
Insertion Order: 7045 - May Sale Plan
Advertiser Name: Spirit Airlines
Agency: Eisner Interactive
Campaign Dates: 11/01/2006 - 11/10/2006
Billing Period: 11/01/2006 - 11/10/2006

| Insertion Order | | Customer ID | Salesperson ID | Payment Terms | |
|---|---|---|---|---|---|
| | | EISNERI | | Net 30 | |

| Contracted Impressions (000) | Tribal Impr Delivered (000) | Description | CPM | Amount |
|---|---|---|---|---|
| 500,000 | 158,028 | 728x90 Leaderboards in Custom Channel | $5.00 | $790.14 |
| 500,000 | 161,104 | 120x600 Skyscrapers in Custom Channel | $5.00 | $805.52 |
| 434,783 | 142,053 | 300x250 Large Rectangles in Custom Channel | $5.75 | $816.80 |
| 1,162,791 | 380,151 | 728x90 Leaderboards in RON | $2.15 | $817.32 |
| 1,162,791 | 380,638 | 120x600 Skyscrapers in RON | $2.15 | $818.37 |
| 769,231 | 251,413 | 300x250 Large Rectangles in RON | $3.25 | $817.09 |

| Total Invoice USD | $4,865.24 |
|---|---|

Please Remit Payment to:
Wire Transfer: Account#: 0297349763; Routing#: 121000248; SWIFT BIC: WFBIUS6S; Wells
Fargo Bank 420 Montgomery Street, San Francisco, CA 94104 USA

ACH: Wells Fargo Bank; Account#: 0297349763; ABA#: 121042882

Check: Please mail checks to Tribal Fusion, Dept 33785, P.O. Box 39000, San Francisco, CA
94139

Tax ID: 94-3370688; Contact Phone # (510) 250-5542; Contact Email: billing@tribalfusion.com



| Invoice | 007676 |
|---|---|
| Date | 9/30/2006 |
| Page | 1 |



**TRIBAL** f u s i o n

**Tribal Fusion**
2200 Powell Street
Suite 600
Emeryville CA 94608

Bill To:

Eisner Interactive
Attn: The Finance Department
509 S. Exeter Street
Baltimore MD 21202

Invoice Description:

Advertising For SEPTEMBER 2006
Impressions are Base on Mediaplex Numbers
IO: 7045 - May Sale Plan
Advertiser Name: Spirit Airlines
Billing Period: 09/01/2006 - 09/30/2006

| Insertion order # | | Customer ID | Salesperson ID | Payment Terms | | |
|---|---|---|---|---|---|---|
| | | EISNERI | | NET 30 | | |

| Contracted Impressions ('000s) | Impressions Delivered ('000s) | Description | CPM | Amount |
|---|---|---|---|---|
| 1,200,000 | 1,275,616 | 120x600 Skyscrapers In Custom Channel | $5.00 | $6,000.00 |
| 1,043,478 | 1,109,313 | 300x250 Large Rectangles In Custom Channel | $5.75 | $6,000.00 |
| 1,200,000 | 1,250,594 | 728x90 Leaderboards In Custom Channel | $5.00 | $6,000.00 |

| | Total | $18,000.00 |
|---|---|---|

Please Remit Payment to:
**Tribal Fusion, Inc**
Dept 33785
P.O. Box 39000
San Francisco, CA 94139

Tax ID: 94-3370688
Contact Phone # (510) 250-5542
Contact Email: billing@tribalfusion.com



# AOL
## Outstanding Balances Owed by Spirit Airlines

| Item Date | Due Date | Item Number | Original Amount | Open Amount | Contract Num | Days Past Due | Advertiser Name |
|---|---|---|---|---|---|---|---|
| 11/21/2006 | 12/21/2006 | 212495 | $30,000.00 | $30,000.00 | 9014268 | 21 | AOL Advertising Insertion order Eisner Communications Advertiser: Spirit Airlines Term: 7/5/06 - 6/30/07 October 2006 activity capped at $30,000 6,081,752 impressions @ $5.00 CPM = $30,408.76 |
| 11/20/2006 | 12/20/2006 | 212365 | $5,567.42 | $5,567.42 | 9015772 | 22 | Advertiser: Spirit Airlines Opportunity: (S) Spirit November 2006 Contract Term: 11/06 to 11/06 Advertising Flight On: Travel AOL REF# 9015772 DART# 2074738 CSR 111906 FE REV V# 3 Replaces invoice # 211564 |
| 10/20/2006 | 11/19/2006 | 210380 | $20,000.00 | $20,000.00 | 9014268 | 53 | AOL Advertising Insertion Order Eisner Communications Advertiser: Spirit Airlines Term: 7/5/06 - 6/30/07 September 2006 activity 4,070,298 @ $ 5.00 CPM capped at $20,000 for September 2006 |
| 9/22/2006 | 10/22/2006 | 208942 | $35,000.00 | $35,000.00 | 9014268 | 81 | AOL Advertising Insertion Order Eisner Communications Advertiser: Spirit Airlines Term: 7/5/06 - 6/30/07 August 2006 activity 7,146,712 impressions @ $ 5.00 CPM capped at $35,000.00 for August 06 |
| 8/16/2006 | 9/15/2006 | 206429 | $19,551.67 | $19,551.67 | 9014268 | 118 | AOL Advertising Insertion Order Eisner Communications Advertiser: Spirit Airlines Term: 7/5/06 - 6/30/07 July 2006 Activity 3,910,334 impressions @ CPM of $5.00 CSR08140GAM |

**EXHIBIT F**

# AOL
## Outstanding Balances Owed by Spirit Airlines

| Date | Invoice | Amount | Amount | Ref | No. | Details |
|---|---|---|---|---|---|---|
| 6/6/2006 | 202692 | $25,000.00 | $25,000.00 | 9013358 | 189 | Advertiser: Spirit Airlines<br>Opportunity: (S) Spirit June 2006 GEO Sale<br>Contract Term: 06/06 to 06/06<br>Advertising Flight On: AOL CityGuide, MapQuest<br>AOLREF# 9013358 DART# 1920313<br>BR 06/05/06 DT<br>Invoice 1 of 1 |
| 5/9/2006 | 201187 | $30,000.00 | $30,000.00 | 9012983 | 217 | Advertiser: Spirit Airlines, USH<br>Opportunity: (S) Spirit May 2006 GEO Sale<br>Contract Term: 05/06 to 05/05<br>Advertising Flight On: MapQuest, Travel<br>AOLREF# 9012983 DART# 1888074<br>BR 05/08/06 DT<br>Invoice 1 of 1 |
| 4/20/2006 | 200271 | $24,000.00 | $24,000.00 | 9012683 | 236 | Advertiser: Spirit Airlines<br>Opportunity: (S) April 2006 GEO Sale<br>Contract Term: 04/06 to 04/06<br>Advertising Flight On: MapQuest, Travel News & Information<br>AOLREF# 9012683 DART# 1872910<br>BR 04/19/06 DT<br>Invoice 1 of 1 |
| 4/7/2006 | 199573 | $23,500.00 | $23,500.00 | 9012442 | 249 | Advertiser: Spirit Airlines<br>Opportunity: (S) Spirit April Sale<br>Contract Term: 04/06 to 04/06<br>Advertising Flight On: MapQuest, Travel<br>AOLREF# 9012442 DART# 1861900<br>BR 04/06/06 DT<br>Invoice 1 of 1 |
| 3/9/2006 | 197951 | $23,500.09 | $1,486.15 | 9011918 | 278 | Advertiser: Spirit Airlines<br>Opportunity: (S) Spirit March Sales<br>Contract Term: 03/06 to 03/06<br>Advertising Flight On: MapQuest, Travel<br>AOLREF# 9011918 DART# 1827170<br>BR 03/08/06 DT<br>Invoice 1 of 1 |
| | | $236,119.18 | $214,105.24 | | | |

**EXHIBIT**

G

# ROGERS, MOORE and ROGERS, LLP
## *Attorneys at Law*

WILLIAM C. ROGERS (1921-1970)

WILLIAM C. ROGERS JR.
W. CHARLES ROGERS, III

ROBERT JAMES PARSONS, JI
BRIAN N. ROGERS
M. RAMSAY BELL

SIX SOUTH CALVERT
BALTIMORE, MD 21202
(410) 727-4456
FAX (443) 524-0835

January 22, 2007

RECEIVED JAN 25 2007

Connie A. Lahn, Esq.
Fafinski Mark & Johnson, P.A.
Flagship Corporate Center
775 Prairie Center Drive, Suite 400
Eden Prairie, MN  55344

RE:  Eisner Communications, Inc., Vendor
     Spirit Airlines, Vendee
     Carrollton Bank, Secured Creditor

Dear Ms. Lahn:

I am the attorney for the secured creditor, Carrollton Bank, in the above-captioned collection matter.

Enclosed please find a Statement of Account and copies of invoices issued by Eisner Communications, Inc. for its account with Spirit Airlines for the period from 8/2/06 through 11/7/06. These documents were assembled by Eisner for Carrollton Bank at the said Bank's request in December, 2006.

The Eisner Statement of Account reflects a Total Amount due by Spirit Airlines to Eisner of $660,697.73.

The last payment check #673577, dated October 23, 2006, was received by Eisner from Spirit in October, 2006.

Please review these enclosures on behalf of your client as soon as you are able to do so and then give me a call to discuss payment of the same to Carrollton Bank, as secured creditor of Eisner.

I have also requested that my client contact Eisner and secure for you a list of printers, outside contractors, etc.

**EXHIBIT G**

Connie A. Lahn, Esq.
January 22, 2007
Page Two


that Eisner contracted with on Spirit's behalf so that you can
contact the same and determine what amounts, if any, Spirit owes
to such third-party contractors.

    Please feel free to call if you have any questions or
problems regarding this matter.

                    Very truly yours,

                    Robert J. Parsons, II

RJP,II/cmd
Enclosures

EISNER COMMUNICATIONS
ACCOUNTS RECEIVABLE

12/18/2006

## SPIRIT AIRLINES

| Invoice Date | Invoice Number | Job Number | Description | Amount |
|---|---|---|---|---|
| 08/02/06 | 20379 | 6607 | Service Fee | 26,400.00 |
| 08/02/06 | 20381 | 6620 | Marketplace Window Hosting | 710.00 |
| 08/18/06 | 20491 | 6870 | March 2006 - Red Light Special | (422.00) |
| 10/03/06 | 20802 | 7402 | TravelZoo Newsflash September | 14,025.00 |
| 10/03/06 | 20803 | 7382 | October 2006 Media Plan | 279,958.00 |
| 10/03/06 | 20805 | 7363 | Forward to a Friend | 1,360.00 |
| 10/13/06 | 20849 | 6607 | Service Fee | 26,400.00 |
| 10/19/06 | 20884 | 6620 | Marketplace Window Hosting | 710.00 |
| 10/30/06 | 20970 | 7444 | November 2006 Media Plan | 279,217.88 |
| 10/30/06 | 20971 | 6607 | Service Fee | 26,400.00 |
| 10/31/06 | 20975 | 6620 | Marketplace Window Hosting | 710.00 |
| 11/01/06 | 20987 | 6846 | Spirit March Baseline | 12,452.41 |
| 11/01/06 | 20988 | 7045 | May 2006 Sale | 4,560.38 |
| 11/01/06 | 20990 | 7096 | June 2006 Baseline | 16,678.77 |
| 11/01/06 | 20992 | 7180 | Default Ads | 363.97 |
| 11/07/06 | 21013 | 6971 | April 2006 - Sale Part 1 | (12,887.92) |
| 11/07/06 | 21014 | 7033 | May 2006 Baseline | (5,355.26) |
| 11/07/06 | 21015 | 7097 | June 2006 Sale | (10,583.50) |
| | | | Totals | 660,697.73 |

NOTE:  Last payment check # 673577 dated 10/23/06.



e i s n e r   c o m m u n i c a t i o n s

| | | |
|---|---|---|
| Spirit Airlines | **Invoice :** | 20379 |
| Attention: Accounting: Maria Ramirez | **Date :** | 8/2/2006 |
| 2800 Executive Way | | |
| Miramar, FL  33025 | | |

### INVOICE

**Job Number:** **006607** Spirit Airlines Service Fee

August Service Fee $26,400.00

**Invoice Total:** **$26,400.00**

 eisner communications

## *Invoice*

Spirit Airlines
Attention: Accounting: Maria Ramirez
2800 Executive Way
Miramar, FL  33025

**Invoice :**   20381
**Date :**   8/2/2006

**Job Number:**   **6620**   Marketplace Window Hosting/ Rackspace   **Budget Code:  60870-64100**

| **Description** | **Amount** |
| --- | --- |
| August Hosting | $710.00 |

**Invoice Total:**   **$710.00**



P.O. Box 671337
Dallas, TX 75267-1337
U.S.A

| | |
|---|---|
| Customer Number: | 32235 |
| Invoice Number: | SP393590 |
| Invoice Date: | 09/01/06 |
| Invoice Currency: | USD ($) |

| | |
|---|---|
| Amount Due: | $ 1,420.00 |
| Due Upon Receipt | |

Eisner Interactive
Steven Gladstone
509 S. Exeter
Baltimore, MD 21202
UNITED STATES

Please detach here and return top portion with payment

# INVOICE

Page 1

## Account Summary

Customer Number: 32235

Eisner Interactive
Steven Gladstone
509 S. Exeter
Baltimore. MD 21202
UNITED STATES

| | |
|---|---|
| Previous Balance | $ 710.00 |
| Payments & Credits | $ 0.00 |
| Other Charges & Invoices | $ 0.00 |
| This Invoice SP393590 | $ 710.00 |
| Total Account Balance Due | $ 1,420.00 |

## Current Invoice Charges

Invoice Number: SP393590

Billing Cycle: 09/01/06 - 09/30/06

Invoice Date: 09/01/06

| | Qty | Units | Unit Price | Total |
|---|---|---|---|---|
| September Hosting Fee (Including September bandwidth subscription) | | | | |
| Server Number 76362 | 1 | Month | $ 710.00 | $ 710.00 |
| | | | Subtotal | $710.00 |

| | |
|---|---|
| Sales Tax | $ 0.00 |
| Current Invoice Charges | $ 710.00 |

During the month of September, take advantage of our FREE Advanced Reporting & Monitoring Bundle (with an annual
value of $1980) when you have a net addition to your contract or when you renew your current Rackspace contract. Throughout
your entire tenure as a Rackspace customer you will receive both an Enhanced Monitoring tool - based on the complexity
of your configuration - and Urchin Web Analytics Software for free.
Your Account Manager or Business Development Consultant will assist you with contract renewal options, which may include this
offer or other upgrades: 1-800-961-4454.
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
Your Account Information is now available on-line. To view your invoice for the September billing cycle and verify your
address visit http://my.rackspace.com/billing.php

Tax Payer Identification Number
74-2900680

Registered office: 2 Longwalk Road, Stockley Park, Uxbridge. UB11 1 BA
Registered in England No.3897010
VAT Registration No. GB 843 4735 17

Questions? Contact us with a support ticket on
my.rackspace.com or call us at the numbers to the right.

Rackspace Managed Hosting | P.O. Box 671337 | Dallas, TX 75267-1337 | U.S.A.
Toll Free: 1-800-961-4454 | Intl: 210-447-4600 | www.rackspace.com



# *Invoice*

Attention: Accounting: Maria Ramirez
Spirit Airlines
2800 Executive Way
Miramar, FL 33025

Invoice # : 20491
Date : 8/18/2006
Page : 1

**Job #: 006870** *March 2006 - Red Light Specials Part*

| Description | Amount |
|---|---|
| Online Media Plan | -422.00 |
| **Invoice Total:** | **-422.00** |

## _Invoice_

Attention: Accounting: Maria Ramirez
Spirit Airlines
2800 Executive Way
Miramar, FL  33025

| Invoice: | 20802 |
| --- | --- |
| Date : | 10/3/2006 |
| Page : | 1 |



**Job #:   007402**      _Travel Zoo Newsflash '06_

| Description | Amount |
| --- | --- |
| Online Media Plan | 14,025.00 |
|  |  |
| **Invoice Total:** | **$14,025.00** |



Travelzoo Inc.
P.O. Box 391330
Mountain View, CA 94039-1330

**TRAVELZOO**®

Phone Number (650) 943-2410
Fax Number (650) 943-2433
e-mail: accounting@travelzoo-inc.com

| Sold To: | Eisner Interactive, Inc.<br>509 S. Exeter Street<br>Baltimore, MD 21202 |
| --- | --- |
| Attn: | Kirsten Ellison |

| | |
| --- | --- |
| **Number:** | IN14945 |
| **Page:** | 1 |
| **Date:** | 9/25/2006 |

| PO # | Customer No. | Insertion Order # | Terms Code |
| --- | --- | --- | --- |
| – | EISNER-01 | 16892.A | NET30 |

| Item No. | Description | Quantity | Unit Price | Amount |
| --- | --- | --- | --- | --- |
| NEWSFLASH | 210,000 Newsflash E-mails<br>(Central Florida region)<br>50% OFF Promotion | 105,000 | 0.055 | 5,775.00 |
| NEWSFLASH | 150,000 Newsflash E-mails<br>(South Florida region)<br>50% OFF Promotion | 75,000 | 0.055 | 4,125.00 |
| NEWSFLASH | 150,000 Newsflash E-mails<br>(Michigan region)<br>50% OFF Promotion | 75,000 | 0.055 | 4,125.00 |

Comments: Spirit Airlines Advertising 9/25/06

| **Due Date** | **Amount Due** |
| --- | --- |
| 10/25/2006 | 14,025.00 |

Remit To:

Travelzoo Inc.
PO Box 391330
Mountain View, CA 94039-1330

| **Total amount** | 14,025.00 |
| --- | --- |
| **Payment received** | 0.00 |
| **Amount due (in USD)** | 14,025.00 |

Federal Tax I.D. #36-4415727

| **Invoice** |
| --- |

## *Invoice*

| | |
|---|---|
| Attention: Accounting: Maria Ramirez | **Invoice # :** 20803-0 |
| Spirit Airlines | **Date :** 10/3/2006 |
| 2800 Executive Way | **Page :** 1 |
| Miramar, FL  33025 | |

COPY

*Job #:  007382*   *October 2006 Media Plan*       *Comp #:  01*    *October 2006 Media Plan*

| Description | Amount |
|---|---|
| Campaign Tracking & Analysis | 270,540.00 |
| Online Media Plan | 9,418.00 |
| **Invoice Total:** | **279,958.00** |



## _Invoice_

Attention: Accounting: Maria Ramirez
Spirit Airlines
2800 Executive Way
Miramar, FL  33025

| | |
|---|---|
| **Invoice:** | 20805 |
| **Date :** | 10/3/2006 |
| **Page :** | 1 |

_Job #:  007363_     _Forward To A Friend_

| Description | Amount |
|---|---|
| Web Design / Development | 1,360.00 |
| | |
| **Invoice Total:** | **$1,360.00** |



e i s n e r   c o m m u n i c a t i o n s

## INVOICE

Spirit Airlines
Attention: Accounting: Maria Ramirez
2800 Executive Way
Miramar, FL  33025

**Invoice:** 20849
**Date:** 10/13/2006

*Job Number:* **006607** *Spirit Airlines Service Fee*

| Description | Amount |
|---|---|
| October '06 Service Fee | $26,400.00 |

| | Invoice Total: | $26,400.00 |



eisner communications

## *INVOICE*

Spirit Airlines
Attention: Accounting: Maria Ramirez
2800 Executive Way
Miramar, FL  33025

**Invoice:**  20884
**Date:**  10/19/2006

**Job Number: *006620 Marketplace Window Hosting—Rackspace***          ***Budget Code: 60870-64100***

**Description**                                                                                     **Amount**

October '06 Hosting                                                                                $710.00

                                                                   **Invoice Total:**          **$710.00**



eisner communications

## *INVOICE*

Spirit Airlines
2800 Executive Way
Miramar, FL 33025
Attention: Accounting: Maria Ramirez

**Invoice #:** 20970
**Date :** 10/30/2006
**Page :** 1

**Job Number:** *007444 November 2006 Media Plan*

| Description | Amount |
|---|---|
| Media Buyer | 279,217.88 |

| | |
|---|---|
| **Invoice Total:** | **$279,217.88** |



eisner communications

## *INVOICE*

Spirit Airlines
2800 Executive Way
Miramar, FL 33025
Attention: Accounting: Maria Ramirez

**Invoice #:** 20971
**Date :** 10/30/2006
**Page :** 1

**Job Number:**        *006607   Spirit Airlines Service Fee*

| Description | Amount |
|---|---|
| Service Fee | 26,400.00 |

| **Invoice Total:** | **$26,400.00** |
|---|---|



eisner communications

## *INVOICE*

Spirit Airlines
2800 Executive Way
Miramar, FL 33025

Attention: Accounting: Maria Ramirez

**Invoice #:** 20975
**Date :** 10/31/2006
**Page :** 1

*Job Number:*     *006620   Marketplace Window Hosting -*

| Description | Amount |
|---|---|
| Hosting- RackSpace- November | 710.00 |

| **Invoice Total:** | **$710.00** |
|---|---|

# eisner communications

## INVOICE

Spirit Airlines
2800 Executive Way
Miramar, FL  33025

Attention: Accounting: Maria Ramirez

| | |
|---|---|
| Invoice #: | 20987 |
| Date : | 11/1/2006 |
| Page : | 1 |

*Job Number:  006846*      *Spirit March Baseline*

| Description | Amount |
|---|---|
| Project Management | 12,452.41 |

| | |
|---|---|
| **Invoice Total:** | **$12,452.41** |

509 South Exeter Street  |  Baltimore, Maryland  21202  |  410-685-3390 PH  |  410-685-0387 FX  |  eisner-communications.com



# eisner communications

## INVOICE

Spirit Airlines
2800 Executive Way
Miramar, FL  33025
Attention: Accounting: Maria Ramirez

| | |
|---|---|
| Invoice #: | 20988 |
| Date : | 11/1/2006 |
| Page : | 1 |

**Job Number:  007045      May 2006 Sale**

| Description | Amount |
|---|---|
| Project Management | 4,560.38 |

| | |
|---|---|
| **Invoice Total:** | **$4,560.38** |

# e eisner communications

## INVOICE

Spirit Airlines
2800 Executive Way
Miramar, FL  33025

Attention: Accounting: Maria Ramirez

| | |
|---|---|
| **Invoice #:** | 20990 |
| **Date :** | 11/1/2006 |
| **Page :** | 1 |

**Job Number: 007096**      *June 2006 Baseline*

| Description | Amount |
|---|---|
| Project Management | 16,678.77 |

| | |
|---|---|
| **Invoice Total:** | **$16,678.77** |

# e eisner communications

## INVOICE

Spirit Airlines
2800 Executive Way
Miramar, FL 33025
Attention: Accounting: Maria Ramirez

| | |
|---|---|
| Invoice #: | 20992-0 |
| Date : | 11/1/2006 |
| Page : | 1 |

**Job Number: 007180**      *Default Ads*

| Description | Amount |
|---|---|
| Photography/Art | 363.97 |

| Invoice Total: | $363.97 |
|---|---|



## Media Contacts

| Property | Contact | Phone | Email | Fax |
|---|---|---|---|---|
| 247 Media | Ji Kim | 212.231.7229 | ji.kim@247realmedia.com | 212.760.1707 |
| Advertising.com | Brian Tomesette | 410.454.0381 | btomesette@advertising.com | 410.244.8860 |
| AOL | Todd John | 703.265.3856 | toddjohn@aol.com | |
| Burst Media | John Babcock | (781) 852-5280 | jbabcock@burstmedia.com | (781) 852-8688 |
| CheapFlights | Denise Champagnie-Pope | +44 (0)20 7467 3553 | Denise.Champagnie-Pope@cheapflights.com | +44(0)20 7034 3201 |
| Echo Target | Greg Smith | 646-274-4119 | gsmith@echotarget.com | 646-274-4110 |
| LowestFare/Priceline | Toby Mckenna | 203-299-8435 | toby.mckenna@priceline.com | 203-299-8933 |
| Sherman's Travel | Sandy Haberman | (212) 417-9130 x114 | shaberman@shermanstravel.com | 212-417-9131 |
| SideStep | Krystal Woodworth | (408) 235-1700x110 | kwoodworth@sidestep.com | (408) 235-1717 |
| SmarterLiving | Colin Quigley | (617) 886-5542 | colin.quigley@smarterliving.com | (617) 886-5501 |
| Specific Media | Mark Evans | (561) 995-8507 | mevans@specificmedia.com | (775) 878-5310 |
| TravelZoo | Jim Allen | (305) 913-3409 | jallen@travelzoo-inc.com | (305) 913-3401 |
| TripAdvisor | Brian Schuster | (781) 444-1113 x251 | brian@tripadvisor.com | (781) 444-7767 |
| Tribal Fusion | Scott Waxenberg | 914-690-9665 | scott.wax@tribalfusion-corp.com | 443-331-0310 |
| Underfone Network | Jeremy Wallace | (212) 685-8000 , ext. 135 | jeremy@undertone-inc.com | (212) 685-8001 |
| ValueClick | Alex Bengzon | 212.471.9551 | abengzon@valueclick.com | 775.257.1519 |
| Weather.com | Cathy Ryan | (770) 226-2802 | cryan@weather.com | (770) 226-2753 |

**EXHIBIT H**





EXHIBIT I

**EXHIBIT**

J

# ROGERS, MOORE and ROGERS, LLP
### Attorneys at Law

WILLIAM C. ROGERS (1921-1970)

WILLIAM C. ROGERS JR.
W. CHARLES ROGERS, III

SIX SOUTH CALVERT
BALTIMORE, MD 21202
(410) 727-4456
FAX (443) 524-0835

ROBERT JAMES PARSONS, II
BRIAN N. ROGERS
M. RAMSAY BELL

February 2, 2007

Connie A. Lahn, Esq.
Fafinski Mark & Johnson, P.A.
Flagship Corporate Center
775 Prairie Center Drive, Suite 400
Eden Prairie, MN  55344

RE:  Eisner Communications, Inc., Vendor
     Spirit Airlines, Vendee
     Carrollton Bank, Secured Creditor

Dear Ms. Lahn:

    As you are aware, I am the attorney for the secured
creditor, Carrollton Bank ("Bank"), in the above-captioned
collection matter.

    Enclosed please find two (2) invoices recently provided to
the Bank by Sara Eisner, Senior Vice President of Eisner
Communications, Inc., for the account of Spirit Airlines for
advertising, etc. in a total amount shown due of $18,524.70.
The parties to whom these invoices are owed are reflected at the
top of each invoice.

    The Bank will consent to a direct full-dollar set-off of
the full amount of the enclosed invoices by Spirit Airlines
against the balance of $660,697.73 it owes to Eisner, now
payable to Eisner's secured creditor, Carrollton Bank.

    Please feel free to call if you have any questions or
problems regarding this matter.

Very truly yours,

Robert J. Parsons, II

RJP,II/cmd
Enclosures

**EXHIBIT J**

01/29/2007  15:28    5152512494           TRAVEL_MKTG                    PAGE  02

# Invoice

**Travel Marketing Group, Inc.**
5525 Meredith    Suite C
Des Moines, IA  50310

Invoice Number:
4539

Invoice Date:
1/23/06

Voice:   (515) 251-2687
Fax:     (515) 251-7424

Page:
1

Sold To:
EISNER INTERACTIVE
509 S EXETER STREET
BALTIMORE, MD  21202

Customer ID: EISNER

| Customer PO | Payment Terms | Sales Rep ID | Due Date |
|---|---|---|---|
| PAM GALEONE | Net Due | | 1/23/06 |

| Description | Amount |
|---|---|
| ADVERTISING    DECEMBER 2005        TRAVEL MEDIA NETWORK | 97.96 |
| CLIENT:  SPIRIT AIRLINES | |
| IMPRESSIONS DELIVERED:  30,629 | |

|  | |
|---|---|
| Subtotal | 97.96 |
| Sales Tax | |
| Total Invoice Amount | 97.96 |
| Payment/Credit Applied | |
| **TOTAL** | 97.96 |

Check/Credit Memo No:

# Statement

SideStep, Inc.

2980 Bowers Ave.

Santa Clara, CA 95051

| Date |
|------|
| 1/29/2007 |

| To: |
|-----|
| Eisner Communications<br>Attn: Accounts Payable<br>509 South Exeter St.<br>Baltimore, MD 21202 |

| | Amount Due | Amount Enc. |
|---|---|---|
| | $18,426.74 | |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 09/30/2006 | Spirit Airlines Q3-Q4 2006-<br>INV #42109. Due 10/30/2006. Orig. Amount $10,293.25.<br>--- Flight 228x80, 45.47 @ $10.20 = 463.79<br>--- Flight 180x150, 181.124 @ $10.20 = 1,847.46<br>--- Email weekly Specials Text Link, 1 @ $4,250.00 = 4,250.00<br>--- Deals Standard Text Link, 7,464 @ $0.50 = 3,732.00<br>---<br>--- Billing period 9/1/06-9/30/06 | 10,293.25 | 10,293.25 |
| 10/31/2006 | INV #42408. Due 11/30/2006. Orig. Amount $8,133.49.<br>--- Flight 228x80, 27.438 @ $10.20 = 279.87<br>--- Flight 180x150, 109.129 @ $10.20 = 1,113.12<br>--- Email weekly Specials Text Link, 1 @ $4,250.00 = 4,250.00<br>--- Deals Standard Text Link, 4,981 @ $0.50 = 2,490.50<br>---<br>--- Billing period 10/1/06-10/31/06 | 8,133.49 | 18,426.74 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---------|--------------------|--------------------|--------------------|-----------------------|------------|
| 0.00 | 0.00 | 8,133.49 | 0.00 | 10,293.25 | $18,426.74 |



# ROGERS, MOORE and ROGERS, LLP

*Attorneys at Law*

WILLIAM C. ROGERS (1921-1970)

WILLIAM C. ROGERS JR.
W. CHARLES ROGERS, III
————————
ROBERT JAMES PARSONS, II
BRIAN N. ROGERS
M. RAMSAY BELL

SIX SOUTH CALVERT
BALTIMORE, MD 21202
(410) 727-4456
FAX (443) 524-0835

February 8, 2007

Connie A. Lahn, Esq.
Fafinski Mark & Johnson, P.A.
Flagship Corporate Center
775 Prairie Center Drive, Suite 400
Eden Prairie, MN 55344

RECEIVED FEB 1 2 2007

RE:   Eisner Communications, Inc., Vendor
      Spirit Airlines, Vendee
      Carrollton Bank, Secured Creditor

Dear Ms. Lahn:

Enclosed please find copies of a facsimile transmission sheet, demand
letter, Advertising.com statement, and New York Judicial Decisions, which was
received by Sara Eisner of Eisner Communications, Inc. on or about February
1, 2007. Mrs. Eisner is attempting, at the Bank's request, to locate all
venders who are owed money for advertising work done for Spirit Airlines, at
the request of Eisner Communications, Inc. The total amount claims as due on
the Advertising.com, Inc. statement is $292,739.06. The party to whom the
said statement is owed is alleged to be Advertising.com, Inc.

With respect to the legal analysis contained in the enclosed demand
letter of Martin S. Cole, Esq., the secured creditor does not necessarily
agree with his conclusions and Carrollton Bank feels that the results under
Maryland Agency Law may be different then alleged by Mr. Cole.

Given this rather large invoice that has popped up recently, we
probably should now discuss alternatives to the dollar-for-dollar set-off
arrangement, earlier proposed by Carrollton Bank. Such an alternative
payment mechanism would be a Complaint for Interpleader.

Please give me a call to discuss this matter further at your
convenience.

Very truly yours,

Robert J. Parsons, II

RJP,II/cmd
Enclosures

**EXHIBIT K**

# MARTIN S. COLE
# LAW OFFICES

67 Wall Street, 22nd Floor
New York, NY 10005-3111
Tel.: (212) 929-0606 • Fax: (212) 608-7266

## VIA FACSIMILE TRANSMISSION

**TRANSMIT TO:**      410-625-0355

**ADDRESSEE:**      Eisner Communications/Interactive, et al

**DATE:**      February 1, 2007

**RE:**      Advertising.com Inc.
         v.
         Eisner Communications/Interactive

**OUR FILE NO.:**      ACHSS293CB

**TOTAL NO. OF PAGES (INCLUDING THIS TRANSMITTAL PAGE):** 11

**REMARKS: PLEASE SEE ATTACHED.**

## CONFIDENTIALITY NOTE

The documents accompanying this telecopy transmission contain information from the Law Firm of Martin S. Cole which is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. Also if you are not the intended recipient, please contact us, so as to allow us to arrange for the documents to be returned to us at no cost to you.

# MARTIN S. COLE
## LAW OFFICES
### 67 WALL STREET, 22nd FLOOR
### NEW YORK, NY 10005-3111
Tel.: (212) 929-0606  Fax: (212) 698-7266

February 1, 2007

**WITHOUT PREJUDICE AND FOR**
**SETTLEMENT PURPOSES ONLY.**

Eisner Communications/Interactive, et al

Via facsimile transmission to:  410-625-0355

Re:  Advertising.com Inc.
v.
Eisner Communications/Interactive
Advertiser:  Spirit Airlines

Our File No.:  ACHSS293CB
Amount Due:  $292,739.06

Gentlemen/Ladies:

I was previously in communication with your then-attorney, James B. Astrachan, Esq. However, he informs me that he does not any longer represent the Eisner entity/entities.

My client, Advertising.com, informs me it received a cryptic telephonic message from a woman, requesting certain documentation supporting my client's claim against Eisner, et al.

The woman, according to my client, did not identify herself or her company/entity/firm, but merely provided my client with this fax number (410-625-0355).

Inasmuch as there are several potential party defendants pertinent to this matter, I respectfully request that upon receipt of this communication, you contact this office, as litigation counsel for Advertising.com, Inc., and identify yourself/your entity. Alternatively, you may fax to this office your request on your letterhead.

I am enclosing, for your edification, a copy of the Decisions of the Supreme Court, Appellate Division, First Department, dated March 8, 2005 (*News America Marketing Inc. v. Lepage Bakeries Inc.*).

I represented News America Marketing Inc. (News America) with regard to the original judgment (December 2003) and through the appeal process. News America was the publisher/judgment creditor, while Lepage Bakeries Inc. (Lepage) was the advertiser.

Page 2
Eisner Communications/Interactive, et al
February 1, 2007

Lepage claimed that it had paid its agent (McDonald Communications) with regard to the advertising published by News America.

McDonald Communications eventually filed a bankruptcy petition, amid claims of fraud, which were filed by Lepage and other creditors.

News America decided to proceed with litigation against the advertiser, Lepage. Judgment was obtained against Lepage in December 2003, in the amount of $132K, against a principal amount of $95K.

Lepage decided to appeal the judgment, and the enclosed Decisions of March 8, 2005, are the result of said appeal. Essentially, the Supreme Court, Appellate Division, First Department affirmed the original judgment, and further held that the advertiser (Lepage) was liable with regard to the actions of its agent (McDonald Communications), whether those actions were lawful or unlawful, and whether or not Lepage paid McDonald Communications with regard to the media insertions.

Naturally, Lepage reserved its rights with reference to pursuing the principals of McDonald Communications with regard to breach of the corporate fiduciary trust, as Lepage claimed to have paid McDonald Communications in full with regard to the specific media insertions.

Inasmuch as the Supreme Court, Appellate Division ruled in favor of my client, News America, I did not continue to follow any of the actions brought by Lepage against McDonald Communications and its principals. Accordingly, I am not privy to what transpired, if anything. However, I understand Spirit Airlines has paid Eisner with regard to the media insertions/advertising campaign that was published (via the Internet) by Adveritisng.com Inc. (my client). Hence, my client reserves the right to proceed against any and all liable parties for the entire amount due, statutory legal costs, disbursements and interest, in the event this matter is not resolved to our satisfaction.

I have been instructed to prepare to commence litigation in the next 10 – 14 days. In the event you feel this matter can be resolved during this time, I respectfully request that you immediately contact this office with the details.

In the event you are not legal counsel for Eisner and/or its principals, I respectfully request that you immediately provide me with the name, address and telephone number of Eisner's legal counsel by return telefax.

Notwithstanding the above, I am enclosing herein a statement of account pertinent to this matter. Please note the time line, especially as it pertains to Eisner "closing its doors", and especially as it relates to the dates of the outstanding and unpaid invoices.

Inasmuch as the Insertion Order/contract, Terms and Conditions, and the invoices are voluminous, it is not prudent to fax same to you. Hence, I again request that you provide me with your firm's name, address, telephone number and fax. In the event you require copies of the Insertion Order/contract (with Terms and Conditions) and the outstanding and unpaid invoices, I will proceed to send same to you via Priority Mail, or the like.

Page 3
Eisner Communications/Interactive, et al
February 1, 2007

In such event as I do not receive a response from you within the next ten (10) days, I will proceed as previously described and without further notice. Kindly note that I reserve the right to effectuate service of legal process via the appropriate Secretary of State, as provided by law.

Thank you in advance for your cooperation.

Very truly yours,

MARTIN S. COLE

Dictated, but not read.

MSC:dd

# Statement

$\mathcal{A}$dvertising•com™

Date November 13, 2006

Page 1

To:

Eisner Interactive
Triste Smith
509 South Exeter Street
Baltimore, MD 21202

Send Payment To:

Advertising.com
P.O. Box 630353
Baltimore, Maryland 21263-0353

| Document Number | Date | Description | Amount | Running Balance |
|---|---|---|---|---|
| INV17760 | 06/30/2006 | Spirit Airlines | $ 59,867.05 | $ 59,867.05 |
| PMT010359 | 10/25/2006 | Spirit Airlines | $ -23,620.10 | $ 36,246.95 |
| INV18171 | 07/31/2006 | Spirit Airlines | $ 54,665.50 | $ 90,912.45 |
| INV18375 | 08/31/2006 | Spirit Airlines | $ 84,305.72 | $ 175,218.17 |
| INV19025 | 09/30/2006 | Spirit Airlines | $ 48,549.21 | $ 223,767.38 |
| INV19328 | 10/31/2006 | Spirit Airlines | $ 68,971.68 | $ 292,739.06 |
| | | | Amount Due: | $ 292,739.06 |

SUPREME COURT, APPELLATE DIVISION
FIRST DEPARTMENT

MARCH 8, 2005

THE COURT ANNOUNCES THE FOLLOWING DECISIONS:


Tom, J.P., Andrias, Sullivan, Ellerin, Sweeny, JJ.

4550-
4550A    News America Marketing, Inc.,
             Plaintiff-Respondent,

                    -against-

         Lepage Bakeries, Inc.,
             Defendant-Appellant.

Pearce & Luz, LLP, New York (Thomas J. Luz of counsel), for
appellant.

Martin S. Cole, New York, for respondent.

    Judgment, Supreme Court, New York County (Barbara R.

Kapnick, J.), entered December 22, 2003, which awarded plaintiff

damages in the total amount of $132,456, unanimously affirmed,

without costs. Appeal from order, same court and Justice,

entered on or about December 4, 2003, which granted plaintiff's

motion for summary judgment, unanimously dismissed, without

costs, as subsumed within the appeal from the judgment.

    Defendant seeks to avoid payment of $95,645.75 for

advertising materials printed by plaintiff on the ground that the

disputed sum was paid to defendant's agent, nonparty McDonald

Communications, which subsequently declared bankruptcy. The advertising insert orders and invoices received by defendant from plaintiff are addressed to McDonald Communications "AS AGENT FOR Le Page Bakeries." Thus, it is clear from these documents that McDonald acted as the agent for a disclosed principal, which is responsible to make payment for goods and services purchased by its agent within the exercise of the agent's express or implied authority (*Tobron Off. Furniture Corp. v King World Prods.*, 161 AD2d 355, 356 [1990]).

The rule is firmly established that "an agent for a disclosed principal 'will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal'" (*Savoy Record Co. v Cardinal Export Corp.*, 15 NY2d 1, 4 [1964], quoting *Mencher v Weiss*, 306 NY 1, 4 [1953]; see also *Yellow Book of N.Y. v DePante*, 309 AD2d 859 [2003]). There is no evidence proffered to indicate that McDonald agreed to assume defendant's liability. Defendant nonetheless seeks to elude established precedent, arguing that the custom and usage of the advertising industry has evolved to embrace the concept of "sequential liability," whereby "the agency is solely liable for payment of all media invoices if the agency has been paid for those services by the advertiser."

2

The issue confronting this Court is the purely legal question of whether the consequences of a default by an agent, acting for a disclosed principal, should be borne by the principal or the vendor engaged by the agent to supply goods and services to the principal. Generally, principals are liable for the acts of their agents performing within the scope of their apparent authority. As noted in *American Socy. of Mech. Engrs. v. Hydrolevel Corp.* (456 US 556, 566 [1982]):

> "a principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority. Similarly, a principal is liable for an agent's misrepresentations that cause pecuniary loss to a third party, when the agent acts within the scope of his apparent authority." (Internal citations omitted).

To overcome the established rule that a creditor is generally constrained to seek payment only from the agent's principal (see *Stoner Broadcasting of New York v K.L. & Spitler*, 87 AD2d 909 [1982]), defendant offers the affidavit of an expert witness, who opines that the custom and usage of the advertising industry supports "sequential liability." The expert states, "Sequential liability would endorse the fact that when the advertiser pays the agency it has no further liability to the media entity."

The proffered expert testimony must be rejected on several

3

grounds. What defendant misapprehends is that evidence of current industry practice is only "admissible to explain the meaning of terms used in any particular trade, when their meaning is material to construe the contract" (Smith v Clews, 114 NY 190, 193 [1889]). For example, in Zukarov v Register.com (304 AD2d 176, 179 [2003]), a case relied upon by defendant, the question confronting this Court was the meaning to be attributed to the term "registration" as it applied to an Internet domain name. Similarly, in Paz v Singer Co. (151 AD2d 234, 235-236 [1989]), we noted that a photographer who provided prints to the defendant under an express agreement was not barred from attempting to establish, "by operation of law or by virtue of the implicit understanding of the parties with respect to the custom and usage of the trade," that ownership of the negatives, as to which the contract was silent, vested in the photographer.

The matter at bar involves no contractual ambiguity or omission, only a well-settled question of law; thus, defendant's assertion that a "contract must be construed according to the custom and usage prevailing in a particular trade" (Edison v Viva Intl., 70 AD2d 379, 383 [1979]) is inapt. Furthermore, the proffered testimony purports to decide a legal issue that is central to the ultimate disposition of the case. As we stated in Singh v Kolcaj Realty Corp. (283 AD2d 350, 351 [2001]), "Where

4

the offered proof intrudes upon the exclusive prerogative of the court to render a ruling on a legal issue, the attempt by a [party] to arrogate to himself a judicial function under the guise of expert testimony will be rejected." Finally, we have previously ruled that the particular capacity in which a party functions -- either as agent or principal -- "is fundamental to the relationship of the parties and does not come within the scope of the exceptions for either explanation or supplementation permitted pursuant to the parol evidence rule (UCC 2-202)" (*Raj Jewelers v Dialuck Corp.*, 300 AD2d 124, 126 [2002]).

There is no merit to defendant's contention that summary judgment was improperly granted because its request for "documents relevant to Lepage's defense of industry custom and practice" received no response from plaintiff. Significantly, defendant not only opposed plaintiff's summary judgment motion but cross-moved for dismissal of the complaint (CPLR 3212). By doing so, defendant represented not merely that the proof of record was inadequate to warrant judgment in plaintiff's favor, but that the evidence was sufficient to require summary dismissal. The grant of summary judgment is the procedural equivalent of a trial (*Falk v Goodman*, 7 NY2d 87, 91 [1959]). By moving for accelerated judgment, a party submits the case for disposition on the record evidence, and the propriety of the

5

court's decision will be reviewed on the basis of that same evidence. It is settled that an appellate court is bound by the record (*Block v Nelson*, 71 AD2d 509 [1979]), and, absent matter that is subject to judicial notice, review is limited to the evidence before the motion court (*Broida v Bancroft*, 103 AD2d 88, 93 [1984]; see also *Becker v City of New York*, 249 AD2d 96, 98 [1998]). As we stated in *Ritt v Lenox Hill Hosp.* (182 AD2d 560, 562 [1992]), "If a movant, in preparation of a motion for summary judgment, cannot assemble sufficient proof to dispel all questions of material fact, the motion should simply not be submitted." Having submitted an application for judgment on the record, defendant will not be heard to complain that the record was insufficient to support the disposition of its motion.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED: MARCH 3, 2005

*Catherine O'Hagan Wolfe*
CLERK

6



# ROGERS, MOORE and ROGERS, LLP
*Attorneys at Law*

WILLIAM C. ROGERS (1921-1970)

WILLIAM C. ROGERS JR.
W. CHARLES ROGERS, III
——————
ROBERT JAMES PARSONS, II
BRIAN N. ROGERS
M. RAMSAY BELL

SIX SOUTH CALVERT
BALTIMORE, MD 21202
(410) 727-4456
FAX (443) 524-0835

February 9, 2007

RECEIVED FEB 1 2 2007

Connie A. Lahn, Esq.
Fafinski Mark & Johnson, P.A.
Flagship Corporate Center
775 Prairie Center Drive
Suite 400
Eden Prairie, MN 55344

RE: Spirit Airlines, Inc., Vendee
    Eisner Communications, Inc., Vendor
    Carrollton Bank, Secured Creditor

Dear Mr. Lahn:

   I am in receipt of your letter of February 8, 2007 regarding the above-captioned matter and I have reviewed same. I have discussed the same with my client, Carrollton Bank, and have been authorized by the Bank to respond to you as follows:

   1.   The Bank will not agree to indemnify Spirit against liability to third-party vendors hired for Spirit by Eisner, as such potential liability for each indemnification is wholly unknown and unliquidated.

   2.   The Bank does not consent to a direct full dollar set-off for the invoice to Spirit from Tribal Fusion in the sum of $47,867.60.  This is no longer a feasible approach as other vendors have recently surfaced and the Eisner records are incomplete.

   3.   The Bank does not consent to a direct dollar set-off for the Hotwire.com invoice in the amount of $9,000.0 sent to Spirit for the same reasons as stated above in #2.

**EXHIBIT L**

Connie A. Lahn, Esq.
February 9, 2007
Page Two

    4.  The Bank requests that Spirit Airlines, Inc. provide it with an invoice reconciliation so that the actual amount owed by Spirit to Eisner can be calculated and paid, hopefully amicably.

    5.  The Bank plans to continue to provide to Spirit any documentation that is given to it by Eisner regarding third-party vendor obligations concerning Spirit.  The Bank cannot, of course, verify the accuracy or amount of such invoices given to it by Eisner, but will promptly forward the same to Spirit for such verification and payment or rejection thereof.

    By way of suggestion to resolve this complicated matter, the Bank suggests to Spirit that it consider the idea of paying into court, state, or federal the money that is determined to be due and payable to vendors, Eisner, and/or the Bank by means of a Complaint for Interpleader.  The stakeholder, Spirit, would name all vendors, etc. as party defendants, give them notice of the suit, pay the money determined to be owed into court, and require the various claimants thereto to "fight it out in court" among themselves for the money.  See Fed. Rule Civ. Pro., 22 and Form 18 thereunder.

    If Spirit acts so as to plead interpleader in the Federal Court here in Maryland, this law firm would provide Spirit with full logistical support to get the case filed, notice given, etc. in a cooperative effort to get this thorny issue resolved.

    Please let me have your feelings and thoughts regarding the interpleader theory.

                          Very truly yours,

                          *Robert J. Parsons, II*

                          Robert J. Parsons, II

RJP,II/mme
cc:  Robert A. Altieri

**EXHIBIT**

M

# February 28 Reconcilation

| Amount | Invoice | Invoice Date | True Value | Notes |
|---|---|---|---|---|
| $710.00 | 81648020884 | 10/19/2006 | $710.00 | |
| $26,400.00 | 81648220849 | 10/13/2006 | $26,400.00 | |
| $1,360.00 | 81648320805 | 10/3/2006 | $1,360.00 | |
| $14,025.00 | 81648420802 | 10/3/2006 | $14,025.00 | |
| $279,958.00 | 81648720803 | 10/3/2006 | $279,958.00 | |
| $12,452.41 | 81969720987 | 11/1/2006 | $12,452.41 | |
| ($10,583.50) | 81969821015 | 11/7/2006 | ($10,583.50) | |
| $4,560.38 | 81969920988 | 11/1/2006 | $4,560.38 | |
| $710.00 | 81970020975 | 10/31/2006 | $710.00 | |
| $16,678.77 | 81970120990 | 11/1/2006 | $16,678.77 | |
| ($12,887.92) | 81970221013 | 11/7/2006 | ($12,887.92) | |
| ($5,355.26) | 81970321014 | 11/7/2006 | ($5,355.26) | |
| $279,217.88 | 81981620970 | 10/30/2006 | $120,994.41 | Payment through Nov 13 based on Eisner dissolving (invoice amounts outstanding beyond that date paid by Siquis) |
| $26,400.00 | 81981720971 | 10/30/2006 | $8,800.00 | Payment through Nov 10 based on Eisner dissolving (no services were rendered beyond this date) |
| $363.97 | 81981820992 | 11/1/2006 | $363.97 | |
| | | | **$458,186.26** | |

EXHIBIT M

| Vendor | Date | Invoice | Check # | Date | Amount | | |
|---|---|---|---|---|---|---|---|
| EISNER COMMUNICATIONS | 11/2/2005 | 17376-0 | 245485 | 9/26/2005 | $5,040.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 18076-0 | 249632 | ######## | $4,800.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 18075-0 | 249632 | 12/6/2005 | $4,800.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 18151-0 | 249632 | ######## | $9,983.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 18251-0 | 249632 | ######## | ######## | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 18252-0 | 249632 | ######## | ######## | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 18340-0 | 249632 | ######## | $760.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2006 | 17929-0 | 250521 | ######## | ######## | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2006 | 17980-0 | 250521 | ######## | $2,640.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2006 | 18052-0 | 250521 | ######## | ######## | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2006 | 18059-0 | 250521 | ######## | ######## | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2006 | 18110-0 | 250521 | ######## | ######## | CK | VO |
| EISNER COMMUNICATIONS | 1/19/2006 | 18334-0 | 250960 | ######## | ######## | CK | VO |
| EISNER COMMUNICATIONS | 1/26/2006 | 18530-0 | 251845 | 1/6/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 1/26/2006 | 18528-0 | 251845 | 1/6/2006 | $460.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/26/2006 | 18512-0 | 251845 | 1/6/2006 | $460.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/2/2006 | 18506-0 | 252592 | 1/3/2006 | $4,080.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/9/2006 | 18418-0 | 252916 | ######## | ######## | CK | VO |
| EISNER COMMUNICATIONS | 2/9/2006 | 18527-00 | 252916 | 1/6/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 2/16/2006 | 18740-0 | 253558 | 1/12/2006 | $4,800.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 18903-0 | 254393 | 2/1/2006 | $388.97 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 18789-0 | 254393 | 1/23/2006 | $89.99 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 18790-0 | 254393 | 1/23/2006 | $89.99 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 18928-0 | 254393 | 2/3/2006 | $229.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 18929-0 | 254393 | 2/3/2006 | $134.99 | CK | VO |
| EISNER COMMUNICATIONS | 3/9/2006 | 18930-0 | 255213 | 1/25/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 3/9/2006 | 18855-0 | 255213 | 1/25/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 3/9/2006 | 18851-0 | 255213 | 1/24/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 3/9/2006 | 18819-0 | 255213 | 1/11/2006 | $1,042.10 | CK | VO |
| EISNER COMMUNICATIONS | 3/16/2006 | 18737-0 | 256098 | 2/9/2006 | $460.00 | CK | VO |
| EISNER COMMUNICATIONS | 3/16/2006 | 19034-0 | 256098 | 2/3/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 3/16/2006 | 18927-0 | 256098 | 1/31/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 3/16/2006 | 18896-0 | 256098 | 2/9/2006 | $324.96 | CK | VO |
| EISNER COMMUNICATIONS | 3/23/2006 | 19033-0 | 256693 | 2/9/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 3/23/2006 | 19032-0 | 256693 | 2/9/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 4/6/2006 | 19361-0 | 257898 | 3/15/2006 | $1,344.74 | CK | VO |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EISNER COMMUNICATIONS | 4/6/2006 | 257898 | 19360-0 | 3/15/2006 | $146.35 | CK | VO |
| EISNER COMMUNICATIONS | 4/6/2006 | 257898 | 19333-0 | 3/14/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/6/2006 | 257898 | 19332-0 | 3/14/2006 | $250.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/13/2006 | 258484 | 19365-0 | 3/15/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 4/13/2006 | 258484 | 19367-0 | 3/15/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 4/13/2006 | 258484 | 19366-0 | 3/15/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 4/20/2006 | 259193 | 19401-0 | 3/23/2006 | $250.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/20/2006 | 259193 | 19399-0 | 3/23/2006 | $8,600.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/20/2006 | 259193 | 19400-0 | 3/23/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19094-0 | 2/16/2006 | $89.99 | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19165 | 2/23/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19166 | 2/23/2006 | $224.98 | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19188-0 | 2/27/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19189-0 | 2/27/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19364-0 | 3/15/2006 | ######## | CK | AD |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19363-0 | 3/15/2006 | ######## | CK | AD |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19362-0 | 3/15/2006 | ######## | CK | AD |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19331-0 | 3/15/2006 | ######## | CK | AD |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19555 | 4/17/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19556 | 4/17/2006 | $159.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19465 | 3/31/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19464 | 3/31/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19460 | 3/29/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19518 | 4/12/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 5/18/2006 | 261415 | 19704 | 5/3/2006 | $159.99 | CK | VO |
| EISNER COMMUNICATIONS | 5/18/2006 | 261415 | 19703 | 5/3/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 5/18/2006 | 261415 | 19702 | 5/3/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 5/18/2006 | 261415 | 19701 | 5/3/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 5/18/2006 | 261415 | 19471 | 4/4/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19884 | 6/1/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19896 | 6/1/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19897 | 6/1/2006 | $134.99 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19853 | 5/26/2006 | $159.00 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19852 | 5/26/2006 | $129.00 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19898 | 6/1/2006 | ######## | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20127 | 6/28/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20126 | 6/28/2006 | $710.00 | CK | VO |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20125 | 6/28/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20124 | 6/28/2006 | ###### | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20123 | 6/28/2006 | $846.97 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20121 | 6/28/2006 | $1,266.93 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20120 | 6/28/2006 | $124.99 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20119 | 6/28/2006 | $124.99 | CK | VO |
| EISNER COMMUNICATIONS | 7/27/2006 | 667723 | 20118 | 7/7/2006 | $140.00 | CK | VO |
| EISNER COMMUNICATIONS | 7/27/2006 | 668456 | 20257 | 7/7/2006 | $40.00 | CK | VO |
| EISNER COMMUNICATIONS | 8/10/2006 | 668456 | 20255 | 7/26/2006 | ###### | CK | VO |
| EISNER COMMUNICATIONS | 8/10/2006 | 670052 | 20326 | 7/26/2006 | $134.99 | CK | VO |
| EISNER COMMUNICATIONS | ###### | 670052 | 20324 | 7/26/2006 | $1.65 | CK | VO |
| EISNER COMMUNICATIONS | ###### | 670052 | 20325 | 8/10/2006 | $65.24 | CK | VO |
| EISNER COMMUNICATIONS | ###### | 673191 | 20422 | 8/10/2006 | $1,054.97 | CK | VO |
| EISNER COMMUNICATIONS | ###### | 673191 | 20423 | 8/10/2006 | $79.99 | CK | VO |
| EISNER COMMUNICATIONS | ###### | 673191 | 20424 | 8/18/2006 | $422.00 | CK | VO |
| EISNER COMMUNICATIONS | ###### | 673191 | 20491 | 8/18/2006 | ###### | CK | AD |
| EISNER COMMUNICATIONS | ###### | 673577 | 20489 | 8/18/2006 | ###### | CK | AD |
| EISNER COMMUNICATIONS | ###### | 673577 | 20487 | 8/25/2006 | ###### | CK | AD |
| EISNER COMMUNICATIONS | ###### | 673577 | 20524 | 8/31/2006 | ###### | CK | VO |
| EISNER COMMUNICATIONS | ###### | 673577 | 20582 | 9/8/2006 | $234.97 | CK | VO |
| EISNER COMMUNICATIONS | ###### | 673577 | 20608 | 9/8/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | ###### | 673577 | 20610 | 8/10/2006 | ###### | CK | VO |
| EISNER COMMUNICATIONS | ###### | 673577 | 20425 | 8/10/2006 | ###### | CK | AD |
| EISNER COMMUNICATIONS | ###### | 673577 | 20429 | 8/10/2006 | ###### | CK | AD |
| EISNER COMMUNICATIONS | ###### | 673577 | 20432 | 8/21/2006 | ###### | CK | AD |
| EISNER COMMUNICATIONS | ###### | 673577 | 20498 | 8/18/2006 | ###### | CK | AD |
| EISNER COMMUNICATIONS | ###### | 673577 | 20495 | 8/18/2006 | ###### | CK | AD |
| EISNER COMMUNICATIONS | ###### | 673577 | 20493 | | ###### | CK | AD |

GRAND TOTAL PAID ######

§JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS
Spirit Airlines, Inc.

CIV-ALTONAGA

## DEFENDANTS
24/7 Real Media, Inc., et al.

(b) County of Residence of First Listed Plaintiff  Miramar, Florida
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  New York, New York
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Anthony J. Carriuolo, Esq., Berger Singerman, P.A.
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, Florida 33301; (954) 525-9900

MAGISTRATE JUDGE
TURNOFF

Attorneys (If Known)

**07-60399**

(d) Check County Where Action Arose:  ☐ MIAMI-DADE  ☐ MONROE  ☒ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

0:07cr 60399-@ltonaga
Turnoff

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | PERSONAL PROPERTY | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | LABOR | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | FEDERAL TAX SUITS | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | 26 USC 7609 | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☐ NO     b) Related Cases ☐ YES ☐ NO
JUDGE                              DOCKET NUMBER

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 3/20/07

FOR OFFICE USE ONLY
AMOUNT 350.00     RECEIPT # 539163     IFP

## February 28 Reconciliation

| Amount | Invoice | Invoice Date | True Value | Notes |
|---|---|---|---|---|
| $710.00 | 81648020884 | 10/19/2006 | $710.00 | |
| $26,400.00 | 81648220849 | 10/13/2006 | $26,400.00 | |
| $1,360.00 | 81648320805 | 10/3/2005 | $1,360.00 | |
| $14,025.00 | 81648420802 | 10/3/2006 | $14,025.00 | |
| $279,958.00 | 81648720803 | 10/3/2006 | $279,958.00 | |
| $12,452.41 | 81969720987 | 11/1/2006 | $12,452.41 | |
| ($10,583.50) | 81969821015 | 11/7/2006 | ($10,583.50) | |
| $4,560.38 | 81969920988 | 11/1/2006 | $4,560.38 | |
| $710.00 | 81970020975 | 10/31/2006 | $710.00 | |
| $16,678.77 | 81970120990 | 11/1/2006 | $16,678.77 | |
| ($12,887.92) | 81970221013 | 11/7/2006 | ($12,887.92) | |
| ($5,355.26) | 81970321014 | 11/7/2006 | ($5,355.26) | |
| $279,217.88 | 81981620970 | 10/30/2006 | $120,994.41 | Payment through Nov 13 based on Eisner dissolving (invoice amounts outstanding beyond that date paid by Siquis) |
| $26,400.00 | 81981720971 | 10/30/2006 | $8,800.00 | Payment through Nov 10 based on Eisner dissolving (no services were rendered beyond this date) |
| $363.97 | 81981820992 | 11/1/2006 | $363.97 | |
| | | | $458,186.26 | |

EXHIBIT M

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EISNER COMMUNICATIONS | 11/2/2005 | 245485 | 17376-0 | 9/26/2005 | $5,040.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 249632 | 18076-0 | 11/29/2005 | $4,800.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 249632 | 18075-0 | 11/29/2005 | $4,800.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 249632 | 18151-0 | 12/6/2005 | $50,000.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 249632 | 18251-0 | 12/13/2005 | $9,983.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 249632 | 18262-0 | 12/13/2005 | $25,000.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/3/2006 | 249632 | 18340-0 | 12/22/2005 | $14,061.92 | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2006 | 250521 | 17929-0 | 11/15/2005 | $124,000.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2005 | 250521 | 17980-0 | 11/16/2005 | $760.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2006 | 250521 | 18052-0 | 11/28/2005 | $26,400.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2006 | 250521 | 18059-0 | 11/28/2005 | $2,640.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/12/2006 | 250521 | 18110-0 | 11/30/2005 | $37,638.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/19/2006 | 250960 | 18334-0 | 12/22/2005 | $148,595.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/26/2006 | 251845 | 18530-0 | 1/6/2006 | $50,000.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/26/2006 | 251845 | 18528-0 | 1/6/2006 | $49,081.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/26/2006 | 251845 | 18512-0 | 1/6/2006 | $460.00 | CK | VO |
| EISNER COMMUNICATIONS | 1/26/2006 | 251845 | 18506-0 | 1/6/2006 | $460.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/2/2006 | 252692 | 18418-0 | 1/3/2006 | $12,079.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/9/2006 | 252916 | 18417-0 | 1/3/2006 | $4,080.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/9/2006 | 252916 | 18527-00 | 1/6/2006 | $31,186.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/16/2006 | 253558 | 18740-0 | 1/12/2006 | $19,500.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 254393 | 18903-0 | 2/1/2006 | $4,800.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 254393 | 18789-0 | 1/23/2006 | $388.97 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 254393 | 18790-0 | 1/23/2006 | $89.99 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 254393 | 18928-0 | 2/3/2006 | $89.99 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 254393 | 18929-0 | 2/3/2006 | $229.00 | CK | VO |
| EISNER COMMUNICATIONS | 2/23/2006 | 254393 | 18930-0 | 2/3/2006 | $134.99 | CK | VO |
| EISNER COMMUNICATIONS | 3/9/2006 | 255213 | 18855-0 | 1/25/2006 | $214,174.00 | CK | VO |
| EISNER COMMUNICATIONS | 3/9/2006 | 255213 | 18851-0 | 1/25/2006 | $26,400.00 | CK | VO |
| EISNER COMMUNICATIONS | 3/9/2006 | 255213 | 18819-0 | 1/24/2006 | $74,426.00 | CK | VO |
| EISNER COMMUNICATIONS | 3/9/2006 | 255213 | 18737-0 | 1/11/2006 | $1,042.10 | CK | VO |
| EISNER COMMUNICATIONS | 3/16/2006 | 256098 | 19034-0 | 2/9/2006 | $460.00 | CK | VO |
| EISNER COMMUNICATIONS | 3/16/2006 | 256098 | 18927-0 | 2/3/2006 | $25,500.00 | CK | VO |
| EISNER COMMUNICATIONS | 3/16/2006 | 256098 | 18896-0 | 1/31/2006 | $26,400.00 | CK | VO |
| EISNER COMMUNICATIONS | 3/16/2006 | 256098 | 19033-0 | 2/9/2006 | $324.96 | CK | VO |
| EISNER COMMUNICATIONS | 3/23/2006 | 256693 | 19032-0 | 2/9/2006 | $99,521.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/6/2006 | 257898 | 19361-0 | 3/15/2006 | $1,344.74 | CK | VO |

| | | | | | | |
|---|---|---|---|---|---|---|
| EISNER COMMUNICATIONS | 4/6/2006 | 257898 | 19360-0 | 3/15/2006 | $146.35 | CK | VO |
| EISNER COMMUNICATIONS | 4/6/2006 | 257898 | 19333-0 | 3/14/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/6/2006 | 257898 | 19332-0 | 3/14/2006 | $250.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/13/2006 | 258484 | 19365-0 | 3/15/2006 | $39,578.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/13/2006 | 258484 | 19367-0 | 3/15/2006 | $120,412.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/13/2006 | 258484 | 19366-0 | 3/15/2006 | $32,367.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/20/2006 | 259193 | 19401-0 | 3/23/2006 | $250.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/20/2006 | 259193 | 19389-0 | 3/23/2006 | $8,600.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/20/2006 | 259193 | 19400-0 | 3/23/2006 | $25,000.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19094-0 | 2/16/2006 | $89.99 | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19165 | 2/23/2006 | $106,689.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19166 | 2/23/2006 | $224.98 | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19188-0 | 2/27/2006 | $119,607.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19189-0 | 2/27/2006 | $26,400.00 | CK | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 13364-0 | 3/15/2006 | ($1,500.00) | AD | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19363-0 | 3/15/2006 | ($5,398.69) | AD | VO |
| EISNER COMMUNICATIONS | 4/27/2006 | 259665 | 19362-0 | 3/15/2006 | ($15,268.60) | AD | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19331-0 | 3/15/2006 | ($31,777.82) | AD | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19555 | 4/17/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19556 | 4/17/2006 | $159.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19465 | 3/31/2006 | $153,723.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19464 | 3/31/2006 | $26,100.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19460 | 3/29/2006 | $155,758.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/3/2006 | 259792 | 19518 | 4/12/2006 | $166,632.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/18/2006 | 261415 | 19704 | 5/3/2006 | $159.99 | CK | VO |
| EISNER COMMUNICATIONS | 5/18/2006 | 261415 | 19703 | 5/3/2006 | $135,987.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/18/2006 | 261415 | 19702 | 5/3/2006 | $270,692.00 | CK | VO |
| EISNER COMMUNICATIONS | 5/18/2006 | 261415 | 19701 | 5/3/2006 | $26,400.00 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19471 | 4/4/2006 | $26,400.00 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19894 | 6/1/2006 | $243,166.00 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19896 | 6/1/2006 | $123,170.00 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19897 | 6/1/2006 | $134.99 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19853 | 5/26/2006 | $159.00 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19852 | 5/26/2006 | $129.00 | CK | VO |
| EISNER COMMUNICATIONS | 6/15/2006 | 665367 | 19898 | 6/1/2006 | $26,400.00 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20127 | 6/28/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20126 | 6/28/2006 | $710.00 | CK | VO |

| Vendor | Date | Number | Invoice | Invoice Date | Amount | | |
|---|---|---|---|---|---|---|---|
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20125 | 6/28/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20124 | 6/28/2006 | $26,400.00 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20123 | 6/28/2006 | $235,122.00 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20121 | 6/28/2006 | $946.97 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20120 | 6/28/2006 | $1,266.93 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20119 | 6/28/2006 | $124.99 | CK | VO |
| EISNER COMMUNICATIONS | 7/13/2006 | 667723 | 20118 | 6/28/2006 | $124.99 | CK | VO |
| EISNER COMMUNICATIONS | 7/27/2006 | 668455 | 20257 | 7/7/2006 | $40.00 | CK | VO |
| EISNER COMMUNICATIONS | 7/27/2006 | 668455 | 20255 | 7/7/2006 | $40.00 | CK | VO |
| EISNER COMMUNICATIONS | 8/10/2006 | 670052 | 20326 | 7/26/2006 | $337,250.00 | CK | VO |
| EISNER COMMUNICATIONS | 8/10/2006 | 670052 | 20324 | 7/26/2006 | $134.99 | CK | VO |
| EISNER COMMUNICATIONS | 8/10/2006 | 670052 | 20325 | 7/26/2006 | $1.65 | CK | VO |
| EISNER COMMUNICATIONS | 10/13/2006 | 673191 | 20422 | 8/10/2006 | $65.24 | CK | VO |
| EISNER COMMUNICATIONS | 10/13/2006 | 673191 | 20423 | 8/10/2006 | $1,054.97 | CK | VO |
| EISNER COMMUNICATIONS | 10/13/2006 | 673191 | 20424 | 8/10/2006 | $79.99 | CK | VO |
| EISNER COMMUNICATIONS | 10/13/2006 | 673191 | 20491 | 8/18/2006 | $422.00 | CK | AD |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20489 | 8/18/2006 | ($3,401.74) | CK | AD |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20487 | 8/18/2006 | ($6,083.82) | CK | AD |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20524 | 8/25/2006 | $223,938.00 | CK | VO |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20582 | 8/31/2006 | $234.97 | CK | VO |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20608 | 9/8/2006 | $26,400.00 | CK | VO |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20610 | 9/8/2006 | $710.00 | CK | VO |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20425 | 8/10/2006 | ($9,769.19) | CK | AD |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20429 | 8/10/2006 | ($1,922.24) | CK | AD |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20432 | 8/10/2006 | ($15,375.37) | CK | AD |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20498 | 8/21/2006 | ($1,759.31) | CK | AD |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20495 | 8/18/2006 | ($15,702.00) | CK | AD |
| EISNER COMMUNICATIONS | 10/23/2006 | 673577 | 20493 | 8/18/2006 | ($1,596.00) | CK | AD |

GRAND TOTAL PAID    $3,679,539.27