**UNITED STATES DISTRICT COURT**
**FOR THE SOUNTHERN DISTRICT OF FLORIDA**
**MIAMI-DADE DIVISION**

CASE NO. 07-60399-CIV-ALTONAGA/TURNOFF

SPIRIT AIRLINES, INC.,

Plaintiff,

vs.

24/7 REAL MEDIA, INC., ADVERTISING. COM, INC. AMERICA ONLIN, INC., d/b/a AOL, BURST MEDIA CORPORATION, CARROLTON BANK, CHEAPFLIGHTS (USA), INC., ECHO TARGET, INC., HOTWIRE, INC., INTERCEPT INTERACTIVE, INC., PRICELINE.COM, LLC, RACKSPACE, LTD., SHERMANS TRAVEL, INC., SIDESTEP, INC, SMARTER LIVING, INC., et. al.,

Defendants.
_______________________________________/

**DEFENDANT VALUE CLICK INC.'S ANSWER**
**AND AFFIRMATIVE DEFENSES**

Defendant VALUECLICK, INC., ("ValueClick"), hereby files its Answer, and Affirmative Defenses to the Complaint For Interpleader filed by Plaintiff SPIRIT AIRLINES, INC. ("Spirit") and in response states as follows:

**ANSWER**

Defendant ValueClick denies each and every allegation not specifically admitted herein and answers each numbered paragraph of the Complaint as follows:

**PARTIES**

1. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 1 of the Complaint and, therefore, denies same.

2. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 2 of the Complaint and, therefore, denies same.

3. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 3 of the Complaint and, therefore, denies same.

4. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 4 of the Complaint and, therefore, denies same.

5. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 5 of the Complaint and, therefore, denies same.

6. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 6 of the Complaint and, therefore, denies same.

7. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 7 of the Complaint and, therefore, denies same.

8. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 8 of the Complaint and, therefore, denies same.

9. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 9 of the Complaint and, therefore, denies same.

10. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 10 of the Complaint and, therefore, denies same.

11. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 11 of the Complaint and, therefore, denies same.

12. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 12 of the Complaint and, therefore, denies same.

13. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 130 of the Complaint and, therefore, denies same.

14. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14 of the Complaint and, therefore, denies same.

15. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 15 of the Complaint and, therefore, denies same.

16. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 16 of the Complaint and, therefore, denies same.

17. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 17 of the Complaint and, therefore, denies same.

18. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 18 of the Complaint and, therefore, denies same.

19. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Complaint and, therefore, denies same.

20. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20 of the Complaint and, therefore, denies same.

21. Admitted.

22. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 22 of the Complaint and, therefore, denies same.

23. Defendant admits that Plaintiff purports to have brought an action for rule interpleader under Rule 22 of the Federal Rules of Civil Procedure, and for statutory interpleader under the Federal Interpleader Act, 28 U.S.C.A. § 1335.

24. Defendant admits that Plaintiff purports to have brought an action in which the amount in dispute exceeds the sum of $500.00, but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 24 of the Complaint and, therefore, denies the remaining allegations of Paragraph 24.

25. Defendant admits that Plaintiff purports to have brought an action in which the amount in dispute exceeds the sum of $75000.00, but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 25 of the Complaint and, therefore, denies the remaining allegations of Paragraph 25.

26. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 26 of the Complaint and, therefore, denies same.

## FACTS

### A. Agreement Between Eisner And Spirit Airlines

27. Defendant admits that Plaintiff has attached Exhibit A to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 27 of the Complaint and, therefore, denies same.

28. Defendant admits that Exhibit A speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 28 of the Complaint and, therefore, denies same.

29. Defendant admits that Exhibit A speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 29 of the Complaint and, therefore, denies same.

30. Defendant admits that Exhibit A speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 30 of the Complaint and, therefore, denies same.

31. Defendant admits that Exhibit A speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 31 of the Complaint and, therefore, denies same.

32. Defendant admits that Exhibit A speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 32 of the Complaint and, therefore, denies same.

33. Defendant admits that Exhibit A speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 33 of the Complaint and, therefore, denies same.

34. Defendant admits that Exhibit A speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 34 of the Complaint and, therefore, denies same.

35. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 35 of the Complaint and, therefore, denies same.

36. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 36 of the Complaint and, therefore, denies same.

**B. Communications Spirit Airlines Received From Carrollton Bank and Other Defendants**

37. Defendant admits that Exhibit B to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 37 of the Complaint and, therefore, denies same.

38. Defendant admits that Exhibit C to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 38 of the Complaint and, therefore, denies same.

39. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 39 of the Complaint and, therefore, denies same.

40. Defendant admits that Exhibit D to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 40 of the Complaint and, therefore, denies same.

41. Defendant admits that Exhibit D speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 41 of the Complaint and, therefore, denies same.

42. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 42 of the Complaint and, therefore, denies same.

43. Defendant admits that Exhibit E attached to the Compliant, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the

truth of the remaining allegations set forth in Paragraph 43 of the Complaint and, therefore, denies same.

44. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 44 of the Complaint and, therefore, denies same.

45. Defendant admits that Exhibit F attached to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 45 of the Complaint and, therefore, denies same.

46. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 46 of the Complaint and, therefore, denies same.

47. Defendant admits that Exhibit G attached to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 47 of the Complaint and, therefore, denies same.

48. Defendant admits that Exhibit G speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 48 of the Complaint and, therefore, denies same.

49. Defendant admits that Exhibit H attached to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 49 of the Complaint and, therefore, denies same.

50. Defendant admits that Exhibit I attached to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the

truth of the remaining allegations set forth in Paragraph 50 of the Complaint and, therefore, denies same.

51. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 51 of the Complaint and, therefore, denies same.

52. Defendant admits that Exhibit J attached to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 52 of the Complaint and, therefore, denies same.

53. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 53 of the Complaint and, therefore, denies same.

54. Defendant admits that Exhibit J speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 54 of the Complaint and, therefore, denies same.

55. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 55 of the Complaint and, therefore, denies same.

56. Defendant admits that Exhibit K attached to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 56 of the Complaint and, therefore, denies same.

57. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 57 of the Complaint and, therefore, denies same.

58. Defendant admits that Exhibit L attached to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the

truth of the remaining allegations set forth in Paragraph 58 of the Complaint and, therefore, denies same.

59. Defendant admits that Exhibit M attached to the Complaint, a document which speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 59 of the Complaint and, therefore, denies same.

60. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 60 of the Complaint and, therefore, denies same.

61. Defendant admits that Exhibit M speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 61 of the Complaint and, therefore, denies same.

62. Defendant admits that Exhibit M speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 62 of the Complaint and, therefore, denies same.

63. Defendant admits that Exhibit L attached to the Complaint, a document speaks for itself. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 63 of the Complaint and, therefore, denies same.

**C. Deposit of Funds**

64. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 64 of the Complaint and, therefore, denies same.

65. Admitted.

66. Defendant lacks knowledge sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 66 of the Complaint and, therefore, denies same.

67. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 67 of the Complaint and, therefore, denies same.

68. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 68 of the Complaint and, therefore, denies same.

69. Plaintiff's proffer calls for no response, and therefore, Defendant denies same.

**COUNT I**

**Interpleader Under 28 U.S.C.A. § 1335 And Rule 22 Of The Federal Rules Of Civil Procedure**

70. Defendant realleges and incorporates their responses to Paragraphs 1 through 69 of the Compliant as though fully set forth herein.

71. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 71 of the Complaint and, therefore, denies same.

72. Plaintiff's admission calls for no response and therefore, Defendant denies same.

73. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 73 of the Complaint and, therefore, denies same.

74. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 74 of the Complaint and, therefore, denies same.

75. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 75 of the Complaint and, therefore, denies same.

76. Plaintiff's proffer calls for no response, and therefore, Defendant denies same.

77. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 77 of the Complaint and, therefore, denies same.

78. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 78 of the Complaint and, therefore, denies same.

79. Denied.

80. Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 80 of the Complaint and, therefore, denies same.

In response to the unnumbered 'Wherefore' clause following Paragraph 80 of the Complaint, Defendant does not oppose Plaintiff's request that this Court determine through interpleader the competing or potentially competing claims of Defendant Value Click and all other persons named in the Complaint to the Eisner Funds, extinguishing with finality these claims and restraining all parties named as defendants in this action from instituting any other proceeding against Plaintiff in any other forum. Defendant denies that Plaintiff should be discharged of all liability in this action by depositing the Eisner Funds with the Court or that it is entitled to its reasonable attorneys' fees and costs associated with filing this interpleader action.

**AFFIRMATIVE DEFENSES**

As and for its Affirmative defenses, Defendant states as follows:

***First Affirmative Defense***
***Improper Party Joined***

1. Upon information and belief, it appears that Plaintiff Spirit Airlines, Inc. is referring at paragraph 49 of its Complaint, to an agreement that was entered into by Eisner Communications, Inc. ("Eisner") and Mediaplex, Inc. ("Mediaplex") and not ValueClick, Inc., despite the fact that Mediaplex is a wholly owned subsidiary of Value Click, Inc.

2. On November 18, 2005, Mediaplex entered into an agreement ("Contract") with Eisner to provide *inter-alia* access to the specific third party advertising tools known as MOJO technology services. (Exhibit "A" Contract between Eisner and Mediaplex).

3. In return for providing the above-stated services, Mediaplex was to be compensated by Eisner pursuant to the rates and terms enumerated in Exhibit "A" attached to the Contract, the MOJO Adserver Rate Card.

4. Pursuant to the terms of the Contract, Mediaplex billed Eisner for its services performed and was paid by Eisner until November, 2006, when it closed its business operations.

5. At this time there were three outstanding invoices unpaid by Eisner. (Composite Exhibit "B" Three Invoices from Mediaplex to Eisner).

6. Said invoices clearly state that the clients are Eisner Interactive/Spirit Air (see Composite Exhibit "B").

7. Pursuant to the invoices dated 7/31/2006, 9/30/2006, 10/31/2006, the outstanding payments due are $19,929.86; $ 2,582.12; and $10,317.97 respectively. (see Composite Exhibit "B").

8. Thus the total payment still outstanding from Eisner with regard to the Spirit account is $32,829.95.

9. Therefore, Spirit should have joined Mediaplex as a defendant, rather than ValueClick.

***Second Affirmative Defense***

Plaintiff is not entitled to recovery of reasonable attorney's fees and costs.

***Third Affirmative Defense***

The mere deposit of the Eisner Funds into the Court's registry should not alone relieve Plaintiff of any liability in this action.

***Fourth Affirmative Defense***

Defendant reserves the right to assert additional defenses or claims, which may become known during the course of discovery.

WHEREFORE, Defendant VALUECLICK, INC. respectfully requests that this Court:

(a) determine through interpleader that portion of the Eisner Funds which is due to its subsidiary Mediaplex, Inc.;

(b) extinguish with finality the claims to the Eisner Funds of all parties joined as defendants to this action;

(c) restrain all parties joined as defendants from instituting an action against Plaintiff to recover the Eisnser Funds in any other federal or state court; and

(d) order Plaintiff to drop ValueClick as a party and substitute Mediaplex, Inc. instead;

(e) grant Defendant such other relief as the Court deems just and proper.

Date: 10th, May, 2007

Case 1:07-cv-00341-SLR Document 62 Filed 05/29/2007 Page 14 of 35

Respectfully submitted,

CONCEPCION SEXTON & MARTINEZ
355 Alhambra Circle, Suite 1250
Coral Gables, Florida 33134
Tel: (305) 444-6669
Fax: (305) 444-3665
*Attorneys for Defendant*

By: ______________________
FRANCIS X. SEXTON, JR. ESQ.
Fla. Bar. No.: 345423
fsexton@cfclaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and conveyed electronically to all on the attached Service List this 10th day of May, 2007.

By: ______________________
FRANCIS X. SEXTON, JR. ESQ.
Fla. Bar. No.: 345423
fsexton@cfclaw.com

Concepción Sexton & Martinez, Attorneys at Law
355 Alhambra Circle Suite 1250 • Coral Gables, Florida 33134 • Tel. 305.444.6669 • Fax. 305.444.3665
www.cfclaw.com

14

**SERVICE LIST**

Anthony J. Carriuolo, Esq.
Attorney for Plaintiff
BERGER SINGERMAN
350 East Las Olas Blvd., Suite 1000
Ft. Lauderdale, Florida 33301.
acarriuolo@bergersingerman.com

Connie A. Lahn, Esq.
Lara O. Glaesman, Esq.
Attorney for Plaintiff
Fafinski Mark & Johnson, P.A.
775 Prairie Center Drive, Suite 400
Eden Prairie, MN 55344
lara.glaesman@fmilaw.com
connie.lahn@fmilaw.com

Steven J. Lachterman, P.A.
Attorney for Hotwire Inc.
Smarter Living Inc. & Tripadvisor LLC.
848 Brickell Avenue, Suite 750
Miami, FL 33131

T:\CFCLAW\CASES\U-Z\Valueclick\Spirit Airlines, Inc\Pleadings\Firms Pleadings\Complaints Answers Counterclaim\Def ValueClick's Answer To Complaint For Interpleader.doc

Concepción Sexton & Martinez, Attorneys at Law
355 Alhambra Circle Suite 1250 • Coral Gables, Florida 33134 • Tel. 305.444.6669 • Fax. 305.444.3665
www.cfclaw.com
15

Received: 11/18/05 1:50PM; 2124719599 -> MEDIAPLEX SALES1; Page 5
11/18/2005 05:32 FAX 2124719599 Mediaplex NYC 005

Mediaplex
177 Steuart Street, 6th Floor
San Francisco, CA 94105
Phone: 415-808-1900
Fax: 415-808-1901
www.mediaplex.com

**October 19, 2005**

**Mr. Michael Teitelbaum**
**Eisner Interactive - A Division of Eisner Communications, Inc.**
**509 South Exeter Street**
**Baltimore, MD 21202**

**Re: Mediaplex Agreement with Eisner Interactive - A Division of Eisner Communications, Inc. for the MOJO Technology Services**

Dear Mr. Teitelbaum:

Mediaplex, Inc. ("Mediaplex") thanks you for the opportunity to provide you with our MOJO ad serving technology. We are excited about our prospective collaboration, and we look forward to a long and mutually rewarding relationship with Eisner Interactive - A Division of Eisner Communications, Inc. ("Agency"). The purpose of this letter is to memorialize the terms of our agreement (the "Agreement").

**1. Mediaplex's Technology Services**

Mediaplex will provide access to the specific third-party advertising technology tools referenced in Exhibit A ("MOJO Technology Services").

**2. Implementation Training and Ongoing Training**

Mediaplex will provide initial implementation priced pursuant to Exhibit A (the "Rate Card"). Additional ongoing training shall be invoiced upon completion of training, which shall be due and payable upon receipt

**3. Compensation**

It is agreed that Agency shall receive pricing for use of Mediaplex's MOJO Technology Services pursuant to Exhibit A. Mediaplex will submit invoices monthly to Agency, based on impression levels reported by the MOJO system that shall be due and payable within thirty (30) days of its receipt by Agency. Agency shall be responsible for any and all charges and costs incurred by Mediaplex on behalf of Agency or Agency's Clients. In the event that any of Agency's Clients become unable to pay, insolvent or bankrupt, Agency will be solely responsible for any and all outstanding charges owing and due to Mediaplex as a result of the campaign.

EXHIBIT A

Mediaplex

Mediaplex's obligation to perform under the terms of this Agreement is contingent upon a showing by Agency of acceptable credit history. In the event Agency is unable to show acceptable credit history, Mediaplex and Agency may agree to alternate Compensation terms at the sole discretion of Mediaplex. In addition, if Agency cannot show a history of good credit, Mediaplex may cancel this Agreement at its sole discretion. Either party may terminate this Agreement with thirty (30) days prior written notice.

## 4. Technology and Licenses

This Agreement shall not be construed to grant any license under any trade secret, patent, patent application, industrial design, trademark, copyright, confidential process, formula, plan, computer program, data or other valuable confidential information or know-how of either party. Each party shall retain all right, title and interest in all of its proprietary property rights and Confidential Information, as defined below, both currently used and which may be developed and used in the future.

## 5. Service Levels

The MOJO Technology Products consist of MOJO Adserver, MOJO Publisher, and MOJO Mail. MOJO Adserver and MOJO Publisher serve banner advertisements. MOJO Mail provides email list management, email campaign configuration, and message delivery. Users access interfaces to configure campaigns and banners, as well as access performance reports. The MOJO Technology Products will be "available" at the following minimums:

a) <u>99% for MOJO Adserver and MOJO Publisher Ad Serving</u>

Ad serving is "available" if the MOJO Adserver or MOJO Publisher product successfully processes Ad Serving requests in no more than 2 seconds and performs the ad delivery as defined per the configuration in the MOJO Adserver or MOJO Publisher product.

b) <u>99% for MOJO Mail email message delivery</u>

MOJO Mail Email message delivery is "available" if one successful attempt to send all configured email messages is made within 24 hours of the creation of the email messages.

c) <u>95% for MOJO Adserver, MOJO Publisher, MOJO Mail Configuration and Reporting Interfaces</u>

The MOJO Adserver, MOJO Publisher, and MOJO Mail products contain web based interfaces for campaign, ad banner, and email message configuration, and for performance reporting. These interfaces will be "available" no less than 95% of the time for access by Agency or Agency's client.

In addition, performance reports available in the interfaces will be considered "available" if the reporting data presented to users is no more than 24 hours old for those reports processed in near-real time, hourly or daily. For reports processed on

Received: 11/18/05 1:51PM; 2124719599 -> MEDIAPLEX SALES1; Page 7
11/18/2005 05:33 FAX 2124719599 Mediaplex NYC 007

Mediaplex

weekly or monthly cycles, report data will be "available" if the report data is current as of the previous week or month.

If the above standards for the MOJO Technology Products are breached four (4) times in a six-month period, Agency will have the right to terminate this Agreement on 15 days notice. However, for the purposes of this provision, acceptable system down time shall include the following: (a) time required for reasonable routine system maintenance that is performed by Mediaplex for up to 4 hours each week; and (b) time resulting from technical malfunctions in Agency or Agency's client site systems.

Mediaplex will calculate the above percentages on a monthly basis. Mediaplex is not responsible for any damages, which may result from Mediaplex's MOJO Technology Services being unavailable if the unavailability of such services falls within the acceptable availability parameters of this Section 5.

## 6. Ownership of Data

Agency will retain the sole and exclusive right to use all data derived from its use of Mediaplex's Technology Services provided that Mediaplex may use and disclose the visitors data (other than personally identifiable information) derived from Agency's use of the MOJO Technology Services only for (1) Mediaplex's reporting purposes consisting of compilation of aggregated statistics about these technology tools (e.g., the aggregate number of ads delivered) that may be provided to customers, potential customers and the general public, and (2) if required by court order, law or government agency. Any re-marketing or other use of this data (excluding the exceptions listed above) by Mediaplex or Agency requires the explicit, written approval of the other party.

## 7. Relationship of the Parties and Term

The parties have agreed to work together as independent contractors. This Agreement shall commence on the first day it is signed by both parties (fax signatures are acceptable) (the "Effective Date") and shall run for a term of twelve months. Any termination of this Agreement will not affect Agency's obligations with respect to payment for any charges or costs already incurred as of the termination date. Mediaplex reserves the right to change or modify the terms and conditions of Exhibit A upon ninety (90) days written notice. This Agreement shall automatically renew for successive one-year terms if not terminated in writing by either party. Mediaplex reserves the right to modify, amend or curtail its privacy policy and opt-in requirement to conform to the Industry Best Practices and accommodate changes made by its Internet Services Providers from time to time.

## 8. Forecasting and Projecting

In order to effectively plan for infrastructure enhancements needed to service Agency's business, Mediaplex must regularly forecast and project the number of ad impressions to be served through its system. As such, Agency agrees to provide initial and regular (no less than on a monthly basis) projections of impression volume pursuant to Mediaplex's then current impression volume ad serving projections.

Mediaplex

Agency expressly acknowledges and agrees that Agency's adherence to the forecasts and projections requirement represents a material provision of this Agreement.

## 9. Press Releases/Publication

Each party may use the name of the other party in acknowledging the relationship between the two parties, provided that the confidentiality provision is strictly enforced. Press releases involving both parties (or which mention both parties) shall not be released without the consent of both parties. Notwithstanding the foregoing, it is anticipated that the parties may release an initial announcement regarding the substance of their relationship within fourteen (14) days of the Effective Date. Thereafter, it is anticipated that the parties will participate in joint press releases and announcements, and cooperate in the preparation of case studies and marketing materials, as mutually agreed upon. In addition, Agency agrees to opt-in and be a recipient of emails sent by Mediaplex from time to time concerning, among other things, Mediaplex Service updates and other related communications.

## 10. Confidentiality

Each party acknowledges and represents that during the performance contemplated by this Agreement such party may be provided with "Confidential Information" relating to the other party. As such, the parties hereby acknowledge and confirm that each will not disclose any Confidential Information of the other to any third-party without the others' prior written permission. For purposes of this Agreement, the term "Confidential Information" shall mean certain valuable Confidential Information, including without limitation, certain information, plans, target companies, customer information, business plans, marketing, sales and other related information, specifications, drawings, sketches, models, samples, data, financial information, contracts, vendors, employees, officers, directors, shareholders, notes, computer programs, documentation, and other technical and business information, in written, oral, graphic or other tangible form relating to Mediaplex's and Agency's products, systems, services, and technology that: 1) the parties take measures to protect; 2) could be valuable to the competitor of either party; and, 3) is not publicly available.

The parties agree to hold all Confidential Information disclosed hereunder by the other party in confidence from the date of its receipt hereunder and to use the same degree of care, but no less than a reasonable degree of care, to prevent any unauthorized disclosure or publication thereof as they use to protect their own Confidential Information of a like nature. The parties agree not to disclose or divulge any of such Confidential Information to anyone except their employees or other third-parties who have a need to know such information and are directly involved in the performance of the activities contemplated by this Agreement. The parties also agree to make all necessary and appropriate efforts to safeguard the Confidential Information that it receives from the other party from disclosure to anyone other than as permitted hereby. The parties further agree not to use any of the Confidential Information disclosed hereunder by the other party for any purpose other than to pursue the business transaction(s) contemplated herein without the prior written consent of the disclosing party. All Confidential Information disclosed pursuant to this Agreement and all documents relating thereto disclosed hereunder shall remain

Received: 11/18/05 1:51PM; 2124719599 -> MEDIAPLEX SALES1; Page 9
11/18/2005 05:34 FAX 2124719599 Mediaplex NYC 009

Mediaplex

the property of the disclosing party and shall be returned promptly by the receiving party to the disclosing party together with any copies thereof upon receipt by the receiving party of a written request from the disclosing party therefore which the disclosing party may make at any time and from time to time. Each party acknowledges that the other may be currently or in the future developing information internally or receiving information that is similar to the Confidential Information described herein. As such, nothing herein shall prohibit a recipient party from developing or having developed for it designs, drawings, products, inventions, concept or techniques contemplated by or embodied in the Confidential Information that compete with the disclosing party provided that such development is done independently and does not violate any obligations under this Agreement. The terms of this Agreement shall not be construed to limit either party's right to independently develop or acquire products without use of Confidential Information.

Except as otherwise expressly permitted hereunder, no license for any confidential information or know-how is granted to the receiving party or can be implied by disclosure to the receiving party by the disclosing party of any of the disclosing party's Confidential Information hereunder. Each party acknowledges and agrees that, in the event of a breach by the other party of any of the provisions of this Confidentiality section, the non-breaching party would have no adequate remedy and that such breach may result in irreparable injury to such party for which monetary damages alone would not be an adequate remedy. Therefore, each party agrees that in the event of a breach or threatened breach of any of such provisions, the non-breaching party shall be entitled to injunctive or other equitable relief as a remedy therefore, without the necessity of posting a bond with respect thereto. Any such relief awarded shall be in addition to, and not in lieu of, any appropriate relief which may be awarded in the form of monetary damages, and the non-breaching party shall be entitled to monetary damages to the fullest permitted under applicable law. If any action or proceeding at law or in equity (including, without limitation, an arbitration or mediation) is necessary to enforce or interpret the terms of this Confidentiality section, the prevailing party shall be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

## 11. Representations and Warranties

Each party represents and warrants that (i) such party has all of the requisite right, title and authority to enter into this Agreement and to perform the acts required of it hereunder; and (ii) the entry into the Agreement and performance hereunder do not and will not violate any agreement of such party or by which such party is bound. Further, it is agreed that Agency is responsible for the accuracy, completeness and ownership of any and all information provided to Mediaplex and similarly, that Agency will be responsible for ensuring the acquisition of all required consents in respect of the use of all such information, including, without limitation, all intellectual property contained in these materials. Agency represents and warrants that any information provided to Mediaplex, or action taken pursuant to this Agreement, will not: (i) infringe on any third-party's copyright, patent, trademark, trade secret or other proprietary rights, or rights to privacy or publicity; (ii) violate any applicable law, statute, ordinance or regulation ("Legal Requirement"), including but not limited to any Legal Requirement relating to email marketing; (iii) be

Received: 11/18/05 1:52PM; 2124719599 -> MEDIAPLEX SALES1; Page 10
11/18/2005 05:34 FAX 2124719599 Mediaplex NYC 010

defamatory or trade libelous; or (iv) violate any laws regarding unfair trade competition, anti-discrimination or false advertising.

## 12. Indemnification

Each party agrees to indemnify and hold the other party and its respective affiliates, employees, officers, agents, directors and representatives, harmless from any and all claims, liabilities, damages, actions, or causes of action, either at law or in equity, including without limitation reasonable attorneys' fees, costs related to in-house counsel time, court costs and witness fees (collectively "Losses") attributable to, arising out of, or in connection with, its own breach or violation or alleged breach or violation of any representations and warranties or obligations herein, or any other third-party claim with respect thereto.

## 13. Limitation of Liabilities

LIMITATIONS ON LIABILITY: IN NO EVENT SHALL MEDIAPLEX BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY INCLUDING, DAMAGES RELATING TO LOSS OF PROFITS, INCOME, GOODWILL, OR OF ANY NATURE. IN NO EVENT SHALL MEDIAPLEX'S TOTAL OBLIGATIONS AND/OR OR LIABILITY FOR MONETARY DAMAGES UNDER THIS AGREEMENT EXCEED THE AMOUNTS RECEIVED FROM AGENCY UNDER THIS AGREEMENT, EVEN IF MEDIAPLEX HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 14. Force Majeure

If either party shall be delayed, prevented, or restricted in its performance of any obligation under this Agreement due to causes or events beyond its reasonable control, including, but not limited to, Internet disruptions, viruses, network delays, acts of God, acts of terrorism, fire, and governmental restriction, such delay or non-performance shall be excused and not considered a breach of this Agreement.

## 15. Advertising Content

Mediaplex reserves the right to review all advertising content for full service clients. In the event any content is deemed inappropriate, obscene or objectionable, Mediaplex reserves the right to reject such content outright or request that the client traffic it on their own. Such determination shall be made at Mediaplex's sole discretion.

## 16. Choice of Law and Venue

It is agreed that any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement, shall be exclusively governed by California law without respect to conflict of law provisions.

Received: 11/18/05 1:52PM; 2124719599 -> MEDIAPLEX SALES1; Page 11
11/18/2005 05:34 FAX 2124719599 Mediaplex NYC ☑011

Mediaplex

The parties further agree to submit to personal jurisdiction in the courts of the State of California as such courts shall serve as the exclusive venue for all dispute resolution. The prevailing party of any litigated dispute arising out of or relating in any way to this Agreement shall receive its reasonable attorneys' fees, together with its costs and expenses incurred resolving the dispute, as part of the judgment.

## 17. MOJO Mail Privacy Protection and Use of Data

MOJO Mail is an **opt in** email product which only may be used to deliver email to Web users who have opted in to receive promotional offers through an online relationship marketing program. Each email address provided to Mediaplex by Agency must be a United States email address that was received by the Agency in an opt in fashion whereby Web user has opted in to receive email messages from the Agency and sending emails to such address would not constitute a mobile service message as defined by the CAN-SPAM Act (Public Law 108-187). Mediaplex will not deliver emails to addresses that were received by Agency and/or Agency's client based on Web users' failure to **opt out** of promotional offers. It is incumbent upon the Agency to ensure, and the Agency hereby represents, that (i) the **opt in** email list provided to Mediaplex fully complies with its own privacy policy as well as Mediaplex's privacy policy (included at the Mediaplex web site at www.Mediaplex.com and incorporated into the terms and conditions of this Agreement by this reference), specifically with the MOJO Mail **opt in** requirement and (ii) the CAN-SPAM Act, any other laws applicable to commercial email and/or any regulations or orders relating thereto. Further, as Web users opt out of the Agency's email program, such opt out information must be promptly provided to Mediaplex by Agency within two (2) business days to ensure that these Web users do not receive any email after the opt out date. Agency agrees to indemnify and hold Mediaplex and its respective affiliates, employees, officers, agents, directors and representatives, harmless from all allegations, claims, actions, causes of action, lawsuits, damages, liabilities, obligations, costs and expenses (including without limitation reasonable attorneys' fees, costs related to in-house counsel time, court costs and witness fees) (collectively "Losses") attributable to, arising out of or in connection with Agency's breach or violation or alleged breach or violation of this **opt in** representation and warranties or obligations associated thereby,. Mediaplex reserves the right to modify, amend or curtail its privacy policy and opt in requirement to conform to the Industry Best Practices and accommodate changes made by its Internet Service Providers from time to time.

## 18. Opt-Out Management

Mediaplex can handle all opt out activity and email list management on behalf of the Agency for an up front fee to be agreed between the parties. Mediaplex does not send, participate in or condone the use of unsolicited commercial email (commonly referred to as "SPAM").

## 19. Entire Agreement

This Agreement embodies the entire agreement between the parties, supersedes all prior oral and written agreements, and may not be amended or modified except by an agreement signed by both parties. The law of the State of California shall govern

Received: 11/18/05 1:52PM; 2124719599 -> MEDIAPLEX SALES1; Page 12
11/18/2005 05:35 FAX 2124719599 Mediaplex NYC 012

Mediaplex

this Agreement. This Agreement may be executed in any number of counterparts and facsimile copies, each of which shall be deemed an original, and all of which together shall be deemed one and the same instrument. In the event that any of the provisions included herein are held to be unenforceable, the remaining portions of the Agreement will remain in full force and effect. Any notice or report required or permitted by this Agreement shall be made by personal delivery, mail or fax to the then operating fax number or business address to the attention of Elizabeth Ure, if to Mediaplex, or to Michael Teitelbaum, if to Agency.

If this Agreement as written is satisfactory to you, please sign it and fax us a copy for our file. Please retain the original for your files.

Regards,

MEDIAPLEX, INC.

**AGREED TO AND ACCEPTED:**

Mediaplex, Inc.

By: [signature]

Title: GM

Date: 11/18/05

Eisner Interactive - A Division of Eisner Communications, Inc.

By: [signature]

Title: Campaign Manager

Date: 11/18/2005

Received: 11/18/05 1:49PM; 2124719599 -> MEDIAPLEX SALES1; Page 2
11/18/2005 05:32 FAX 2124719599 Mediaplex NYC 002

Mediaplex

# Exhibit A: MOJO Adserver Rate Card

## Terms

This document, presented to Eisner Interactive on November 16, 2005 by Nancy Hall, provides Eisner Interactive with the pricing structure for Mediaplex technology and services. All rates in this contract expire within 60 days of original presentation to Eisner Interactive if not signed and received by Mediaplex.

Prior to any full-service campaign or custom work, Mediaplex will provide Eisner Interactive with a detailed Statement of Work estimating all campaign costs as outlined in this Rate Card.

## MOJO Adserver Implementation

In an ASP Self Service Model:

Implementation services enable Eisner Interactive to use MOJO Adserver to manage ad serving campaigns in an ASP environment. This service includes:

- Assigned Account Manager
- Setup of user-defined access to the MOJO Adserver interface and to MOJO Reports
- Customized training program
- Hands-on assistance implementing and testing <15> ROI tags
- Set up, training and support of MediaDirector
- Added Technical Support assistance during trafficking of initial campaigns

| Item | Rate |
|---|---|
| One-Time Implementation Fee | $2500 ASP |

## MOJO Adserver Pricing

| Yearly Impressions (MM) | CPM |
|---|---|
| 0-100 MM | $0.10 |
| 101 – 200 MM | $0.09 |
| 201 – 300 | $0.07 |
| 300+ | Custom |

Confidential Information | Not to be disclosed, pursuant to the Nondisclosure Agreement

Received: 11/18/05 1:50PM; 2124719599 -> MEDIAPLEX SALES1; Page 3
11/18/2005 05:32 FAX 2124719599 Mediaplex NYC 003

MOJO Adserver Rate Card

| Item | Rate |
|---|---|
| Click-Only Tracking | $0.01 per click |

| Item | Rate |
|---|---|
| **Monthly Minimum**<br>*Monthly minimum will commence as of December 2005 | $2,000 |

- Click-only tracking is defined as the tracking and reporting of clicks when no impressions are served. (For example clicks in emails and/or hard-coded text links)
- Monthly invoices are based on actual impressions served and click-only activity
- Tracer tags inserted in creative served by another system count towards impression volume

## MOJO Adserver Optional Services

| Item | Rate |
|---|---|
| **Standard Trafficking Services**<br>Including GIF, text links and click tracking. Up to 20 ad serving rules and 20 creatives included, additional rules $10 per rule per placement. $250 per hour fee for creatives that do not meet MFAA standards. | $50 per placement |
| **Advanced Trafficking Services**<br>Including all rich media including but not limited to Flash, HTML, Java Script and Java Applets. Up to 20 ad serving rules and 20 creatives included, additional rules $10 per rule per placement. $250 per hour fee for creatives that do not meet MFAA standards | $75 Per placement |
| **eBusiness Messaging**<br>Dynamic content from a client's live data source served in creative templates.<br>See attached Exhibit B, SOW | Set-up fee and monthly maintenance fee based upon requirements |
| **Optimizer**<br>Automatic optimization of creative based upon performance. | Included in CPM pricing above |
| **ROI Tags**<br>Additional back-end conversion tags provide click-through and view-through conversion tracking beyond those included in the initial implementation. | $100 per ROI tag, one-time fee |
| **Organic Search**<br>Track and report unduplicated organic and paid search results | $5000 Set up<br>CPM (quoted above) based on tracking pixel volume |

Received: 11/18/05 1:50PM; 2124719599 -> MEDIAPLEX SALES1; Page 4
11/18/2005 05:32 FAX 2124719599 Mediaplex NYC ☑004

## MOJO Adserver Rate Card

| Item | Rate |
|---|---|
| **Custom Reports** | TBD based upon scope of work |
| **Performance Data Feed**<br>Automated delivery of detailed campaign performance data. | $2,500 set-up, one-time fee<br>$750 monthly fee per Client |
| **Training**<br>Additional web-based training is available. | $250 per hour |
| **Engineering Services**<br>Advanced engineering services are available as needed including: custom database configuration, ad hoc reporting or analysis requests and custom projects. | $250 per hour |
| **Technical Services**<br>Technical services are available as needed including: assistance trafficking, custom datafeed spec and set up, testing of custom features and rush jobs. | $125 per hour for Spirit Airline work<br>$150 per hour any other Eisner clients |

## Approvals

[signature] 11/18/05

Mediaplex Date

[signature] 11/18/2005

Eisner Interactive Date

eisner interactive

**Eisner Interactive Insertion Order**

**Insertion Ord** 7155 July Media Plan
**Today's Date** 07/26/06

**Web Property**
Valueclick

**Advertising Representative**
Alex Benqzon

**Phone** 212-471-9551 **Fax** 775-257-1519 **Email** abengzon@valueclick.com

**Traffic**

**Phone** **Fax** **Email**

**ADVERTISER**

**Name:** Spirit Airlines
**Address:** 2800 Executive Way
**City:** Miramar
**State:** FL
**Zip:** 33025

**Contact:** Robert Schroeter - Director, Interactive Marketing
**Phone:** (954) 628-4904
**Fax:** (954) 447-8084
**E-Mail:** bobby.schroeter@spiritair.com

**AGENCY**

**Name** Eisner Interactive
**Address** 509 South Exeter Street
**City** Baltimore
**State** MD
**Zip** 21202

**Contact** Kirsten Ellison
**Phone** (410) 843-3266
**Fax** (410) 625-2497
**E-Mail** kirsten@eisnerinteractive.com

**Traffic** Steve Gladstone
**Phone** (410) 843-3066
**Fax** (410) 843-4447
**E-Mail** steven@eisnerinteractive.com

| Element | Flight Dates | Impressions | Placement | CPM | Net Cost | Geo-Targeting | Frequency Caps |
|---|---|---|---|---|---|---|---|
| 728x90, 120x600, 160x600, 300x250, 468x60 | August 1 - 31, 2006 | 16,000,000 | RON | $1.25 | $20,000.00 | Detroit 12%, New York 12%, Fort Lauderdale/Miami 12%, Orlando 10%, Atlantic City 8%, Tampa 8%, Atlanta 5%, Chicago 5%, Fort Myers 5%, Providence, RI 5%, Washington, DC 5%, West Palm Beach 5%, Los Angeles 2%, Las Vegas 2%, Myrtle Beach 2%, San Francisco 2%; 50% budget spend Tuesday, 25% budget spend Wednesday, 25% budget spend Thursday | 3/24 hr |

**Bill To:** Agency (Net)

**Contact** The Finance Department
**Phone** 410-843-3014
**Fax** 410-685-0387
**E-Mail** kgrevey@eisner-communications.com

**Total Cost:** $20,000.00
**Total Impressions** 16,000,000
**Average CPM:** $1.25

**Notes:** This Insertion Order incorporates and includes Eisner Interactive's Standard Terms and Conditions, attached hereto.

Approval: [signature] Date 7/26/2006

Eisner Interactive

On Behalf of (Agency or Advertiser): ______

Approval ______ Date ______
On Behalf of: Web Property

## Terms and Conditions

**Introduction.**

The matters set forth below specify the terms and conditions agreed to by Elsner Communications, Inc., and Valueclick, hereinafter referred to as "Web Property."

**Definitions:** The following terms from this statement of "Terms and Conditions" are defined as follows:

**Advertiser** - The party whose Creative Property Elsner will display on Web Property's website and/or network in accordance with these Terms and Conditions and Elsner's Insertion Order.

**Campaign** - An advertising promotion for a third party Advertiser undertaken by Elsner that utilizes Web Property's website(s) and/or network as the medium to communicate the advertising promotion to the public.

**CPA Campaign** - "Cost per action campaign" or "CPA" - a campaign where the cost of such campaign to Elsner (for Advertiser) is determined according to the number of identified actions taken by visitors on the Advertiser's website.

**CPC Campaign** - "Cost per click campaign" or "CPC" - a campaign where the cost of such campaign to Elsner (for Advertiser) is determined according to the number of clicks to Advertiser's web site as measured by a Third Party Ad Server designated by Elsner.

**CPM Campaign** - "Cost per thousand campaign" or "CPM" - a campaign where the cost of such campaign to Elsner (for Advertiser) is determined per thousand impressions as measured by a Third Party Ad Server designated by Elsner.

**Creative Property** - All materials (written, drawn, electronically generated or otherwise), submitted by Elsner (for Advertiser) to Web Property to be displayed on Web Property's website(s) and/or network in accordance with the Insertion Order.

**Insertion Order** - An order issued that describes: (a) the Creative Property Elsner will display on the Web Property's website or network; (b) the term or other duration (quantity of clicks, impressions, or actions) that Advertiser's Creative Property will be posted on Web Property; (c) specifications establishing where and how the Creative Property will be displayed; and, (d) the cost associated with displaying the Creative Property for the specified term.

**Third Party Ad Server** - An entity designated by Elsner to monitor, count and/or ascertain the number of clicks, impressions and/or actions made by visitors to Advertiser's Creative Property, as displayed on Web Property.

**Web Property** - The contractee to this Agreement, comprised of a website or a network of websites on which Elsner displays Advertiser's Creative Property in accordance with these Terms and Conditions and Elsner's Insertion Order.

**1. Elsner Products.**

1.1 This Agreement, in conjunction with the corresponding *Insertion Order*, shall constitute the collective understanding of Elsner Communications, Inc. (doing business as Elsner Interactive), its clients, its agents, and Advertiser on the one hand, and *Web Property* on the other, through which Web Property agrees and obligates itself to promote Advertiser's product or services by showing banners, text links, and/or e-mail creative ("Creative" or "Creative Property"), provided by Elsner on the Web Property or in e-mail transmissions. The submission of a signed Insertion Order by Elsner to Web Property, and approval by Web Property shall constitute Web Property's acceptance of all the terms and conditions stated in the Insertion Order and acceptance of these "Terms and Conditions." Elsner's Insertion Orders, and modifications thereof shall be governed by the Terms and Conditions herein. Web Property may only modify the flight date of Campaign(s): (a) (1) if the Creative Property or linking URL's are not delivered on time; (2) if there are delays due to a Third Party Ad Server; (3) inventory fluctuation; or (4) other circumstances that render it impossibleto comply with the flight date, and (b) Web Property has notified Elsner and received Elsner's written consent to the delay.

**2. Delivery Measurements Standards.**

2.1 *Web Property* will use commercially reasonable efforts to deliver the clicks, actions, and/or impressions consistent with the term or quantity stated in the Insertion Order and in accordance with these Terms and Conditions, beginning with the start date and concluding with the end date set forth in the Insertion Order, and will make commercially reasonable efforts to spread such clicks, actions, and/or impressions evenly throughout the term of the Agreement unless otherwise instructed by Elsner.

2.2 Unless otherwise agreed in writing, all invoices created by *Web Property* for work performed and delivered shall be in accordance with the IAB's (I*nternet Advertising Bureau* (http://www.iab.net)) measurement and tracking methodology for measuring impressions and clicks. Using this methodology, impression and/or click delivery guarantees will be considered "met" when the impressions, actions, and/or clicks equal the amount specified in Elsner's Insertion Order. For CPC and CPM Campaigns, Web Property agrees that impressions and click-throughs billed by Web Property to Elsner shall be measured by a Third Party Ad Server designated by Elsner, and that Web Property shall bill Elsner (for Advertiser) only for the impressions, actions and clicks recorded by the Third Party Ad Server.

IAB GOVERNS INVOICES/NUMS

2.3 Over-delivery: *Web Property* will conduct billing on all campaigns according to data collected by Eisner, or by *Third Party Ad Server* for Eisner, whether as a CPA, CPC or CPM campaign. In the event of over-delivery, Eisner is not responsible to *Web Property* for any units delivered over the amount specified in the Insertion Order.
2.5 *Web Property* will not charge Eisner (as agent for *Advertiser*) for any unacceptable or incorrect data confirmed by the pixel tracking technology for any reason, including, but not limited to: incorrect data, invalid data or unacceptable conversion rates. Eisner and *Advertiser* hold no legal or financial responsibility to *Web Property* or any third party to filter data to ensure that unacceptable or inaccurate submissions are limited or screened.

**3. Payment, Credit and Cancellation Terms.**
3.1 Unless otherwise agreed in writing, all invoices created by *Web Property* for work performed and delivered shall be in accordance with measurement and tracking described in Sections 2.1 to 2.5 herein. Payment terms are Net 30 from date of Eisner's receipt of *Web Property* invoice. *Web Property* acknowledges that Eisner is serving as an agent for a disclosed principal, the *Advertiser*.
~~Web Property agrees that its sole redress for nonpayment of invoices lies with Advertiser~~, and in return for the consideration provided with the Insertion Order,
Web Property hereby waives any right, redress, or cause of action against Eisner for nonpayment of invoices, and all damages related thereto.

3.2 Either party may cancel the Agreement created by delivery and acceptance of an Insertion Order upon providing five (5) days written notice via e-mail, fax or U.S. Mail to the other party. However, these Terms and Conditions shall survive any such cancellation and govern any and all disputes arising out of any Insertion Order, as specified and section 9, herein.

3.3 If Eisner fails to pay overdue invoices for a campaign on *Advertiser's* behalf, *Web Property* reserves the right to terminate that campaign following five (5) days' written notice of planned termination (the "Notice Period") to Eisner. Prior to the end of the Notice Period, Eisner shall have the option to pay all of the overdue invoices for the campaign, whereupon Web Property shall have no right to terminate the campaign until and unless Eisner again fails to pay overdue notices on Advertiser's behalf for that campaign.

3.4 Eisner (on its behalf and as agent for *Advertiser*) and *Web Property* agree to follow the dispute resolution Agreement as specified in section 9 herein.

3.5 *Web Property* agrees to accept payments from Eisner in U.S. funds.

**4. Creative Standards.**
4.1 *Web Property* agrees that Eisner may hold *Web Property* liable for errors in Creative position and/or placement, or typographic errors of any kind that *Web Property* causes.

**5. Warranties.**
5.1 *WEB PROPERTY* HEREBY ISSUES ALL APPLICABLE IMPLIED WARRANTIES CONSISTENT WITH MARYLAND LAW. In the event of any technical incompatibilities between *Creative Property* and the *Web Property* 's systems, or between the *Third Party Ad Server* 's system and *Web Property* 's systems, *Web Property* warrants that it will notify Eisner and take all steps commercially reasonable to work with Eisner and/or the *Third Party Ad Server* to resolve the technical incompatibilities, and shall do so at no additional cost to Eisner as agent for *Advertiser* .

**6. Indemnification.**
6.1 All *Creative Property* has been accepted and published upon the representation that *Advertiser* is authorized to publish the entire contents and subject matter thereof on behalf of *Advertiser* . However, *Web Property* agrees that Eisner, as agent for *Advertiser* , holds no responsibility to indemnify, defend, or save
Web Property harmless from any and all liability for any claim, damages, costs, or suits for libel, defamation, violation of rights of privacy, plagiarism, attorney's fees,
trademark infringement, copyright infringement, unauthorized content (including text, illustrations, representatives, sketches, maps, labels, or other copyrighted matter)
contained in Creative Property, or the unauthorized use of any person's name or photograph, arising from Web Property reproduction and publishing of such Creative Property.
Conversely, Web Property shall fully indemnify, defend,
and save Eisner harmless from any and all liability for any third party claim or suits arising from the failure of Web Property to take all commercially
reasonable steps to promote Eisner or Advertiser's product or services, consistent with the terms set forth herein.

6.2 If Eisner reasonably determines that the placement of any advertisement by *Web Property* hereunder harms the goodwill or reputation of Eisner, or disparages or brings Eisner into disrepute, (including but not limited to association with web sites that contain indecent, illegal, misleading, harmful,
abusive, harassing, libelous, defamatory, or other offensive materials), then Web Property shall use commercially reasonable efforts to immediately remove such advertisement(s) promptly following Eisner's notice thereof to Web Property, whereupon Web Property

shall make all commercially reasonable efforts to immediately relocate the advertisement(s) to a site that Eisner deems acceptable. If Web Property reasonably believes that removal of an advertisement from a site will have a material impact on Web Property's ability to deliver advertisements in accordance with the Insertion Order, Web Property may make written
request to Eisner for an extension of the flight dates from Eisner, and Eisner agrees that its consent to any such extension request will not be unreasonably withheld.

**7. Force Majeure.**
7.1 In the event of an act of God, actions by any governmental or quasi-governmental entity, internet failure, equipment failure, power outage, fire, earthquake, flood, insurrection, riot,
explosion, embargo, strike (whether legal or illegal), labor or material shortage, transportation interruption of any kind, work slow-down, or any condition beyond Web Property's control
affecting production or delivery in any manner, Web Property shall immediately notify Eisner of Web Property's' inability to deliver clicks, actions and/or impressions.

7.2 In the event of a confirmed terrorist attack on the United States and/or an airline based in the United States, an attack on the United States by a foreign government, an attack by the
United States on a foreign government, a declaration of war by the United States against a foreign government, or by a foreign government against the United States, Web Property will take all
commercially reasonable steps to hold all advertising upon receiving general notice of such event, or upon receiving specific notice by Eisner. Eisner and Web Property will then communicate
as soon as possible to determine how to proceed.

**8. Confidentiality.**
8.1 The parties have disclosed or may disclose to each other information relating to each party's business, which to the extent previously, presently or subsequently disclosed to each other is "Proprietary Information."
Proprietary Information does not include information that each party can document: (a) is or becomes (through no improper action or inaction of each party or its
Representatives) generally known by the public; (b) was in its possession or known by it without restriction prior to receipt from the other party; or, (c) becomes available to a party from a source
other than the other party or its Representatives having no obligation of confidentiality. ("Representatives," when used with respect to either party, means that party's affiliates, agents,

officers, directors, consultants and employees). Parties agree: (i) to hold Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information (including, without limitation,
all precautions each party employs with respect to its most confidential materials); (ii) not to make any use whatsoever at any time of such Proprietary Information, except for the purpose of evaluating the results of Eisner's advertising campaign; (iii) not to copy any
Proprietary Information for any purpose whatsoever without written permission from each party; and, (iv) not to divulge any Proprietary Information or any information derived therefrom to any third party or employee, except those of each party's employees who have a l
egitimate "need to know" and are bound in writing to the restrictions herein. Each party will be responsible for a breach of this Agreement by any of its Representatives. Each party shall promptly notify the other party upon discovery of any unauthorized use or
disclosure of Proprietary Information and will cooperate with the other party in every reasonable way to help regain possession of such Proprietary Information and prevent its future unauthorized use.

**9. Disputes, Choice of Law and Venue.**

9.1 It is agreed that any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement, shall be exclusively governed by Maryland law without respect to conflict of law provisions. The parties further agree to submit themselves and all disputes arising from this Agreement to the binding arbitration before the American Arbitration Association, and that such arbitration shall be conducted in Baltimore City, Maryland, and that all
disputes concerning the arbitrability of disputes arising from this agreement shall be resolved by the arbitrator, in Baltimore City, Maryland.

**10. Entire Agreement.**

10.1 This Agreement, together with the Insertion Order (which is incorporated by reference), embodies the parties' entire and final Agreement, supersedes all prior oral and written agreements, and may not be amended or modified except by

an agreement signed by both parties. In entering this Agreement, each party specifically represents that the other party has neither made any representation to them, nor agreement with them that is not set forth in this Agreement.
This Agreement may be executed in any number of counterparts and facsimile copies, each of which shall be deemed an original, and all of which together shall be deemed one and the same instrument.
In the event that any of the provisions included herein are held to be unenforceable, the remaining portions of the Agreement will remain in full force and effect.
Any notice or report required or permitted by this Agreement shall be made by e-mail, U.S. Mail, personal delivery, or fax to each parties' then-operating fax number or business address.
10.2 Failure of either party to require strict performance by the other party of any provision shall not affect the first party's right to require strict performance thereafter. Waiver by either party of a breach of any provision shall not waive either the provision itself or any subsequent breach.

**11. Survivability.**
11.1 Clauses 5, 6, 8, 9, and 10 shall survive in perpetuity after the termination of this Agreement by either party.

READ, AGREED, AND ACCEPTED:

Web Property Date

Eisner Interactive 7/23/10 Date



30699 Russell Ranch Road
Suite 250
Westlake Village, CA 91362
Phone: (818) 575-4500 Fax: (818) 575-4503

# INVOICE

| | |
|---|---|
| Invoice No | 1310018935 |
| Invoice Date | 7/31/2006 |
| Customer ID | 13007604 |

**BILL TO:**

Accounts Payable
Eisner Interactive (Agency)
509 South Exeter Street
Baltimore, MD 21202

PAGE 2

| SALES PERSON | CUSTOMER P.O. | TERMS | DUE DATE |
|---|---|---|---|
| Alexander Bengzon | See Reference Number | Net 30 Days | 8/30/2006 |

| PRODUCT ID/DESCRIPTION | START | END | CAMPAIGN ID/NAME | REFERENCE NBR | QTY | RATE | EXT. PRICE |
|---|---|---|---|---|---|---|---|
| | | | Spirit Airlines - Miami July | 7155 July Media Plan | | | |
| 106-110 | 07/01/2006 | 07/31/2006 | 54742 | | 381.9940 | 1.250000 | 477.49 |
| | | | Spirit Airlines - Miami July | 7155 July Media Plan | | | |
| 101-110 | 07/01/2006 | 07/31/2006 | 54743 | | 320.0000 | 1.250000 | 400.00 |
| | | | Spirit Airlines - Orlando July | 7155 July Media Plan | | | |
| 101-110 | 07/01/2006 | 07/31/2006 | 54744 | | 317.8900 | 1.250000 | 397.36 |
| | | | Spirit Airlines - Orlando July | 7155 July Media Plan | | | |
| 103-110 | 07/01/2006 | 07/31/2006 | 54745 | | 318.7220 | 1.250000 | 398.40 |
| | | | Spirit Airlines - Orlando July | 7155 July Media Plan | | | |
| 103-110 | 07/01/2006 | 07/31/2006 | 54746 | | 314.8530 | 1.250000 | 393.57 |
| | | | Spirit Airlines - Orlando July | 7155 July Media Plan | | | |
| 106-110 | 07/01/2006 | 07/31/2006 | 54747 | | 320.4540 | 1.250000 | 400.57 |
| | | | Spirit Airlines - Orlando July | 7155 July Media Plan | | | |
| 101-110 | 07/01/2006 | 07/31/2006 | 54749 | | 1,728.0000 | 1.250000 | 2,160.00 |
| | | | Spirit Airlines - Cities July | 7155 July Media Plan | | | |
| 101-110 | 07/01/2006 | 07/31/2006 | 54750 | | 1,723.9480 | 1.250000 | 2,154.94 |
| | | | Spirit Airlines - Cities July | 7155 July Media Plan | | | |
| 103-110 | 07/01/2006 | 07/31/2006 | 54752 | | 1,723.6960 | 1.250000 | 2,154.62 |
| | | | Spirit Airlines - Cities July | 7155 July Media Plan | | | |
| 103-110 | 07/01/2006 | 07/31/2006 | 54755 | | 1,722.3840 | 1.250000 | 2,152.98 |
| | | | Spirit Airlines - Cities July | 7155 July Media Plan | | | |
| 106-110 | 07/01/2006 | 07/31/2006 | 54756 | | 1,724.5950 | 1.250000 | 2,155.74 |
| | | | Spirit Airlines - Cities July | 7155 July Media Plan | | | |

## *PLEASE NOTE CHANGE IN REMIT ADDRESS*

REMIT TO:

ValueClick Media
Dept. 9725
Los Angeles, CA 90084-9725

| | |
|---|---|
| Invoice Total | 19,929.86 |
| Paid/Applied Amount | 0.00 |
| **INVOICE BALANCE** | 19,929.86 |

Please make checks payable to ValueClick Media and include invoice number 1310018935 with your remittance.
Contact ValueClick Media's Accounts Receivable department at (818)575-4667 for wire transfer instructions.

EXHIBIT
B

 30699 Russell Ranch Road
Suite 250
Westlake Village, CA 91361
Phone: (818) 575-4500
Fax: (818) 575-4503

**INVOICE**

| | |
|---|---|
| Invoice No. | I0014517 |
| Date | 09/30/2006 |
| Order No. | O0017062 |
| Order Type | Invoice |

| BILL TO: | CLIENT: |
|---|---|
| Eisner Interactive/Spirit Air<br>506 Exeter St.<br>Baltimore, MD 21202<br>Attn: Michael Teitelbaum | Michael Teitelbaum<br>SPIRIT AIRLINES<br>506 Exeter St.<br>Baltimore, MD 21202 |

PAGE 1

| MEDIAPLEX ORDER NBR. | SALES REP | TERMS | CUSTOMER ID |
|---|---|---|---|
| 647-6432 | Elizabeth Rodriguez | Net 30 Days | EISNER02 |
| **ORDERED BY** | **CUSTOMER P.O. NBR.** | **CUSTOMER JOB NBR.** | **CUSTOMER I/O NBR.** |
| | | NA | |

| PRODUCT/DESCRIPTION | FLIGHT DATES | | UNITS | PRICE | EXT. PRICE |
|---|---|---|---|---|---|
| Adserving Impressions<br>MAY 2006 - SALES | 9/1/2006 | 9/30/2006 | 103.000 | 0.000100 | 0.01 |
| Adserving Impressions<br>SUN SENTINEL FREE PLACEMENTS 2 | 9/1/2006 | 9/30/2006 | 146.000 | 0.000100 | 0.01 |
| Adserving Impressions<br>MARCH 2006 - RED LIGHT SPECIAL | 9/1/2006 | 9/30/2006 | 171.000 | 0.000100 | 0.02 |
| Adserving Impressions<br>OCTOBER 2006 - ONLINE MEDIA | 9/1/2006 | 9/30/2006 | 446.000 | 0.000100 | 0.04 |
| Adserving Impressions<br>JUNE 2006 - SALES | 9/1/2006 | 9/30/2006 | 467.000 | 0.000100 | 0.05 |
| Adserving Impressions<br>JULY 2006 - ONLINE MEDIA | 9/1/2006 | 9/30/2006 | 669.000 | 0.000100 | 0.07 |
| Adserving Impressions<br>TRAVELZOO SUPERSEARCH - 2006 | 9/1/2006 | 9/30/2006 | 28,578.000 | 0.000100 | 2.86 |
| Adserving Impressions<br>AUGUST 2006 - ONLINE MEDIA | 9/1/2006 | 9/30/2006 | 575,100.000 | 0.000100 | 57.51 |
| Adserving Impressions<br>INSIDEFLYER CAMPAIGN 2006 | 9/1/2006 | 9/30/2006 | 913,538.000 | 0.000100 | 91.35 |
| Adserving Impressions<br>ECHOTARGET BONUS PLACEMENTS 20 | 9/1/2006 | 9/30/2006 | 983,647.000 | 0.000100 | 98.36 |
| Adserving Impressions<br>APRIL 2006 - BASELINE | 9/1/2006 | 9/30/2006 | 1,807,928.000 | 0.000100 | 180.79 |
| Adserving Impressions<br>SEPTEMBER 2006 - ONLINE MEDIA | 9/1/2006 | 9/30/2006 | 47,500,328.000 | 0.000100 | 4,750.03 |

REMIT TO:

Mediaplex
Attn: Accounts Receivable
P.O. Box 5600
Thousand Oaks, CA 91359-5600

Or call Accts Receivable @ (818) 575-4500 to arrange payment by wire transfer.

Continued



30699 Russell Ranch Road
Suite 250
Westlake Village, CA 91361
Phone (818) 575-4500
Fax: (818) 575-4503

# INVOICE

| | |
|---|---|
| Invoice No. | I0014517 |
| Date | 09/30/2006 |
| Order No. | O0017062 |
| Order Type | Invoice |

| BILL TO: | CLIENT: |
|---|---|
| Eisner Interactive/Spirit Air<br>506 Exeter St.<br>Baltimore, MD 21202<br>Attn: Michael Teitelbaum | Michael Teitelbaum<br>SPIRIT AIRLINES<br>506 Exeter St.<br>Baltimore, MD 21202 |

PAGE 2

| MEDIAPLEX ORDER NBR. | SALES REP | TERMS | CUSTOMER ID |
|---|---|---|---|
| 647-6432 | Elizabeth Rodriguez | Net 30 Days | EISNER02 |
| **ORDERED BY** | **CUSTOMER P.O. NBR.** | **CUSTOMER JOB NBR.** | **CUSTOMER I/O NBR.** |
| | | NA | |

| PRODUCT/DESCRIPTION | FLIGHT DATES | | UNITS | PRICE | EXT. PRICE |
|---|---|---|---|---|---|
| Adserving Clicks<br>JUNE 2006 - BASELINE | 9/1/2006 | 9/30/2006 | 29.000 | 0.010000 | 0.29 |
| Adserving Clicks<br>JULY 2006 - ONLINE MEDIA | 9/1/2006 | 9/30/2006 | 100.000 | 0.010000 | 1.00 |
| Adserving Clicks<br>TRAVEL HOT LINK - SEPT BONUS | 9/1/2006 | 9/30/2006 | 1,130.000 | 0.010000 | 11.30 |
| Adserving Clicks<br>SPIRIT - KAYAK CLICK TAG | 9/1/2006 | 9/30/2006 | 4,242.000 | 0.010000 | 42.42 |
| Adserving Clicks<br>AUGUST 2006 - ONLINE MEDIA | 9/1/2006 | 9/30/2006 | 10,813.000 | 0.010000 | 108.13 |
| Adserving Clicks<br>SEPTEMBER 2006 - ONLINE MEDIA | 9/1/2006 | 9/30/2006 | 169,711.000 | 0.010000 | 1,697.11 |
| Adserving Clicks<br>AD.COM SEARCH LINKS | 9/1/2006 | 9/30/2006 | 212,807.000 | 0.010000 | 2,128.07 |

REMIT TO:

Mediaplex
Attn: Accounts Receivable
P.O. Box 5600
Thousand Oaks, CA 91359-5600

| | |
|---|---|
| Invoice Total | 9,169.42 |
| Paid/Applied Amount | -6,587.30 |
| **INVOICE BALANCE** | 2,582.12 |

Please Reference Invoice # I0014517 and Customer ID EISNER02 with remittance, or call Accts Receivable @ (818)575-4500 to arrange payment by wire transfer.

Or call Accts Receivable @ (818) 575-4500 to arrange payment by wire transfer.



30699 Russell Ranch Road
Suite 250
Westlake Village, CA 91361
Phone: (818) 575-4500
Fax: (818) 575-4503

# INVOICE

| | |
|---|---|
| Invoice No. | I0014882 |
| Date | 10/31/2006 |
| Order No. | O0017428 |
| Order Type | Invoice |

| BILL TO: | CLIENT: |
|---|---|
| Eisner Interactive/Spirit Air<br>506 Exeter St.<br>Baltimore, MD 21202<br>Attn: Michael Teitelbaum | Michael Teitelbaum<br>SPIRIT AIRLINES<br>506 Exeter St.<br>Baltimore, MD 21202 |

| MEDIAPLEX ORDER NBR. | SALES REP | TERMS | CUSTOMER ID |
|---|---|---|---|
| 647-6432 | Alicia Allijan | Net 30 Days | EISNER02 |
| **ORDERED BY** | **CUSTOMER P.O. NBR.** | **CUSTOMER JOB NBR.** | **CUSTOMER I/O NBR.** |
| | | NA | |

| PRODUCT/DESCRIPTION | FLIGHT DATES | | UNITS | PRICE | EXT. PRICE |
|---|---|---|---|---|---|
| Adserving Impressions<br>MAY 2006 - SALES | 10/1/2006 | 10/31/2006 | 51.000 | 0.000100 | 0.01 |
| Adserving Impressions<br>MARCH 06-RED LIGHT SPEC PART 2 | 10/1/2006 | 10/31/2006 | 86.000 | 0.000100 | 0.01 |
| Adserving Impressions<br>NOVEMBER 2006 - ONLINE MEDIA | 10/1/2006 | 10/31/2006 | 182.000 | 0.000100 | 0.02 |
| Adserving Impressions<br>JUNE 2006 - SALES | 10/1/2006 | 10/31/2006 | 187.000 | 0.000100 | 0.02 |
| Adserving Impressions<br>SUN SENTINEL FREE PLACEMNTS 06 | 10/1/2006 | 10/31/2006 | 307.000 | 0.000100 | 0.03 |
| Adserving Impressions<br>JULY 2006 - ONLINE MEDIA | 10/1/2006 | 10/31/2006 | 355.000 | 0.000100 | 0.04 |
| Adserving Clicks<br>JUNE 2006 - BASELINE | 10/1/2006 | 10/31/2006 | 21.000 | 0.010000 | 0.21 |
| Adserving Clicks<br>JULY 2006 - ONLINE MEDIA | 10/1/2006 | 10/31/2006 | 48.000 | 0.010000 | 0.48 |
| Adserving Clicks<br>AUGUST 2006 - ONLINE MEDIA | 10/1/2006 | 10/31/2006 | 88.000 | 0.010000 | 0.88 |
| Adserving Impressions<br>AUGUST 2006 - ONLINE MEDIA | 10/1/2006 | 10/31/2006 | 16,789.000 | 0.000100 | 1.68 |
| Adserving Impressions<br>TRAVELZOO SUPERSEARCH - 2006 | 10/1/2006 | 10/31/2006 | 41,401.000 | 0.000100 | 4.14 |
| Adserving Impressions<br>SEPTEMBER 2006 - ONLINE MEDIA | 10/1/2006 | 10/31/2006 | 42,948.000 | 0.000100 | 4.29 |

REMIT TO:

Mediaplex
Attn: Accounts Receivable
P.O. Box 5600
Thousand Oaks, CA 91359-5600

Or call Accts Receivable @ (818) 575-4500 to arrange payment by wire transfer.

Continued



30699 Russell Ranch Road
Suite 250
Westlake Village, CA 91361
Phone: (818) 575-4500
Fax: (818) 575-4503

**INVOICE**

| | |
|---|---|
| Invoice No. | I0014882 |
| Date | 10/31/2006 |
| Order No. | O0017428 |
| Order Type | Invoice |

| BILL TO: | CLIENT: |
|---|---|
| Eisner Interactive/Spirit Air<br>506 Exeter St.<br>Baltimore, MD 21202<br>Attn: Michael Teitelbaum | Michael Teitelbaum<br>SPIRIT AIRLINES<br>506 Exeter St.<br>Baltimore, MD 21202 |

PAGE 2

| MEDIAPLEX ORDER NBR. | SALES REP | TERMS | CUSTOMER ID |
|---|---|---|---|
| 647-6432 | Alicia Allijan | Net 30 Days | EISNER02 |
| **ORDERED BY** | **CUSTOMER P.O. NBR.** | **CUSTOMER JOB NBR.** | **CUSTOMER I/O NBR.** |
| | | NA | |

| PRODUCT/DESCRIPTION | FLIGHT DATES | UNITS | PRICE | EXT. PRICE |
|---|---|---|---|---|
| Adserving Clicks<br>TRAVEL HOT LINK - SEPT BONUS | 10/1/2006 10/31/2006 | 1,048.000 | 0.010000 | 10.48 |
| Adserving Clicks<br>NOVEMBER 2006 - ONLINE MEDIA | 10/1/2006 10/31/2006 | 2,719.000 | 0.010000 | 27.19 |
| Adserving Clicks<br>SEPTEMBER 2006 - ONLINE MEDIA | 10/1/2006 10/31/2006 | 4,221.000 | 0.010000 | 42.21 |
| Adserving Clicks<br>SPIRIT - KAYAK CLICK TAG | 10/1/2006 10/31/2006 | 5,285.000 | 0.010000 | 52.85 |
| Adserving Impressions<br>INSIDEFLYER CAMPAIGN 2006 | 10/1/2006 10/31/2006 | 1,029,561.000 | 0.000100 | 102.96 |
| Adserving Impressions<br>ECHOTARGET BONUS PLACEMNTS 06 | 10/1/2006 10/31/2006 | 1,395,464.000 | 0.000100 | 139.55 |
| Adserving Impressions<br>APRIL 2006 - BASELINE | 10/1/2006 10/31/2006 | 1,659,069.000 | 0.000100 | 165.91 |
| Adserving Clicks<br>OCTOBER 2006 - ONLINE MEDIA | 10/1/2006 10/31/2006 | 127,759.000 | 0.010000 | 1,277.59 |
| Adserving Clicks<br>AD.COM SEARCH LINKS | 10/1/2006 10/31/2006 | 267,382.000 | 0.010000 | 2,673.82 |
| Adserving Impressions<br>OCTOBER 2006 - ONLINE MEDIA | 10/1/2006 10/31/2006 | 58,136,030.000 | 0.000100 | 5,813.60 |

REMIT TO:

Mediaplex
Attn: Accounts Receivable
P.O. Box 5600
Thousand Oaks, CA 91359-5600

| | |
|---|---|
| Invoice Total | 10,317.97 |
| Paid/Applied Amount | 0.00 |
| **INVOICE BALANCE** | 10,317.97 |

Please Reference Invoice # I0014882 and Customer ID EISNER02 with remittance, or call Accts Receivable @ (818)575-4500 to arrange payment by wire transfer.

Or call Accts Receivable @ (818) 575-4500 to arrange payment by wire transfer.